$\mathcal{TH}$

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| DOMINIQUE FORD-SHOLEBO, | ) | |
| individually and as administrator of the | ) | |
| estate of HABIB SOLEBO, | ) | |
|  | ) | |
| Plaintiff, | ) | No. 09 C 2287 |
|  | ) | |
| v. | ) | Chief Judge Ruben Castillo |
|  | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
|  | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Dominique Ford-Sholebo, individually and as administrator of the estate of her deceased husband, Habib Solebo ("Solebo"), brings this wrongful death action against the United States pursuant to the Federal Tort Claims Act (the "Act" or "FTCA"), 28 U.S.C. §§ 1346, 2671 *et seq.* (R. 101, Fifth Am. Compl. at 2-8.) Solebo, Plaintiff's decedent, died on May 1, 2007, while incarcerated at the Metropolitan Correctional Center (the "MCC") pending criminal trial proceedings. Plaintiff alleges that the United States, by and through the MCC and MCC physicians, staff, supervisors, employees, agents, and apparent agents, negligently failed to provide Solebo with proper and adequate medical attention, thereby proximately causing Solebo's death. (*Id.* at 2-8.) Plaintiff seeks a total of $1,650,000.00 in wrongful death damages for loss of consortium, loss of society, companionship, money, benefits, goods, services, grief, sorrow, and mental suffering. (R. 93, Proposed Pretrial Order, Ex. G: Statement of Damages at 1.)

In February 2012, this Court voluntarily accepted the transfer of this lawsuit to its docket

1

during the unfortunate illness of its friend and judicial colleague, the Honorable William J. Hibbler, who prematurely passed away on March 19, 2012, at the age of 65. Thereafter, it was brought to this Court's attention that it had also presided over Solebo's criminal proceedings and the less than successful criminal prosecution of Solebo's co-defendant in those proceedings. Nevertheless, this Court is confident that it approached these trial proceedings from a neutral standpoint; not favoring one side or the other. Unfortunately, the bottom line is that this Court must conclude that the repeated negligence of officials at the MCC caused Solebo's premature death.

After bifurcating the proceedings, this Court conducted a five-day bench trial on liability beginning in late February 2012. (R. 102, Min. Entry; R. 103, Min. Entry; R. 104, Min. Entry; R. 105, Min. Entry; R. 106, Min. Entry.) On March 15, 2012, this Court ruled that Plaintiff established by a preponderance of the evidence that the United States negligently violated the appropriate standard of care for treating Solebo's seizure disorder and that its negligence proximately caused his death in a reasonably foreseeable manner during his ongoing treatment for seizure disorder. (R. 109, Order on Liability at 1; R. 108, Min. Entry.) On May 16, 2012, this Court issued an order on comparative fault, finding that the United States bore 67% of the responsibility for Solebo's death and that Solebo's contributory fault was 33%. (R. 117, Order on Comparative Fault at 1.) On June 4, 2012, this Court held the damages phase of the trial. (R. 118, Min. Entry.) That same day, the case was referred to the Honorable Morton Denlow for one final settlement conference, which proved to be unsuccessful, and on July 16, 2012, the case was referred back to this Court for a ruling. (R. 125, Min. Entry.)

In this memorandum opinion and order, this Court explains its findings of fact and

2

conclusions of law. Pursuant to Federal Rule of Civil Procedure 52, this Court hereby enters the following written Findings of Fact and Conclusions of Law, which are based upon consideration of all the admissible evidence as well as this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent that matters expressed as Conclusions of Law may be considered Findings of Fact, they shall also be deemed Findings of Fact.

## FINDINGS OF FACT

This Court concludes that Plaintiff established through both direct and circumstantial evidence, as well as reasonable inferences drawn therefrom, the following facts by a preponderance of the evidence:

### I. General Background

1. Habib Solebo was born on June 10, 1983. (Pl.'s Ex. A at 84; June 4, 2012 Tr. 9, June 4, 2012.)[1] He and Plaintiff were married on October 4, 2005. (June 4, 2012 Tr. 2.) On October 8, 2006, while Solebo was incarcerated at the MCC, their daughter, Jadesola Sholebo was born. (June 4, 2012 Tr. 5-6.)

2. Solebo was arrested on January 25, 2006. (Stip. Ex., *United States v. Mustapher*,

---

[1] The parties' exhibits that were admitted and received into evidence at trial are cited as "Pl.'s Ex. __," "Def.'s Ex. __," or "Jt. Ex. __." Witness depositions that were admitted and received into evidence are cited as "[last name of deponent] __, [date of deposition]," in the first instance, and thereafter as "[last name of deponent] __." Per an agreement with Plaintiff's counsel, the Government also submitted exhibits and a stipulation in advance of the damages phase of the trial on June 1, 2012; such exhibits are cited as "Stip. Ex. __," and the stipulation is cited as "Damages Hr'g Stip. ¶ __." Finally, as the trial transcript for the damages phase of the trial is only available in rough form, this Court cites that transcript by the date of the proceeding, as "June 4, 2012 Tr. __."

No. 06 CR 61-2, Excerpt of Trial Tr. 61-62 (Jan. 24, 2007, J. Castillo); Stip. Ex., Arrest and Interview of Habib Solebo Jan. 25, 2006.) The next day, he was taken to the Kankakee County Detention Center/Jerome Combs Detention Center ("Kankakee"). (*See* Jt. Ex. 3 at 1-3.) On August 28, 2006, Solebo was transferred to the MCC in Chicago, Illinois. (Def.'s Ex. 22 at 1.) Following his arrest, he was indicted for conspiracy to distribute and to possess with intent to distribute 100 grams or more of a substance containing heroin in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2 (Count I), and distribution of a substance containing .33 grams of heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count II), and possession with the intent to distribute and distribution of 99.4 grams of a substance containing heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count III). (Def.'s Ex. 8, Indictment at 1-3, *United States v. Solebo and Mustapher*, No. 06 CR 61 (N.D. Ill. Feb. 23, 2006).)[2]

3.      Solebo was found dead in his cell at the MCC in the early morning of May 1, 2007. (R. 93, Proposed Pretrial Order, Ex. A: Stip. of Uncontested Facts ¶¶ 1-2.) At the time of his death, he was 23 years old. (Pl.'s Ex. A at 58.) He is survived by his wife and his minor daughter, (R. 93, Proposed Pretrial Order, Ex. A: Stip. of Uncontested Facts ¶ 3), who was six months old at the time of his death, (June 4, 2012 Tr. 17).

## II.     Solebo's time at the Kankakee County Detention Center: January 2006 to August 2006

4.      On January 26, 2006, Solebo was incarcerated at Kankakee. (*See* Jt. Ex. 3 at 1-2.) At this time, Solebo reported that he did not have an individual or family history of seizures and

---

[2] A copy of the indictment was admitted and received into evidence on June 4, 2012. (June 4, 2012 Tr. 38.) Although counsel for the Government stated that the indictment was Defendant's Exhibit 11, the indictment is actually labeled Defendant's Exhibit 8. (*See* June 4, 2012 Tr. 38.)

that he was not taking any medications. (*Id.*) A report of Solebo's past medical history indicated that Solebo had a history of smoking and that he did not have a history of seizures. (*Id.* at 3.)

5.      On February 17, 2006, Solebo experienced his first episode of loss of consciousness and was admitted to the emergency room at Provena St. Mary's Hospital ("Provena"). (*Id.* at 24, 41-43.) Although Solebo's chief complaint was described as a fall, the medical note from the emergency room visit provides, "? [seizure] prior to fall ?" (*Id.* at 45.) A February 23, 2006 progress note from Solebo's Kankakee medical records describing this episode states: "In ER on 2/17. Was laying in bed sleeping. Next thing he knew he was being brought to hospital. The roommate says he was shaking. No incontinence. No personal or [family] history of [seizures]. Stated head injury . . . [with] blowout [fracture]." (*Id.* at 24; *see also* Trial Tr. 578-79.)

6.      While at Provena, Solebo underwent a Computed Tomography scan ("CT scan"). (Jt. Ex. 3 at 39.) The CT scan impression stated, in part: "No hemorrhage, mass effect or contusion in the brain. Blow out fracture of the left lamina papyracea of indeterminate age. Minimally displaced fracture of the nasal bones." (*Id.* at 39.) This was not a normal CT scan in that there were some findings. (Trial Tr. 365.)

7.      On February 23, 2006, Dr. Jeffrey Long of the Medical Group of Kankakee County ("Kankakee Medical") saw Solebo after he returned to Kankakee. (Jt. Ex. 3 at 24.) Dr. Long's assessment at this time was "loss of consciousness [with] shaking activity." (*Id.*; Trial Tr. 271.) Dr. Long's recommendations and treatment plan provided that if Solebo had "further [seizures] empiric RX [with] Dilantin or phenobarbital" should be commenced. (Jt. Ex. 3 at 24; *see also* Trial Tr. 271-72, 578.) Dr. Long also ordered that Solebo undergo an

5

electroencephalogram ("EEG") test for possible seizures. (Jt. Ex. 3 at 24, 36; Trial Tr. 364.)

8.      On February 24, 2006, Solebo underwent an EEG at Provena. (Jt. Ex. 3 at 38.)
The EEG results state: "[t]his is a case of a patient with possible seizures." (*Id.*) The EEG was
"within normal limits," and no epileptiform activity was detected. (*Id.*)

9.      On April 17, 2006, Dr. Abigail Martinez of Provena prescribed Solebo 100
milligrams of Dilantin to be taken twice a day. (Jt. Ex. 3 at 14, 40.) Dilantin, also known as
Phenytoin, (Trial Tr. 409), is an anti-seizure medication that lowers the risk of having seizures,
(Trial Tr. 497, 504; Trial Tr. 758), and is customarily administered in the form of pills, (Trial Tr.
223).

10.     Three days later, on April 20, 2006, Physician Assistant K. Patterson of Kankakee
Medical saw Solebo to follow up on an emergency room visit and discontinued his Dilantin. (Jt.
Ex. 3 at 14, 20, 31.) A progress note for this visit provided: "Habib states woke up in am with
correctional officers standing over him, they had called ambulance. He has no other recollection
of event and I have no history from [correctional officers]. I have no ER paperwork. Came back
[with prescription] for Dilantin. Habib refuses [medications], states he does[ not] have seizures.
Does not want to be housed in this building, wants to return to old jail." (*Id.* at 20; *see also* Trial
Tr. 582.) The progress note also stated that Solebo did not have a history of seizures. (Jt. Ex. 3
at 20.) The assessment at this time was "Questionable episode [loss of consciousness]/seizure.
Normal EEG." (Jt. Ex. 3 at 20; *see also* Trial Tr. 582.)

11.     On May 24, 2006, Solebo experienced an episode that he described as a seizure
with violent shaking of his whole body. (Jt. Ex. 3 at 15, 18, 56-57.) During this episode, Solebo
fell out of his bunk. (*Id.* at 57.) The very day of this episode, Solebo submitted a request to a

Kankakee nurse and requested that his Dilantin be resumed. (*Id.* at 18, 58.) In his request, Solebo wrote, "I was previously on Dilantin medication and was taken off prescription and believe I may have suffered a seizure because of discontinuation of Dilantin. I want to be put back on the medication Dilantin." (*Id.* at 58.)

12.     On May 25, 2006, Physician Assistant Patterson saw Solebo for his episode the day prior. (*Id.* at 18.) The progress note for this visit stated that Solebo "woke up on [the] floor, near incontinent of urine," and that his "cellmate told him he was shaking on the floor." (*Id.* at 18.) The assessment at this time was "Questionable seizures." (*Id.* at 18.) During this visit, Physician Assistant Patterson resumed Solebo's Dilantin. (*Id.* at 14, 18, 32.) Solebo continued to take 100 milligrams of Dilantin twice a day until August 28, 2006. (*Id.* at 33-35.)

13.     On August 22, 2006, Physician Assistant Patterson noted that Solebo "refuse[d] follow-up today for seizure management." (*Id.* at 27, 29.) That same day, this Court entered an order, as the presiding trial judge in Solebo's pending criminal case, requiring Solebo to undergo a forensic evaluation to assess his competency to stand trial. (*See* Def.'s Ex. 22 at 1; *see also* Trial Tr. 158, 160.)

## III.     The Metropolitan Correctional Center

14.     On August 29, 2006, Solebo was transferred to the MCC. (Jt. Ex. 3 at 35; *see also* Def.'s Ex. 22 at 1.) In the early morning of May 1, 2007, Solebo was found dead in his cell. (R. 93, Proposed Pretrial Order, Ex. A: Stip. of Uncontested Facts ¶ 2.) This Court refers to the time period during which Solebo was at the MCC as "the relevant time period."

### A.     MCC personnel

#### 1.     The MCC warden

7

15.     At the time of Solebo's transfer to the MCC, there was no official warden at the MCC; instead, Associate Wardens Janet Purdue and James Henry were acting as interim wardens. (Trial Tr. 694-95.) Eric Wilson became the warden of the MCC on April 1, 2007, and was the warden of the MCC at the time of Solebo's death. (Trial Tr. 694.) As warden, Wilson was the person who was ultimately in charge of running the MCC. (Trial Tr. 695.)

16.     Warden Wilson testified at trial. (Trial Tr. 694-720.) He testified that he was responsible for ensuring that inmates received medical care and treatment that was necessary for their medical conditions. (Trial Tr. 695.) He was responsible for overseeing that medications were administered to inmates in accordance with the MCC's rules and regulations and that the MCC's rules were generally followed. (Trial Tr. 696.) Warden Wilson was also responsible for ensuring that the MCC personnel followed the Bureau of Prisons ("BOP") program statements, procedural statements, and technical reference manuals. (Trial Tr. 696; *see also* Trial Tr. 702-03.)

17.     Warden Wilson also testified that he had to ensure that there was an adequate medical staff at the MCC to care for the inmates. (Trial Tr. 699-700.) He testified that he had a thorough knowledge of BOP regulations in effect to protect the lives of the MCC's inmates. (Trial Tr. 698.) Warden Wilson also testified that if he knew an inmate was acting in a way that could cause the inmate's own death, he had a duty to protect the inmate from killing himself. (Trial Tr. 698.)

## 2.     The MCC Physicians

18.     During the relevant time period, only two physicians practiced at the MCC: Dr. Arthur Hoffman and Dr. Bonnie Nowakowski (the "Physicians" or the "MCC Physicians").

8

(Trial Tr. 481-82.) Dr. Hoffman and Dr. Nowakowski each testified at trial. (Trial Tr. 387-474, 479-560.) Dr. Hoffman was evasive and combative during questioning, and his testimony was generally not credible.

19.      Dr. Hoffman was the MCC's Clinical Director from November 2005 until about November 2007. (Trial Tr. 390-91; 481). Dr. Nowakowski was a staff physician who worked under the supervision of Dr. Hoffman. (Trial Tr. 481, 487.) The Physicians' regular hours were 7:45 a.m. to 4:15 p.m., Monday through Friday. (Pl.'s Ex. Y at 1; Trial Tr. 482.) Beginning in approximately the second half of March 2007, Dr. Hoffman went on leave and did not return to his role as Clinical Director at the MCC at any point in time prior to Solebo's death. (Trial Tr. 402-03.) In Dr. Hoffman's absence, Dr. Nowakowski was the Acting Clinical Director, (Trial Tr. 144, 482-83), and was the only physician on the MCC's premises from mid-March through the Fall of 2007, (Trial Tr. 487-88.)

20.      Dr. Hoffman, as the Clinical Director, oversaw the clinical care provided at the MCC and was responsible for all health care delivered at the MCC. (Pl.'s Ex. C at 3.) Dr. Hoffman also supervised MCC health care providers, such as physician assistants. (Trial Tr. 392, 396; Pl.'s Ex. C at 5.) Specifically, Dr. Hoffman testified that it was his job, as Clinical Director, to ensure that the Physicians and physician assistants provided medical care and treatment to the inmates at the MCC in a proper manner. (Trial Tr. 393-95.) The Clinical Director also had a duty and responsibility to be directly involved in the evaluation and treatment of patients with medically complex problems. (Trial Tr. 397; Pl.'s Ex. C at 3.)

21.      As a staff physician, Dr. Nowakowski's duties included providing patient care, either directly through patient visits or by supervising physician assistants. (Trial Tr. 481.) Dr.

9

Hoffman and Dr. Nowakowski shared the responsibility of treating the MCC's inmates, including Solebo. (Trial Tr. 545.)

22.     Dr. Nowakowski testified that when she was out, she provided the physician assistants with a contact number at which they could call her if there was an urgent medical problem. (Trial Tr. 491-92.) When the Physicians were not physically present at the MCC, a BOP regional medical director or a physician from a different BOP institution was designated to be available to provide clinical guidance to a physician assistant or nurse telephonically. (Trial Tr. 168.)

### 3.     The MCC physician assistants

23.     In 2007, the MCC physician assistants, also known as mid-level practitioners, included Albert Iskandar, (Trial Tr. 28), Maria Velasquez, (Trial Tr. 66), Victoria Carrera, (Trial Tr. 99), and Roberto Aruiza, (Aruiza Dep. 7, Mar. 10, 2010). Iskandar, Velasquez, and Carrera each testified at trial. (Trial Tr. 28-140.) Aruiza's deposition was admitted into evidence. (*See* Trial Tr. 721, 788.) Each MCC physician assistant was a physician in another country who was not licensed to practice medicine in the United States. (Trial Tr. 100, 395-96.) The Physicians supervised the physician assistants. (Sample Dep. 24, Jan. 25, 2011.) Dr. Hoffman testified that he regularly had contact with the physician assistants and discussed medical care and treatment with them. (Trial Tr. 396.)

24.     During the relevant time period, physician assistants were on the premises at the MCC from 7:30 a.m. until 11:00 p.m. (Trial Tr. 33, 484.) Medical personnel were not physically present between 11:00 p.m. and 6:00 a.m., (Trial Tr. 33), and all emergencies during those hours would be called out to 911, (Trial Tr. 483-84). Physician assistants who worked the

10

night shift in 2007 overlapped with the Physicians' day shift. (Trial Tr. 131.) Thus, if physician assistants who worked the night shift at the MCC had a concern about an inmate missing his medication, they could tell the Physicians about this during the overlapping time. (Trial Tr. 131.)

25.     The physician assistants' duties included, in part, administering medication on the pill line. (Trial Tr. 29; Aruiza Dep. 28.) Physician assistants were responsible for working with the Physicians, (Trial Tr. 100), and assisting the Physicians with managing chronic health problems, such as seizure disorders, (Aruiza Dep. 14-15). Physician assistants were also responsible for making decisions, in conjunction with the Physicians, concerning the patients' medical care and special needs. (Aruiza Dep. 15-16.) Because the physician assistants had daily contact with the inmates, they were in essence the Physicians' eyes and ears on the ground regarding the medications inmates were and were not receiving. (Trial Tr. 36-37, 89-90.)

### 4.     Health Services Administration

26.     At all times relevant to this action, Ken Sample was the Health Services Administrator ("HSA") at the MCC. (Sample Dep. 20, 23.) He managed the MCC's Health Services Unit. (Trial Tr. 768.) Although Sample did not testify at trial, his deposition was admitted into evidence. (*See* Trial Tr. 721, 788.) In his capacity as HSA, Sample managed and directed the MCC Laboratory, the MCC Pharmacy, and the Medical Records departments. (Sample Dep. 24, 32; Trial Tr. 436.) In managing the MCC Laboratory, for example, Sample relied on a BOP Program Statement on Laboratory Services ("Lab Services Statement") that was in effect during the relevant time period to perform his job as the HSA. (Sample Dep. 84.) As the HSA, Sample was responsible for formulating and implementing administrative policies and programs essential to medical and dental operations. (Sample Dep. 31.) In addition, he was

11

responsible for coordinating and controlling MCC programs and resources to achieve a balance between patient care and the inmate population. (Sample Dep. 31-32.)

27. Sample also evaluated MCC employees, with the exception of the Physicians. (Sample Dep. 24.) Although Sample was the physician assistants' administrative supervisor, they were under the medical and clinical supervision of the Physicians. (Sample Dep. 24, 29.) Therefore, when evaluating the physician assistants on those areas that involved the clinic, Sample sought input from the Physicians and others. (Sample Dep. 29-30.)

28. From January 2007 through May 2007, Deborah Lamping was the Assistant HSA and was supervised by Sample. (Trial Tr. 141-43.) Lamping testified at trial. (Trial Tr. 141-175.) In her role as the Assistant HSA, Lamping had direct contact with the inmates. (Trial Tr. 144.) Nevertheless, she never had any conversations with Solebo about his medical care and treatment. (Trial Tr. 144-45.)

### a. Medical Records

29. Sample was in charge of the Medical Records department. (Sample Dep. 24.) In that capacity, Sample provided overall management reporting, and the two medical records clerks reported to him. (Sample Dep. 41.) Sample required the medical records clerks to stay current with their filing, their audits, and any other required tasks that were outlined in their program statement. (Sample Dep. 41.) In short, Sample was responsible for ensuring that the medical records clerks followed their job descriptions as defined in their program statement. (Sample Dep. 42.)

30. Medical records were maintained in an inbox ("Medical Records Inbox"). (Sample Dep. 42.) Sample did not have any input or control over the types of documents that

were contained in the Medical Records Inbox, and a program statement directed where each one of those documents was placed. (Sample Dep. 42.)

### b. MCC Laboratory

31.     The MCC Laboratory was in a separate office from the Medical Records department. (S. Wilson Dep. 34, Sept. 27, 2010.) From 2006 through March 2007, the only nurse at the MCC was Duane Wagner. (Trial Tr. 501, 767-68.) He worked from Monday through Friday and oversaw the MCC Laboratory. (Trial Tr. 768-69.) Wagner was called to testify at trial. (Trial Tr. 767-88.) The MCC Laboratory also employed a phlebotomist, Sandra Wilson, through a staffing agency. (S. Wilson Dep. 9, 14.) The phlebotomist worked a morning shift from Monday through Friday. (S. Wilson Dep. 10, 14, 19.) Although the phlebotomist did not testify at trial, her deposition was admitted into evidence. (*See* Trial Tr. 721, 788.)

32.     HSA Sample supervised Nurse Wagner. (Sample Dep. 24, 27; Trial Tr. 393-94, 502-03.) Sample also supervised the phlebotomist, as he was the Contracting Officer's Technical Representative ("COTR") for her position and was administratively responsible for her. (Sample Dep. 25, 27, 48; S. Wilson Dep. 21.) In that capacity, Sample was responsible for scheduling her hours and ensuring that she showed up on time and performed blood draws. (Sample Dep. 25-26; S. Wilson Dep. 21.) The phlebotomist also reported to Wagner, who directed her work and answered her questions. (S. Wilson Dep. 23, 33; Sample Dep. 33.)

33.     In March 2007, Wagner permanently left the MCC. (Trial Tr. 779, 787.) Wagner's duties as the staff nurse included, among other things, processing the Physicians' and physician assistants' orders for laboratory tests requiring blood draws, drawing inmates' blood, and following up on laboratory tests to ensure that the Physicians received test results. (Trial Tr.

13

502-03, 768-69, 773.) On a day-to-day basis, the phlebotomist drew inmates' blood for lab requisitions. (S. Wilson Dep. 27-28; Trial Tr. 132-33, 769, 774.) Unless the phlebotomist needed a patient's medical chart to see a blood test, or unless Sample asked her to pull a chart, the phlebotomist did not pull patients' medical charts on a daily basis. (S. Wilson Dep. 35.)

34. At the MCC, the process for ordering laboratory tests and following up on the results of those tests worked as follows: Physicians ordered laboratory tests that required blood draws by placing the orders on a patient's medical chart. (*See* Trial Tr. 768-69.) Nurse Wagner then transcribed the order onto a requisition form. (Trial Tr. 768-69, 782-83.) If a Physician ordered multiple laboratory tests, Wagner listed all of the tests on a single requisition form. (Trial Tr. 769.) The requisition forms were then sent to a testing laboratory along with the specimens that were collected. (Pl.'s Ex. V at 28.) The Lab Services Statement that was in effect during the relevant time period instructed that the MCC Laboratory was to "maintain a daily accession record of specimens collected, specimens processed, and an appropriate identification system for each." (Pl.'s Ex. E at 5; Trial Tr. 783.) Inmates' blood draws and the laboratory results for those blood draws were tracked in a logbook ("MCC Laboratory Logbook"); this was the only system in place at the MCC for tracking laboratory results. (Trial Tr. 120-22, 769-73; *see also* Pl.'s Ex. A at 636, 845.) The MCC Laboratory Logbook consisted of a chart with the following information: the date of a blood draw, an inmate's name and number, the laboratory tests that were ordered and the ordering practitioner, the date that the results were returned, and the signature of the person who drew the blood. (Pl.'s Ex. A at 636, 845; Trial Tr. 133, 769-70; Sample Dep. 81-82.) The primary purpose of the MCC Laboratory Logbook was to document the return of laboratory results to the MCC. (Sample Dep. 82-83.)

14

35.     HSA Sample was responsible for implementing policies for the MCC Laboratory regarding the types of containers to be used for specific blood draws. (Sample Dep. 46-47.) Sample's role was limited to informing the MCC personnel that the blood specimens had to go out in a timely manner and that they had to be placed in the proper containers. (Sample Dep. 45-46.)

36.     During the relevant time period, all routine blood draws were packaged and sent to the Federal Medical Center in Rochester, Minnesota ("Rochester Lab") for processing. (Trial Tr. 509, 769-70.) The Rochester Lab then faxed or mailed the results back to the MCC. (Trial Tr. 769-70; Sample Dep. 50-5) HSA Sample testified that if the results of a specimen had a panic value, meaning that the results were significant, the Rochester Lab called the MCC in advance. (Sample Dep. 50-51.) Other than laboratory results containing panic values, however, Sample did not have any knowledge of other types of laboratory results that warranted a telephone call from the Rochester Lab prior to sending the fax to the MCC. (Sample Dep. 51.)

37.     The phlebotomist testified that after laboratory results were faxed to the MCC, either the nurse or the Physicians received the results and reviewed them. (S. Wilson Dep. 58.) Nurse Wagner testified that upon receiving laboratory results, he or the phlebotomist logged the date that the results were received in the MCC Laboratory Logbook, but they did not log the actual test results that were returned. (Trial Tr. 770, 772-73.) Laboratory results logged by the phlebotomist were given to her by Nurse Wagner after he reviewed them. (S. Wilson Dep. 84-85.) While it was possible that laboratory results could be placed on the phlebotomist's desk by someone other than Nurse Wagner, the phlebotomist testified that if a Physician had done so after reviewing the results, then the laboratory results would have been stamped. (S. Wilson

15

Dep. 85-86, 102-04.) When multiple laboratory tests were ordered, the results of the tests were not normally returned to the MCC on the same day. (S. Wilson Dep. 56.) Despite this fact, there was no system in place for noting which specific laboratory test results were returned and which ones were outstanding. (Trial Tr. 772-73; S. Wilson Dep. 77-78.)

38.    Afer laboratory results were logged in the MCC Laboratory Logbook, Nurse Wagner testified that the results were sent to the MCC Physicians for their review. (Trial Tr. 771, 773.) Sandra Wilson, the phlebotomist, however, could not remember what she did with laboratory results after logging them. (S. Wilson Dep. 84.) The Physicians were required to review the laboratory results pursuant to an internal MCC policy. (Trial Tr. 499.) After the Physicians reviewed the laboratory results, all such results were supposed to be timely filed into the inmates' medical charts. (Trial Tr. 500, 773; Sample Dep. 45.) Dr. Nowakowski testified that different patients' laboratory results were viewed at the same time and then signed. (Trial Tr. 500.) The laboratory results were then placed in a to-be-filed pile that was known as "the black hole." (Trial Tr. 548.) The to-be-filed pile contained documents that were supposed to be filed in the inmates' medical charts. (Trial Tr. 500, 548.) The purpose of placing laboratory results in an inmate's medical chart was to ensure that there was a history of blood draws and the corresponding laboratory test results, and that the Physicians were aware of an inmate's blood levels for a particular laboratory test. (Trial Tr. 125-26, 500, 773.) Nurse Wagner did not make entries in the inmates' medical charts to note that laboratory results were returned. (Trial Tr. 771.) Nurse Wagner testified that he had an obligation to timely follow up on all laboratory results, based on his training and the policy manual that he was familiar with at the MCC. (Trial Tr. 783.)

39.     When a blood specimen that was shipped to the Rochester Lab was unacceptable for testing, the Rochester Lab notified the MCC via a fax or telephone call. (Trial Tr. 774-75.) If the notice was received via fax, that fax was sent to the Physicians. (Trial Tr. 775.) Upon receiving a notice about an unacceptable specimen, Nurse Wagner had the authority to order that an inmate's blood be redrawn. (Trial Tr. 775.) Nurse Wagner could let the Physicians or a physician assistant know that the blood sample was bad. (Trial Tr. 775.) He did not need permission or an additional order from the Physicians to take another blood draw when a blood specimen that was shipped to the Rochester Lab was unacceptable. (Trial Tr. 775.) There was no system in place, however, to make sure that the nurse in fact called the inmate back down for a blood draw. (Trial Tr. 782.) When blood was redrawn, the nurse needed to have a new requisition sheet that would be sent to the Rochester Lab. (Trial Tr. 782-83.) The phlebotomist did not make the decision to redraw blood. (S. Wilson Dep. 44.) Based on the phlebotomist's experience, when a sample was unacceptable or rejected, a Physician would reorder the lab. (S. Wilson Dep. 79.)

40.     If the notice that the specimen was unacceptable was received through a telephone call, someone, such as the phlebotomist, informed the nurse about the telephone call. (Trial Tr. 781-82.) This was the only system in place at the MCC to account for such telephone calls. (Trial Tr. 782.) The phlebotomist testified that she sometimes followed up by calling the Rochester Lab to determine what happened with the unacceptable specimen. (S. Wilson Dep. 40.) She also testified that the Physicians were responsible for ensuring that laboratory test results were returned to the MCC Laboratory or to the Medical Records department. (S. Wilson Dep. 72.)

17

41.     The Physicians relied on Nurse Wagner to inform them that laboratory results were not returned. (Trial Tr. 512.) Although the Physicians could call the Rochester Lab themselves and ask for the laboratory results that day, this was not routinely done. (Trial Tr. 512.) Dr. Hoffman testified that at the clinical level, he, as the Clinical Director, was ultimately responsible for ensuring that results for laboratory tests that were ordered for inmates were actually performed. (Trial Tr. 436.) At an operational level, however, HSA Sample possessed that responsibility. (Trial Tr. 436-37.) Dr. Hoffman testified that he was responsible for attending to what was and was not being done, and for giving recommendations and suggestions to Sample, the associate warden, and Warden Wilson as to how he thought things could be best done to serve the interests of the patients. (Trial Tr. 437.)

42.     The customary turn-around time for a blood test for a Dilantin level, from the time that a Physician ordered the test until the laboratory results were returned, was anywhere from a few days to between two and three weeks. (Trial Tr. 508, 786.) The delay was caused in part by the volume of the requests and by the procedures involved in delivering the results to the Physicians, including logging the results, making copies, and sending the results to the Physicians. (Trial Tr. 509, 786.)

43.     Nevertheless, a STAT lab could be ordered to expedite the process; STAT labs were drawn on the day of the request and usually returned in 24 hours. (Trial Tr. 787; Trial Tr. 507.) The Physicians had the ability to order a blood test for a Dilantin level STAT, and if they did so, they would receive the results in approximately 24 hours. (Trial Tr. 507.)

44.     The Lab Services Statement in effect during the relevant time period outlined the following objectives: (a) "Testing will be performed by qualified health care personnel;" (b)

"Medical laboratory test reports will be accurate and timely;" (c) "Laboratory test results will be reported to inmates as necessary and incorporated into the inmate's health record;" (d) "Accurate records will be maintained;" and (e) "Safety and quality control procedures will be enforced." (Pl.'s Ex. E at 1; Trial Tr. 701, 783.) Warden Wilson was responsible for ensuring that the Lab Services Statement was actually implemented. (Trial Tr. 703.) Dr. Hoffman testified that the objectives in the Lab Services Statement should be followed. (Trial Tr. 448-50.) According to Nurse Wagner, objectives 2(b)-(e) were objectives of the MCC Laboratory in 2007. (Trial Tr. 783-84.) Warden Wilson also testified that objectives 2(c)-(d) were being followed at the MCC. (Trial Tr. 704.) HSA Sample agreed that medical objectives 2(b)-(d) were being followed at the MCC. (Sample Dep. 85.)

45.     The Lab Services Statement also contains a section on Laboratory Manuals. (Pl.'s Ex. E at 3.) That section provides, in part: "The director of the laboratory must approve, sign, and date any policies and procedures manuals." (Pl.'s Ex. E at 3.) Sample agreed that this statement was in effect. (Sample Dep. 85-86.)

### 5.     MCC correctional officers

46.     Beginning February 9, 2007, Solebo was housed in housing Unit 17E. (Pl.'s Ex. B at 1-2; Trial Tr. 186.) In 2007, Andrew Blanco was one of the officers assigned to Unit 17E. (Blanco Dep. 5-6, July 21, 2010.) Although Blanco did not testify at trial, his deposition was admitted into evidence. (*See* Trial Tr. 721, 788.) Vincent Cannon, a correctional officer, was occasionally assigned to Unit 17E during the evening watch in 2007. (Trial Tr. 176, 186.) Cannon was called to testify at trial. (Trial Tr. 175-90.)

47.     Correctional officers assigned to Unit 17E maintained a logbook ("Unit 17E

Logbook") that they updated when they were on duty. (Pl.'s Ex. B at 1-148; Trial Tr. 176-77, 180.) Post orders instructed correctional officers on what to write down in the Unit 17E Logbook. (Trial Tr. 177.)

48.     Correctional Officers did not receive any instructions on how to handle the pill line, nor were there any post orders to instruct them on how to handle the pill line. (Trial Tr. 177-78; Blanco Dep. 16.) Although correctional officers sometimes noted that the pill line was administered on Unit 17E, they were not required to make entries about the pill line or whether an inmate received or did not receive medication on the pill line. (Blanco Dep. 13-14, 44, 47; *see also* Pl.'s Ex. B at 1-148.) If an inmate missed the pill line for any reason, Officer Cannon's practice was to note it in the Unit 17E Logbook and notify a physician assistant that the inmate had missed the pill line. (Trial Tr. 178-79.) If an inmate missed the pill line, Cannon did not call the Physicians to inform them of this, nor did he ask the inmate why he missed the pill line. (Trial Tr. 178-79.) Cannon did not discuss the importance of taking medication with the inmates when they missed the pill line. (Trial Tr. 179.)

49.     Cannon knew that Solebo was taking medication on the pill line because the physician assistants called Cannon and requested that Solebo be brought down to the 7th Floor Health Services Unit ("7th Floor") for medication. (Trial Tr. 179.) Cannon did not, however, know that Solebo was taking medication for seizure disorder. (Trial Tr. 179.) Cannon testified that when he was on duty, inmates always received their medications. (Trial Tr. 179-80.)

## B.     MCC policies and procedures regarding medication

### 1.     Pill line at the MCC

50.     During the relevant time period, some medication, including Dilantin, was

administered to MCC inmates through the pill line and under the direct supervision of the physician assistants. (Pl.'s Ex. A at 493; Trial Tr. 81, 126-27, 427-28.) The physician assistant administering the doses verified the patient's identity and the medication, and ensured that the inmate actually consumed his medication. (Trial Tr. 526.) The Physicians did not administer medication on the pill line. (Trial Tr. 428.) The pill line occurred twice a day, once in the morning and once in the evening. (Pl.'s Ex. A at 493; Trial Tr. 34.) The pill line took place either on the inmates' housing unit or on the 7th Floor. (Pl.'s Ex. A at 493; Trial Tr. 29-30, 81-82, 186-87.)

51.     When the pill line took place on the inmates' housing unit, the physician assistant administering the medication placed it on a cart ("medication cart") and yelled, announcing, "pill line," or some variation thereof on the unit. (Trial Tr. 29, 84, 127; Blanco Dep. 23). The physician assistant then called out the names of each inmate receiving medication on that housing unit. (Trial Tr. 84; Blanco Dep. 25.) Those inmates then brought their identification and a glass of water and stood in a single-file line to receive their medication. (Trial Tr. 84-85, 127.) Officer Blanco's practice was to stand next to the physician assistant while medication was being administered. (Blanco Dep. 17, 23).

52.     When the pill line took place on the 7th Floor, a physician assistant called the correctional officers and provided them with the names of the inmates who were supposed to receive medication on the pill line. (Trial Tr. 178.) The correctional officer on the floor then yelled, announcing, "pill line" on the housing unit. (Aruiza Dep. 33-34.) An internal security officer accompanied the inmates on an elevator to the 7th Floor. (Trial Tr. 30; Aruiza Dep. 29, 31-32.) When the physician assistants administered medication on the 7th Floor, they knew that

an inmate had refused his medication because the officers told them. (Trial Tr. 187.) In 2007, if an inmate did not come down for his medication, Physician Assistant Iskandar did not request that someone bring the inmate to the 7th Floor so that he could receive his medication. (Trial Tr. 35.)

### 2. Medication Administration Records

53.      During the relevant time period, the MCC personnel were required to follow a BOP Program Statement on Pharmacy Services ("Pharmacy Services Statement"). (Pl.'s Ex. J at 16-23; Trial Tr. 528.) Pursuant to the Pharmacy Services Statement, the administration of medication to an inmate was to be documented in an inmate's Medication Administration Record ("MAR"). (Pl's Ex. J at 19; Trial Tr. 81, 527.) The MARs were created for the benefit of the Physicians because the Physicians did not administer medication on the pill line and did not have direct knowledge of whether an individual inmate was receiving his medication. (Trial Tr. 529.) The purpose of the MAR was to have a record that the Physicians could review to see whether an inmate was refusing or missing his medication, and which a Physician could then use when making clinical judgments. (Trial Tr. 36, 529.) The Physicians were supposed review the MARs when they were treating the inmates. (Trial Tr. 36.)

54.      Every inmate receiving medication on the pill line, including Solebo, had a MAR that was generated by the Pharmacy department on a monthly basis. (Trial Tr. 37-38, 528-29.) The MAR contained information such as the inmate's name, the name of the medication, and the dosage the inmate was to receive. (Trial Tr. 528.) Solebo's MAR indicated that he was taking Dilantin. (Trial Tr. 528; Jt. Ex. 1 at 786-803.)

55.      When administering medication on the pill line, the physician assistants had the

inmates' MARs in front of them and the information in the MARs was readily available to them. (Trial Tr. 61.) The MAR contained a designated box for each and every dose, which corresponded to the days of the month, for an appropriate code to be noted in the box by the person who was administering the medication. (Trial Tr. 528.) When an inmate received his medication on the pill line, the physician assistant administering his medication placed his or her initials in a designated box on the MAR. (Trial Tr. 35, 428.) When an inmate refused his medication on the pill line by telling the physician assistant or correctional officer that he did not want to take his medication, the physician assistant wrote "R" in the designated box on the MAR, per the Pharmacy Services Statement. (Pl.'s Ex. J at 19; Trial Tr. 35, 57, 528-29.) When an inmate did not present himself to the physician assistant or correctional officer on the pill line, the physician assistant wrote "NS" for no-show, per the Pharmacy Services Statement. (Pl.'s Ex. J at 19; Trial Tr. 35-37, 59, 62, 528-29.) Thus, there were times when the physician assistants relied only on what the correctional officer told them when they noted "R" or "NS" on an inmate's MAR. (Trial Tr. 58.)

56.     MARs were kept on the medication cart and were available for the Physicians to review during the month that they were in use. (Trial Tr. 37-38, 89.) In addition to reviewing the MAR on the medication cart, the Physicians could also find out whether an inmate was taking his medication during the month by consulting with the physician assistants. (Trial Tr. 89.) At the end of each month, the MARs were given to the Physicians to review, and the MARs then became part of an inmate's medical chart. (Trial Tr. 90; Aruiza Dep. 75.)

### 3.     Missing medication and Medical Treatment Refusal Forms

57.     Inmates commonly failed to line up for the pill line. (Trial Tr. 127, 137).

23

Although there were no written rules at the MCC requiring the physician assistants to notify the Physicians if a patient missed three consecutive doses of medication, Dr. Nowakowski requested the pill line staff to notify her when an inmate missed three or four consecutive doses of medication because it was possible for her to do something about it in that situation. (Trial Tr. 530-531, 555.) Similarly, Dr. Hoffman testified at trial that if he personally knew, in his capacity as a physician, that Solebo had missed three doses of his medication in a row, he would have "definitely" wanted someone to speak to Solebo. (Trial Tr. 474.) Dr. Hoffman also testified that if Solebo had missed two days of medication, he would have wanted to find out why and he may have wanted to speak to Solebo and ask him what was going on. (Trial Tr. 458.)

58.     An admissions and orientation handbook ("A & O Handbook") for inmates instructed them to report to the pill line when scheduled and warned that a failure to show up at the pill line when scheduled "*will* result in an incident report." (Pl.'s Ex. A at 493) (emphasis added). Although incident report forms were available, Dr. Nowakowski testified that it was not the custom or practice at the MCC to complete an incident report form if an inmate missed the pill line. (Trial Tr. 546-47.)

59.     Additionally, a BOP Program Statement on Patient Care ("Patient Care Statement"), that was in effect at the MCC during the relevant time period, instructed that "[a]ny refusal of recommended or offered treatment or a diagnostic procedure will be documented in the inmate health record. The inmate will be asked to sign a Refusal of Medical Treatment form." (Pl.'s Ex. S at 51; Trial Tr. 94-95, 522.) The Patient Care Statement further instructed that if the inmate refused to sign the Medical Treatment Refusal Form ("Refusal Form"), (*see* Pl.'s Ex. H; Trial Tr. 78, 522), "two staff witnesses will attest and sign to the fact that the consequences of

24

refusing the proposed treatment or procedure were explained to the inmate in a language he/she understood," (Pl.'s Ex. S at 51; Trial Tr. 95, 522-23). In addition, the Patient Care Statement provided that "[a]s a general rule, medical and dental treatment, *including medication*, are given only when the inmate consents." (Pl.'s Ex. S at 51) (emphasis added). The Patient Care Statement also identified exceptions to the general rule, i.e., situations when medical treatment was to be provided without the patient's consent or on an involuntary basis. (Pl.'s Ex. S at 51). Thus, per the Patient Care Statement, an inmate who refused his medication was required to sign a Refusal Form. (Pl.'s Ex. S at 51.) Contrary to a plain reading of the Patient Care Statement, Dr. Nowakowski testified, quite incredibly, that the Refusal Form did not apply to the administration of voluntary medication. (Trial Tr. 523-24.)

60. Signed Refusal Forms were supposed to be placed in an inmate's medical chart, (Trial Tr. 33, 429-30, 547), so that the Physicians could see that an inmate refused medication on a certain date, (Trial Tr. 56-57, 78). Despite this purpose, Dr. Nowakowski testified that Refusal Forms were not commonly used at the MCC for medication refusal. (Trial Tr. 521.) Physician Assistants Iskandar and Velasquez testified that there was no written policy at the MCC as to when a physician assistant should provide an inmate with a Refusal Form, and instead each physician assistant could decide whether to provide an inmate who was refusing his medication with a Refusal Form. (Trial Tr. 61, 79-80.) Because Refusal Forms were not signed every single time an inmate missed his medication, there might not be a Refusal Form in an inmate's medical chart for each instance that an inmate missed his medication. (Trial Tr. 79-81.) In those circumstances, the only documentation the physician assistants made that an inmate refused medication on the pill line was the notation of an "R" in the MAR. (Trial Tr. 58.)

25

61.     If a Refusal Form was completed, there could be a record in an inmate's medical chart of when he missed his medication on a day-to-day basis. (Trial Tr. 547.) And, if the incident reports or medical Refusal Forms were in the chart, such as the MARs were, Dr. Nowakowski testified that it could be easy to track when a patient was missing his medication. (Trial Tr. 547-48.)

62.     There were occasions when an inmate talked to Officer Cannon and asked if he could receive his medication. (Trial Tr. 188.) When an inmate on Unit 17E who failed to line up for the pill line subsequently changed his mind and decided he wanted his medication or showed up to receive his medication, the inmate needed to speak with the correctional officer on duty. (Trial Tr. 188.) During those occasions, Cannon's practice was to call the physician assistant and send the inmate down to the 7th Floor to receive his medication. (Trial Tr. 188.) Cannon testified that he never refused an inmate's request to be sent down for his medication or to receive his medication. (Trial Tr. 188.) On the occasions that Cannon contacted a physician assistant and asked them to either return to the housing unit to administer medication to an inmate or to allow an inmate go down to the 7th Floor to receive his medication, a physician assistant never refused. (Trial Tr. 188.)

63.     Physician Assistant Iskandar testified that the physician assistants gave the inmates second chances and accommodated any inmate who came to an officer after missing the pill line and asked for his medication. (Trial Tr. 63.) Physician Assistant Iskandar also testified that he was not aware of any instance in which an inmate requested his medications and was denied them. (Trial Tr. 63.)

### 4.    Daily Meetings

64.    In 2006 and 2007, the Physicians held morning endorsement meetings and close-out meetings to discuss patients. (Trial Tr. 68, 73, 131, 541, 778.) The endorsement and close-out meetings were not held on the weekends because the Physicians were not present. (Trial Tr. 92-93.) If both Physicians were present, they would both attend the endorsement and close-out meetings. (Trial Tr. 541.) Although the meetings were supposed to be held on a daily basis, Dr. Nowakowski testified that when she was present at the MCC the Physicians did not always hold a daily meeting. (Trial Tr. 541-42.) In April 2007, when Dr. Hoffman was on leave, Dr. Nowakowski ran the daily meetings. (Trial Tr. 542.) On the days in April that Dr. Nowakowski was not present, such as the week prior to Solebo's death, a daily meeting did not take place. (Trial Tr. 542.)

65.    Daily meeting participants typically included both Dr. Hoffman and Dr. Nowakowski when they were present, the physician assistants, Nurse Wagner, and HSA Sample. (Trial Tr. 541, 778.) Pharmacists did not normally attend the daily meetings. (Trial Tr. 92.) The purpose of the daily meetings was to ensure that the Physicians and physician assistants discussed and were made aware of important or significant medical issues concerning the inmates. (Trial Tr. 68, 73, 131.) One such important or significant medical issue was inmates who were not taking their medication as prescribed. (Trial Tr. 69, 70, 74; *see also* Trial Tr. 459, 541.) Thus, during the daily meetings, the Physicians and physician assistants discussed what to do when an inmate was not taking his medication as prescribed. (Trial Tr. 71.) Additionally, if the physician assistants had any concerns about an inmate, like Solebo, missing his medication, they could raise and discuss these concerns with the Physicians. (Trial Tr. 131.)

27

IV.     **Solebo's time at the Metropolitan Correctional Center: August 2006 to May 2007**

     A.     **August 2006**

66.     Solebo was incarcerated at the MCC from August 28, 2006 until May 1, 2007, while awaiting trial. (Def.'s Ex. 22 at 1; R. 93, Proposed Pretrial Order, Ex. A: Stip. of Uncontested Facts ¶ 1.) Prior to Solebo's death, none of his medical records from Kankakee were ever at the MCC. (Trial Tr. 540-41.) Although an MCC Physician could have requested those records by signing a standard consent form, having Solebo sign the form, and noting what was requested from where and during what time period, no one did so. (Trial Tr. 493-94.)

67.     On August 28, 2006, Physician Assistant Aruiza conducted an initial medical evaluation of Solebo and prepared the first note in Solebo's medical chart at the MCC. (Jt. Ex. 1 at 804; Aruiza Dep. 79-80.) Aruiza recorded that Solebo stated, "I need my medications." (Jt. Ex. 1 at 804; Aruiza Dep. 81.) Solebo also informed Aruiza that his last seizure occurred one month prior and that he had been taking Dilantin for four months. (Jt. Ex. 1 at 804; Trial Tr. 497; Aruiza Dep. 81.) The assessment at this time was that Solebo had a history of seizure disorder. (Jt. Ex. 1 at 804; Aruiza Dep. 81.)

68.     Solebo's treatment plan included an order by Aruiza to check Solebo's Dilantin levels. (Jt. Ex. 1 at 804.) Significantly, Aruiza entered an order to continue Solebo's Dilantin. (Jt. Ex. 1 at 805; Trial Tr. 494; Aruiza Dep. 84.) Solebo's dosage of Dilantin was increased to three 100-milligram capsules, equaling 300 milligrams, to be taken each evening. (Jt. Ex. 1 at 805.) Aruiza also ordered that Solebo be placed in a lower bunk until December 28, 2006, because of his history of seizure disorder. (Jt. Ex. 1 at 804; Aruiza Dep. 81, 88.) Aruiza considered this a safety issue, meaning that if Solebo had a seizure, he would be safer if he did

not fall from a higher bunk. (Aruiza Dep. 88.)

      69.     Finally, Aruiza ordered that Solebo visit the Chronic Care Clinic ("CCC") for Neurology ("Neurology CCC") for his seizures by September 18, 2006. (Jt. Ex. 1 at 804; Aruiza Dep. 81.) The first time that Solebo was seen by an MCC Physician in the Neurology CCC, however, was on November 30, 2006—over three months after his arrival at the MCC, and over two months after the date specified in Aruiza's order. (Jt. Ex. 1 at 806.) The Neurology CCC was for patients who exhibited neurological-related problems, such as seizure disorder. (Trial Tr. 464.) According to the BOP Patient Care Statement, CCCs were intended to be "a means for inmates with ongoing medical needs to be tracked on [an internal database known as] SENTRY and seen by a health care provider at clinically appropriate intervals." (Pl.'s Ex. S at 18; *see also* Trial Tr. 155). The Patient Care Statement provided that "a physician will see all inmates assigned to a CCC every six months, or more often if clinically indicated." (Pl.'s Ex. S at 18.) The Patient Care Statement further provided that "[h]igh risk or medically complex chronic care inmates will be seen more frequently in accordance with good clinical judgment, in addition to or in conjunction with regular visits with their primary provider." (Pl.'s Ex. S at 18.) Warden Wilson expected that the Patient Care Statement would be enforced and followed at the MCC. (Trial Tr. 711.)

      70.     Aruiza also prepared an Intake Screening form ("Intake Form") for Solebo. (Jt. Ex. 1 at 828-29; Trial Tr. 159.) Aruiza noted that Solebo had a history of seizure disorder and designated Solebo a Care Level 1. (Jt. Ex. 1 at 828-829; Trial Tr. 159.) That same day, Dr. Nowakowski reviewed the Intake Form and signed-off on the Care Level 1 for Solebo. (Jt. Ex. 1 at 828; Trial Tr. 169.) During the relevant time period, there were four levels of care for MCC

29

inmates on a continuum from 1 to 4. (Pl.'s Ex. Q; Trial Tr. 156.) Care Level 1 was considered the least serious medical level, whereas Care Level 4 was considered the most serious medical and psychiatric level. (Trial Tr. 156.) The MCC Physicians determined an inmate's care level. (Trial Tr. 159.)

71.     On August 29, 2006, Dr. Nowakowski conducted an administrative chart review. (Jt. Ex. 1 at 804.) Dr. Nowakowski reviewed, signed and approved Aruiza's orders in Solebo's medical chart, including the prescription for Dilantin. (Jt. Ex. 1 at 804-805, 821; Trial Tr. 494.) When Dr. Nowakowski conducted administrative chart reviews, she would not typically communicate contemporaneously with the physician assistant who had made the notes, unless there was a specific problem that needed to be addressed. (Trial Tr. 492-93.) During the administrative chart review, Dr. Nowakowski questioned the etiology of the seizures and commented in Solebo's medical chart that she needed clarification of the history, prescription, and seizure type. (Jt. Ex. 1 at 804; Aruiza Dep. 83.) Dr. Nowakowski did not meet with Solebo during the administrative chart review. (*See* Trial Tr. 484.)

72.     At trial, Dr. Hoffman testified that he did not disagree with the initial prescription of Dilantin that Solebo received during the MCC's intake process. (Trial Tr. 409-10.) Solebo's prescription, prescription number 96516, did not include any refills and was to expire on September 27, 2006. (Jt. Ex. 1 at 821.)

73.     On August 29, 2006, a "Patient Problem List" that was likely prepared by a Physician provided that the "Significant Diagnosis" for Solebo was status post-seizure and designated Solebo a Care Level 2. (Jt. Ex. 1 at 823; Trial Tr. 159, 170.) According to Dr. Hoffman, Solebo was in the Neurology CCC because he was classified as a Care Level 2 inmate.

(Trial Tr. 461-62.)

74.     On August 30, 2006, Physician Assistant Carrera performed an initial physical examination of Solebo and completed a Report of Medical Examination ("Initial Report"). (Jt. Ex. 1 at 824-25; Trial Tr. 105-06.) In the Initial Report, Carrera noted that Solebo had seizure disorder and that he was currently on medication. (Jt. Ex. 1 at 824; Trial Tr. 106.) Carrera also summarized Solebo's prescription for Dilantin and noted that he was to take 300 milligrams of Dilantin every evening. (Jt. Ex. 1 at 825; Trial Tr. 107-08; 495-96.) In the "Summary of Defects and Diagnoses" section of the Initial Report, the only medical condition noted was that Solebo had a history of seizures that were controlled with medication. (Jt. Ex. 1 at 825; Trial Tr. 107, 496.) Carrera testified that this information was entered into Solebo's medical chart so that all medical personnel who came into contact with Solebo would be aware of his medical history. (Trial Tr. 108.) Carrera also recommended that Solebo be placed in a lower bunk so that he could not fall from an upper bunk if he had a seizure. (Trial Tr. 109.)

75.     On August 30, 2006, Dr. Nowakowski reviewed the Initial Report. (Trial Tr. 109, 496.) In reviewing and signing off on the Initial Report, Dr. Nowakowski was aware that Solebo was presenting with seizure disorder controlled with medication. (Trial Tr. 497.) According to Dr. Nowakowski, the Initial Report did not outline a treatment plan for Solebo at that time because that plan was going to be created when he saw an MCC Physician, which was generally done at the CCC. (Trial Tr. 496-97.) Dr. Nowakowski again did not meet with Solebo during this review. (*See* Trial Tr. 484.)

76.     When Solebo initially presented to the MCC, his prescription for Dilantin needed to be renewed. (Trial Tr. 524-25.) Dr. Nowakowski testified that it was common practice at the

31

MCC to write a prescription for medication that an inmate was already taking when a Physician did not have time to see the patient. (Trial Tr. 525.) She further testified that even after a Physician saw the patient during a clinical visit, it was also common practice to write a prescription for medication that a patient did not medically require. (Trial Tr. 525.) According to Dr. Nowakowski, because Solebo came in to the MCC on Dilantin, his Dilantin was continued because it was better to be safe than sorry. (Trial Tr. 525.) But, in accordance with the MCC's custom and practice, Solebo was to be evaluated in a CCC. (Trial Tr. 525.) At the CCC, a Physician would then determine whether medication was medically necessary. (Trial Tr. 525.) Dr. Nowakowski testified unequivocally that Solebo would not have been prescribed anti-seizure medication if it was of no medical benefit to him. (Trial Tr. 525-26.) Dr. Nowakowski also testified that although she had prescribed medication that was medically unnecessary, such as Tylenol, for a patient at the MCC, she had never written a prescription for a controlled substance, such as Dilantin, when it was not necessary for a patient. (Trial Tr. 526.)

77.     After arriving at the MCC, Solebo took his Dilantin on August 29, 30, and 31. (Jt. Ex. 1 at 802; Trial Tr. 531.)

### B.     September 2006

78.     In early September 2006, Dr. Nowakowski reviewed Solebo's August 2006 MAR. (Jt. Ex. 1 at 802; Trial Tr. 531-532.)

79.     On September 16, 2006, Solebo missed his Dilantin; it was the only dose of medication he missed that month. (Jt. Ex. 1 at 800; Trial Tr. 532.)

80.     On September 18, 2006, Solebo's blood was drawn pursuant to an order by Dr. Nowakowski to test, among other things, his Dilantin level. (Jt. Ex. 1 at 817; Trial Tr. 117-18).

32

The purpose of obtaining a blood draw and corresponding laboratory results for a Dilantin level was to determine the concentration of Dilantin in Solebo's blood; that is, to determine whether the Dilantin was at a therapeutic level. (*See* Trial Tr. 498.) Dr. Nowakowski testified that the purpose of administering Dilantin to Solebo was to keep him in a therapeutic range because maintaining his Dilantin level in a therapeutic range lessened his chances of having a seizure. (Trial Tr. 549.) If Solebo missed multiple doses of Dilantin, this could increase his risk of having a seizure. (Trial Tr. 549.) Dr. Nowakowski explained that there are reference ranges for laboratory tests, which are basically a generic range, i.e., a bell-shaped curve, of the expected test results for a patient. (Trial Tr. 499.) Dr. Nowakowski further testified that the therapeutic range for Dilantin, according to the Rochester Lab, is between 10 µg/ml and 20 µg/ml, and that the therapeutic range and reference range are fairly similar. (Trial Tr. 499-500.)

81. On September 20, 2006, the Rochester Lab faxed the results of Solebo's September 18 blood draw to the MCC. (Jt. Ex. 1 at 817.) The September 20 laboratory results revealed that the Dilantin level in Solebo's blood was 8 µg/ml, which was subtherapeutic. (Jt. Ex. 1 at 817; Trial Tr. 117-18.)

82. On September 21, 2006, Dr. Nowakowski reviewed the results of the September 18 blood draw and became aware that Solebo's Dilantin level was sub-therapeutic. (Jt. Ex. 1 at 817; Trial Tr. 119.)

C. **October 2006**

83. On October 2, 2006, Dr. Nowakowski reviewed Solebo's September 2006 MAR. (Jt. Ex. 1 at 800; Trial Tr. 532.) Because the MAR indicated that Solebo had only missed one dose of his Dilantin, Dr. Nowakowski was not concerned about Solebo. (Trial Tr. 533.)

33