84.     On October 3, 2006, Solebo made a visit to "sick call" and was seen by Physician Assistant Carrera. (Jt. Ex. 1 at 806; Trial Tr. 109-10.)  During this visit, Carrera made a note in Solebo's medical chart ("October 3rd Note"). (Jt. Ex. 1 at 806; Trial Tr. 109-10.)  The subjective portion of the October 3rd Note provided, in part: "[i]ncarceration started with seizure eight months ago. Wants medication refill. Is study case." (Jt. Ex. 1 at 806; *see also* Trial Tr. 110.)  Carrera also noted that Solebo's Dilantin level from September 18, 2006, was 8 µg/ml. (Jt. Ex. 1 at 806.)  The only assessment Carrera made, meaning the finding she made as a result of the information she had regarding Solebo, was subjective seizure disorder. (Jt. Ex. 1 at 806; Trial Tr. 110-11, 138-39.)  If Carrera had any questions regarding whether Solebo had seizure disorder, she could have verified this with the Physicians. (Trial Tr. 139.)

85.     At trial, Physician Assistant Carrera testified that in light of Solebo's history of seizure disorder, the treatment plan for him at this time was to continue his Dilantin. (Trial Tr. 139.)  Specifically, Solebo was to continue taking three 100-milligram capsules of Dilantin by mouth every evening for 180 days. (Jt. Ex. 1 at 806; Trial Tr. 110-11.)  The only medical condition for which Solebo was taking Dilantin was seizure disorder. (Trial Tr. 111.)  The treatment plan also provided that Solebo was to be added to the Neurology CCC for seizures, so that he could be followed up for his seizure disorder. (Jt. Ex. 1 at 806; Trial Tr. 110-11.)  There was no other reason that Solebo was being sent to the Neurology CCC, and Solebo did not have any other medical condition that was being considered. (Trial Tr. 111-112.)  Although Carrera ordered "lab results in chart for Dilantin," (Jt. Ex. 1 at 806), she did not order any medical tests, (Trial Tr. 111).

86.     The October 3 Note contains a stamp on the lower left-hand corner that states:

34

"Written: Patient medication information was provided regarding use, precautions and possible side effects." (Jt. Ex. 1 at 806; Trial Tr. 167.) According to Assistant HSA Lamping, the stamp indicates that a written patient information sheet ("Information Sheet") for Dilantin was provided to Solebo on or about October 3. (Trial Tr. 167; *see also* Def.'s Ex. 1B-C.) The Information Sheet cautioned, "DO NOT STOP TAKING THIS MEDICINE without first checking with your doctor. TO PREVENT SEIZURES, continue taking this medicine on a regular schedule." (Def.'s Ex. 1B-C; Trial Tr. 166.) Although Assistant HSA Lamping testified that Information Sheets were given to inmates by staff members conducting the pill line, (Trial Tr. 164; *see also* Aruiza Dep. 49-50), she personally did not give Solebo an Information Sheet, nor did she have any personal knowledge that Solebo ever received an Information Sheet. (Trial Tr. 173.) Furthermore, none of the physician assistants testified that they had given Solebo the Information Sheet. Thus, the inference that Solebo actually received the Information Sheet is incredibly weak.

87.     Effective October 4, 2006, the day after Solebo's sick call visit, a Physician changed elevated his care level to Care Level 3. (Pl.'s Ex. A at 299; Trial Tr. 155, 171; *see also* Trial Tr. 159.) At the MCC, inmates classified at a Care Level 3 were considered to be "fragile outpatients with conditions that require frequent clinical contacts (daily to monthly)." (Pl.'s Ex. Q; Trial Tr. 157.) According to Assistant HSA Lamping, Solebo was designated a Care Level 3 because he was a forensic study case, as reflected in the October 3 Note, meaning that a judge had ordered Solebo to undergo a forensic or psychiatric evaluation to determine his competency to stand trial. (Trial Tr. 158, 160.) However, according to an internal SENTRY document that contained an inmate profile for Solebo, (Trial Tr. 154), the "current assignment" for Solebo

under Care Level 3 was "Unstable, complex chronic care." (Pl.'s Ex. at 299; Trial Tr. 156.) The SENTRY document did not reflect that Solebo was a forensic study case as of October 4. (Pl.'s Ex. A at 299; Trial Tr. 171.) Between October 4, 2006 and May 1, 2007, Solebo's care level was never changed. (Pl.'s Ex. A at 299; Trial Tr. 174.)

88. On October 10, 2006, Dr. Hoffman reviewed the October 3 Note. (Jt. Ex. 1 at 806; Trial Tr. 112.) If Dr. Hoffman had wanted to add anything regarding Solebo's medical care or treatment, he could have done so at this time, but he did not make any such notation on the October 3 Note. (Jt. Ex. 1 at 806; Trial Tr. 112.) That same day, Dr. Hoffman renewed Solebo's Dilantin prescription with five refills. (Jt. Ex. 1 at 821; Trial Tr. 410.) Solebo was to take three 100-milligram capsules of Dilantin by mouth each evening. (Jt. Ex. 1 at 821.) Solebo's prescription, prescription number 97535, was effective October 10, 2006, and was set to expire on April 7, 2007. (Jt. Ex. 1 at 821.)

89. Between October 1 and October 9, it is unclear whether Solebo received his Dilantin. (Jt. Ex. 1 at 798.) On October 14 and 25, Solebo's MAR reflects that he was a "no-show" on the pill line and missed his doses of Dilantin. (Jt. Ex. 1 at 798.)

### D. November 2006

90. On November 1, 2, and 3, Solebo's MAR reflects that he was a "no-show" on the pill line and missed three consecutive doses of Dilantin. (Jt. Ex. 1 at 796; Trial Tr. 533.) Although missing three consecutive doses was the kind of activity that Dr. Nowakowski wanted to be made aware of, she did not become aware of the missed doses until she reviewed Solebo's MAR in December 2006. (Trial Tr. 533-34; Jt. Ex. 1 at 796.)

91. On November 15, 2006, a report on a forensic evaluation ("Forensic Report") of

36

Solebo was completed.  (Def.'s Ex. 22 at 1-6; Trial Tr. 160-61.)  The Forensic Report noted that

according to Solebo, "he began experiencing seizures for the first time, beginning in January

2006."  (Def.'s Ex. 22 at 2.)  Solebo also told the examiner that he had "suffered multiple

seizures while detained in a county jail, prior to his transfer to MCC Chicago."  (Def.'s Ex. 22 at

2.)  Solebo's mental health prognosis at this time was "determined to be good," and it was

determined that he was competent to stand trial.  (Def.'s Ex. 22 at 6; Trial Tr. 161.)  After the

Forensic Report was completed, Solebo's care level did not change.  (Trial Tr. 161.)  According

to Assistant HSA Lamping, Solebo's care level did not change because the information was not

communicated to the Health Services department for them to change it.  (Trial Tr. 161.)

According to Lamping, an inmate's care level is typically changed once an inmate is sentenced,

and the care level is a factor the BOP uses to determine to which institution to send an inmate.

(Trial Tr. 161-62.)  Lamping testified that therefore, the fact that Solebo had a Care Level 3 after

November 15, 2006, was just an artifact of the fact that he originally came to the MCC as a study

case.  (Trial Tr. 162.)  Lamping also testified that Solebo's care level did not make a difference in

the care that Solebo received while he was at the MCC because the Physicians did not look at an

inmate's care level when deciding what care to provide to an inmate.  (Trial Tr. 162.)

92.    On November 21, 2006, Dr. Nowakowski reviewed Solebo's October 2006 MAR.

(Jt. Ex. 1 at 798.)

93.    On November 30, 2006, Dr. Hoffman examined Solebo in the Neurology CCC for

his seizures.  (Jt. Ex. 1 at 806-07; Trial Tr. 112-13.)  Dr. Hoffman noted that Solebo's seizures

began in February 2006, during Solebo's incarceration, and that his last seizure occurred in

August 2006.  (Jt. Ex. 1 at 806; Trial Tr. 433.)  Dr. Hoffman also noted that Solebo began taking

100 milligrams of Dilantin in March 2006 and that the prescription was increased to 300 milligrams in July,[3] at which point his seizures stopped. (Jt. Ex. 1 at 806-07; Trial Tr. 433.) Dr. Hoffman also noted that Solebo experienced loss of consciousness when he seized, that he fell off the top bunk, experienced incontinence, and that the seizures only happened in his sleep. (Jt. Ex. 1 at 807; Trial Tr. 433.)

94.    Dr. Hoffman's assessment was "grand mal seizure–strong history except only occurs in sleep suggesting [possible] sleep movement [disorder] or [secondary] gain." (Jt. Ex. 1 at 807; Trial Tr. 433-34.) At trial, Dr. Hoffman testified that his assessment was a differential diagnosis of three possibilities: seizure disorder; sleep movement disorder; or that Solebo was seeking a secondary gain. (Jt. Ex. 1 at 807; Trial Tr. 444.) Out of these three possibilities, Dr. Hoffman medicated Solebo for seizure disorder.   (Trial Tr. 445.)

95.    Solebo's treatment plan at this time was to continue his Dilantin. (Jt. Ex. 1 at 807.) Accordingly, Dr. Hoffman ordered that Solebo continue taking three 100-milligram capsules of Dilantin every evening on the pill line for 180 days. (Jt. Ex. 1 at 807; Trial Tr. 434.) The treatment plan also required that Solebo's Dilantin levels be monitored, that Solebo visit the Neurology CCC in two months, and that he undergo CT scan of his head. (Jt. Ex. 1 at 807; Trial Tr. 434.) The only tests ordered at this time were a blood draw to determine Solebo's Dilantin levels and the CT scan. (Trial Tr. 114.) Dr. Hoffman ordered that Solebo's Dilantin levels be monitored because in Dr. Hoffman's clinical judgment, it was indicated in Solebo's case. (Trial Tr. 434-35.)

_____

[3] Dr. Hoffman's note was incorrect.  Solebo's Dilantin was increased to 300 milligrams upon his arrival at the MCC. (*See* Jt. Ex. 1 at 804-05.)

96.     According to Dr. Hoffman, when diagnosing seizure disorder in someone, a primary care doctor takes a history from the patient or an observer, or both. (Trial Tr. 442-43.) In making this diagnosis, Dr. Hoffman testified that it does not have to be a physician who witnesses the seizure. (Trial Tr. 442-43.) According to Dr. Hoffman, no one ever witnessed tonic-clonic movement, loss of consciousness, or any kind of incontinence in Solebo. (Trial Tr. 443.) At trial, Dr. Hoffman testified that he did not diagnose Solebo with seizure disorder at this time because Solebo's seizures had not been witnessed and because it would have been medically incorrect to diagnose Solebo based on history alone. (Trial Tr. 440-42.) Therefore, Dr. Hoffman believed that the safest thing to do was to treat Solebo as if he had seizure disorder. (Trial Tr. 442.)

**E.     December 2006**

97.     Sometime during the first few days of December 2006, Dr. Nowakowski reviewed Solebo's November 2006 MAR and at that point became aware that Solebo had missed three consecutive doses of Dilantin that month. (Jt. Ex. 1 at 796; Trial Tr. 533.) Although Dr. Nowakowski would have wanted to be made aware of the fact that Solebo missed three consecutive doses of Dilantin, by the time she reviewed his November 2006 MAR, Solebo had received the next 28 doses. (Trial Tr. 533.) Thus, Dr. Nowakowski was not concerned that his Dilantin level was subtherapeutic, and she did not counsel Solebo about these missed doses of Dilantin. (Trial Tr. 533-34, 556.)

98.     On December 7, 2006, pursuant to an order by Dr. Hoffman, Solebo's blood was drawn to test his Dilantin level. (Jt. Ex. 1 at 816; Trial Tr. 498.) On December 9, 2006, the Rochester Lab faxed to the MCC the results of Solebo's December 7 blood draw, which revealed

39

that his Dilantin level was 11 µg/ml. (Jt. Ex. 1 at 816; Trial Tr. 119, 497-98.) Solebo's Dilantin

level at the time was low normal, but it was still within the therapeutic range for Dilantin, which

is between 10 µg/ml and 20 µg/ml. (Trial Tr. 119, 499.)

99.    On December 11, 2006, Dr. Nowakowski reviewed the laboratory results from

Solebo's December 7 blood draw and thus became aware of the Dilantin level in his blood. (Jt.

Ex. 1 at 816; Trial Tr. 119-20, 499.)  After reviewing the laboratory results, Dr. Nowakowski

testified that she more than likely placed the December 9 laboratory results in a stack of many

different patients' laboratory reports. (Trial Tr. 500.)  Dr. Nowakowski testified that she may not

have had Solebo's medical chart at the time she reviewed the December 9 laboratory results.

(Trial Tr. 501.)

100.    On December 18, 2006, a week after reviewing Solebo's laboratory results from

his December 7 blood draw, Dr. Nowakowski conducted an administrative review of Solebo's

medical chart and reordered a blood draw to check Solebo's Dilantin levels. (Jt. Ex. 1 at 808;

Trial Tr. 500-01.)  Dr. Nowakowski also added orders for RPR and HIV tests. (Jt. Ex. 1 at 808.)

At some point in December 2006 and following, HSA Sample delegated to Nurse Wagner the

duty of ensuring that laboratory tests that were ordered were carried out and that the

corresponding results were returned to the MCC. (Trial Tr. 501.)  Nurse Wagner was the only

nurse at the MCC at this time. (Trial Tr. 501.)

101.    On December 19, 2006, this Court entered an order as the presiding trial judge in

Solebo's pending criminal case instructing the BOP and the United States Marshals to transport

Solebo "to a suitable medical facility outside of the [BOP]" to undergo an MRI. (Pl.'s Ex. A at

631-33.)  The order stated that, "[t]he examination shall include an MRI and any other test that

40

the examiner deems appropriate in determining the cause of Mr. Solebo's seizures and black-outs." (Pl.'s Ex. A at 631.) The order also requested that a written report be prepared that included: "a) [Solebo's] history and present symptoms; b) a description of the medical tests that were employed, and their results; c) a statement regarding whether the condition may impact Mr. Solebo's cognitive functioning; [and] d) the examiner's opinions as to diagnosis and prognosis." (Pl.'s Ex. A at 631.) The MRI ordered by this Court was never performed. (*See* Trial Tr. 452-53.)

102.    On December 26, 2006, Dr. Hoffman examined and assessed Solebo at the Neurology CCC. (Jt. Ex. 1 at 809; Trial Tr. 114, 503.) Dr. Hoffman's assessment at this time was "possible seizure disorder"; no other medical condition was indicated for Solebo at this time. (Jt. Ex. 1 at 809; Trial Tr. 114-15, 134). At this visit, Dr. Hoffman increased Solebo's Dilantin dosage from 300 milligrams to 400 milligrams to be taken each evening for 180 days. (Jt. Ex. 1 at 809; Trial Tr. 114-15, 411, 504.) Dr. Hoffman again ordered that Solebo's Dilantin levels be monitored via a blood draw and scheduled a Neurology CCC follow-up visit for the second week of February. (Jt. Ex. 1 at 809; Trial Tr. 114-15, 503.) Dr. Hoffman did not reference Dr. Nowakowski's December 18 order for a Dilantin level in his December 26 note. (Trial Tr. 503-04.) Dr. Hoffman also approved a CT scan for Solebo. (Jt. Ex. 1 at 809; Trial Tr. 504.)

103.    Although both Dr. Nowakowski and Dr. Hoffman requested that Solebo's blood be drawn in December 2006, Solebo's blood was not drawn until February 1, 2007. (*See* Trial Tr. 777-78; Pl.'s Ex. A at 636, 845.)

104.    Solebo's revised prescription, prescription number 99214, became effective December 27, 2006, with an expiration date of June 24, 2007. (Jt. Ex. 1 at 794, 821; Trial Tr.

163-64.) The December 26 note is stamped with the following: "Written: Patient medication information was provided regarding use, precautions and possible side effects." (Jt. Ex. 1 at 809; Trial Tr. 166-67.) According to Assistant HSA Lamping, the stamp indicates that an Information Sheet for Dilantin was provided to Solebo on or about December 26. (*See* Trial Tr. 167; *see also* Def.'s Ex. 1B-C.) Assistant HSA Lamping, however, did not personally give Solebo an Information Sheet, nor did she ever see anyone give Solebo an Information Sheet, and did not have any personal knowledge that Solebo ever received an Information Sheet. (Trial Tr. 172-73.) Furthermore, none of the physician assistants testified that they had given Solebo the Information Sheet. Again, the inference that Solebo actually received the Information Sheet is incredibly weak.

105.    Although Solebo did not miss any doses of Dilantin in December 2006, a Physician never reviewed Solebo's December 2006 MAR. (Jt. Ex. 1 at 794; Trial Tr. 534.)

### F.    January 2007

106.    In January 2007, Solebo was to take four 100-milligram capsules of Dilantin by mouth each evening on the pill line pursuant to the prescription entered by Dr. Hoffman. (Jt. Ex. 1 at 792, 809.) On January 10, 2007, Solebo's MAR reflects that he was a "no-show" on the pill line and missed his dose of Dilantin. (Jt. Ex. 1 at 792.) As with the prior month, a Physician never reviewed Solebo's January 2007 MAR. (Jt. Ex. 1 at 792; Trial Tr. 534.)

107.    On January 9, 2007, pursuant to Dr. Hoffman's prior order, a CT scan of the head performed on Solebo.. (Jt. Ex. 2 at 13.) The CT scan findings provided, in part, "There is no evidence of an acute intracranial hemorrhage, mass effect, midline shift or extra-axial fluid collection. The ventricular system and basilar cisterns appear normal. . . . There are no depressed

skull fractures." (Jt. Ex. 2 at 13.) The CT Scan impression provided, in part, "No CT evidence of an intracranial hemorrhage, mass effect or midline shift." (Jt. Ex. 2 at 13.)

108. In January 2007, no one at the MCC drew Solebo's blood to test his Dilantin level. (*See* Trial Tr. 777-78.)

### G. February 2007

#### 1. February 1, 2007 blood draw

109. On February 1, 2007, the phlebotomist drew Solebo's blood to test his Dilantin level, as well as for chemistry metabolic panel, thyroid stimulating hormone ("sTSH"), RPR and HIV testing, pursuant to an order by Dr. Nowakowski. (Pl.'s Ex. A at 636, 845; Trial Tr. 120-21, 132-33, 772; S. Wilson Dep. 49.) The blood specimen from Solebo's February 1 blood draw was sent to the Rochester Lab for processing. (*See* Jt. Ex. 1 at 813; Trial Tr. 509.)

110. On February 6, 2007, the Rochester Lab faxed to the MCC a final report dated February 3, 2007, that contained the results of Solebo's sTSH and RPR tests. (Pl.'s Ex. A at 813, 851; Trial Tr. 779-80.) The next day, the phlebotomist noted in the MCC Laboratory Logbook that the MCC had received the results of Solebo's February 1 blood draw on February 7, 2007. (Pl.'s Ex. A at 636, 845; S. Wilson Dep. 54; Trial Tr. 121-23, 132, 772.) The phlebotomist did not indicate anywhere in the MCC Laboratory Logbook, however, that some laboratory results were still outstanding. (Pl.'s Ex. A at 636, 845.) On February 7, 2007, Dr. Nowakowski reviewed the results of Solebo's sTSH and RPR tests. (Jt. Ex. 1 at 813; Trial Tr. 124.)

111. On February 22, 2007, the Rochester Lab faxed a report containing the results of Solebo's HIV test from the February 1 blood draw to the MCC. (Jt. Ex 1 at 815; Trial Tr. 136.) Dr. Hoffman reviewed the results of Solebo's HIV test the following month, on March 12, 2007,

43

(Jt. Ex. 1 at 815, Trial Tr. 137), and reviewed them a second time on March 18, 2007, (Jt. Ex. 1 at 814; Trial Tr. 137.) Neither the February 3 or February 22 laboratory results contained a result for Solebo's Dilantin level. (Jt. Ex. 1 at 813-815; Trial Tr. 123, 125.)

112.    Nevertheless, on a copy of the February 3 report ("February 3 Report"), which was faxed to the MCC on February 6, the phlebotomist handwrote a note that read, "Was not in plastic tube or not enough serum[;] reget Dilantin." (Pl.'s Ex. A at 851; *see also* Trial Tr. 779-81.) The February 3 Report was never placed in Solebo's medical chart, but was instead placed in a file cabinet. (Trial Tr. 513). Neither Physician saw the February 3 Report prior to Solebo's death. (Pl.'s Ex. A at 851; Trial Tr. 446-47, 513, 516.)

113.    Dr. Hoffman testified that any MCC personnel who saw the February 3 Report knew or should have known, as a result of the handwritten note, that a Dilantin level for Solebo in 2007 was not forthcoming. (Trial Tr. 447.) In light of the handwritten note on the February 3 Report, Dr. Hoffman would have expected the MCC personnel to redraw Solebo's blood so as to obtain his Dilantin level. (Trial Tr. 447-48.) Had Dr. Hoffman seen the February 3 Report, he would have called Solebo down to get another blood draw because it was part of the MCC's clinical evaluation, and if anyone had shown Dr. Hoffman the February 3 Report, he would have signed off on a request for another blood draw. (Trial Tr. 446, 448.) Dr. Nowakowski testified that had Nurse Wagner seen the February 3 Report, he could have redrawn Solebo's blood without obtaining a new order from a Physician because a Physician had already ordered the blood draw. (Trial Tr. 515.) HSA Sample testified that the MCC personnel who saw the handwritten note on the February 3 Report should have acted on it and should have redrawn Solebo's blood. (Sample Dep. 80-81.)

114.    At trial, Nurse Wagner testified that he did not recall the phlebotomist telling him that Solebo's blood draw for a Dilantin level was bad and needed to be redrawn. (Trial Tr. 783.) Nor did he recall informing Dr. Hoffman or Dr. Nowakowski that Solebo's blood draw for a Dilantin level was bad and needed to be redrawn. (Trial Tr. 783.) Nurse Wagner further testified that after Solebo's blood was drawn on February 1, he did not recall doing anything to follow up to see if a result for Solebo's Dilantin level was returned to the MCC. (Trial Tr. 778.)

115.    A Dilantin level from the February 1 blood draw was never obtained by the MCC prior to Solebo's death, (Trial Tr. 126), and Solebo's blood was not redrawn at any time prior to his death, (Trial Tr. 515-16). Thus, the final laboratory results that the MCC obtained of Solebo's Dilantin level prior to his death were those from the December 7, 2006 blood draw. (Trial Tr. 126.)

116.    Between February 7, 2007 and the date of Solebo's death, Dr. Nowakowski did not have any personal knowledge that a Dilantin level was not going to be obtained. (Trial Tr. 516.) Had Dr. Nowakowski known that a valid Dilantin level was not forthcoming, she would have done something about it. (Trial Tr. 516-17.) At trial, Dr. Nowakowski agreed that the MCC personnel knew or should have known that between February 7, 2007 and the date of Solebo's death, no value for his Dilantin level was forthcoming and that something needed to have been done. (Trial Tr. 517-18.)

## 2.    February 12, 2007 Neurology CCC visit

117.    On February 12, 2007, Solebo had a follow-up visit ("February 12 CCC Visit") with Dr. Hoffman in the Neurology CCC. (Jt. Ex. 1 at 810; Trial Tr. 115, 422, 506.) Dr. Hoffman's assessment of Solebo was that Solebo had a history that was suggestive of seizure

disorder. (Jt. Ex. 1 at 810; Trial Tr. 115.) The treatment plan for Solebo included an order for an EEG, a CT scan of his head, and a follow-up visit to the CCC during the first week of May. (Jt. Ex. 1 at 810; Trial Tr. 115-16.) Aside from the seizure disorder, no other medical condition was listed in Solebo's medical records as of the date he was receiving the CCC treatment. (Jt. Ex. 1 at 810; Trial Tr. 115-16.) During this visit, no diagnoses of high blood pressure, arrhythmia, or heart problems were made. (Jt. Ex. 1 at 810; Trial Tr. 439.)

118.    During the February 12 CCC Visit, Dr. Hoffman asked Solebo about side effects and noted that the only possible medication side effect from an increase in Dilantin was a mild headache. (Jt. Ex. 1 at 810; Trial Tr. 423.) Dr. Hoffman also noted that Solebo's Dilantin level on December 9, 2006, was 11 µg/ml, (Jt. Ex. 1 at 810; Trial Tr. 423, 506), which was within the therapeutic range, (Trial Tr. 435). Dr. Hoffman further noted that Solebo's blood was drawn two weeks prior. (Jt. Ex. 1 at 810; Trial Tr. 423). Thus, at the time of this visit Dr. Hoffman knew that the MCC had not yet received a laboratory value for Solebo's Dilantin level from the February 1 blood draw. (Trial Tr. 421.) Nowhere on Solebo's medical chart did Dr. Hoffman re-order or document a follow-up of the February 1 blood draw or the results of the February 1 blood draw, (Jt. Ex. 1 at 810), even though he could have ordered a new blood draw, (Trial Tr. 423).

119.    Dr. Hoffman testified that it was his practice to perform blood draws every three months to check Dilantin levels in a patient's blood. (Trial Tr. 417, 424.) Despite Dr. Hoffman's practice, and the fact that a Dilantin level from the February 1 blood draw had not yet been received, Dr. Hoffman asked Solebo to return in three months. (Jt. Ex. 1 at 810.) Nowhere in the notes of the February 12 CCC Visit did Dr. Hoffman indicate that he intended to obtain

46

Solebo's Dilantin level prior to his next visit. (Jt. Ex. 1 at 810.) Dr. Hoffman's testimony at trial

was unreliable, as he testified that it would not have been appropriate to write an order for a new

blood draw because it would have been "ridiculously expensive." (Trial Tr. 426-27.) Dr.

Hoffman testified that had he seen the February 3 Report during the February 12 CCC Visit, he

would have had Solebo's blood drawn before he left the CCC. (Trial Tr. 450.)

120.    In February and March 2007, the MCC Physicians had the ability to order a STAT

lab. (*See* Trial Tr. 507.) Although Dr. Hoffman did not have the lab results of the February 1

blood draw in Solebo's medical chart during the February 12 CCC Visit, (Jt. Ex. 1 at 810; Trial

Tr. 465), he could have ordered the laboratory test that day STAT. (Trial Tr. 465.) According to

Dr. Hoffman, however, he did not order the STAT lab because he was not worried. (Trial Tr.

466.) Dr. Hoffman testified that Solebo's Dilantin dosage was increased a month-and-a-half

prior and since that time Solebo had not reported any seizure episodes. (Trial Tr. 466.) In

addition, Dr. Hoffman noted in Solebo's medical chart that Solebo did not have any nystagmus,[4]

(Trial Tr. 466; Jt. Ex. 1 at 810), which would have been indicative of Dilantin toxicity, (*see* also

Tr. Tr. 643). Dr. Hoffman reasoned that Solebo was "probably either down 10 or 11 or a little bit

less." (Trial Tr. 466.) Thus, Dr. Hoffman felt comfortable waiting until the Dilantin level

"crossed [his] path through the regular procedures for laboratory return." (Trial Tr. 466.)

### 3.    February 2007 pill line

121.    In February 2007, Solebo was to take four 100-milligram capsules of Dilantin by

mouth each evening on the pill line, pursuant to prescription number 99214 entered by Dr.

---

[4] Nystagmus is defined as "an involuntary, rapid, rhythmic movement of the eyeball, which may
be horizontal, vertical, rotatory, or mixed, i.e., of two varieties." Dorland's Illustrated Medical
Dictionary at 1307 (32d ed. 2012).

Hoffman. (Jt. Ex. 1 at 790, 809; Trial Tr. 50, 83-84.) The only medication Solebo was receiving on the pill line during this month was Dilantin. (Trial Tr. 54.) On February 10, 11, and 12, Solebo's MAR reflects that he was a "no-show" on the pill line and missed three consecutive doses of Dilantin. (Jt. Ex. 1 at 790; Trial Tr. 534; Aruiza Dep. 12.)

122.    On February 13, 2007 Physician Assistant Velasquez administered Dilantin to Solebo. (Jt. Ex. 1 at 790; Trial Tr. 85.) Velasquez knew that Dilantin was being given to Solebo to control his seizures. (Trial Tr. 89.) In administering medication to Solebo, she had his February 2007 MAR before her and could see that Solebo missed his medication on February 10, 11, and 12. (Trial Tr. 85-86.) At trial, Velasquez could not recall specifically informing the Physicians that Solebo missed three days in a row of his medication. (Trial Tr. 87-88.)

123.    On February 15, 2007, Physician Assistant Iskandar administered Dilantin to Solebo. (Trial Tr. 51.) In administering Dilantin to Solebo on this day, Iskandar knew that Solebo had missed three consecutive doses of Dilantin between February 10 and February 12. (Trial Tr. 51.) At trial, Iskandar could not recall if he communicated this fact to a Physician. (Trial Tr. 51.)

124.    On February 19, 2007, Physician Assistant Aruiza administered Dilantin to Solebo on the pill line. (Aruiza Dep. 73.)

125.    Solebo's February 2007 MAR reflects that he was a "no-show" on the pill line and missed additional doses of medication on February 17, 20, 24 and 25, for a total of seven missed doses during the month of February 2007. (Jt. Ex. 1 at 790; Trial Tr. 534-535.)

126.    On February 26, 2007, Physician Assistant Velasquez again administered Dilantin to Solebo on the pill line. (Trial Tr. 88-89.) In administering his medication, Velasquez knew

48

that Solebo had missed his Dilantin on February 10, 11, 12, 24, and 25, and that Dilantin was being given to Solebo to control his seizures. (Trial Tr. 88-89.) Physician Assistant Velasquez testified that an inmate missing multiple days of medication would have been the type of thing about which she would inform a Physician. (Trial Tr. 89.)

127. On February 27, 2007, Physician Assistant Aruiza again administered Dilantin to Solebo on the pill line. (Aruiza Dep. 73.) In February 2007, Aruiza did not make any recommendations regarding the care, treatment or testing of Solebo as a result of his interactions with Solebo on the pill line. (Aruiza Dep. 99.)

128. On February 28, 2007, Physician Assistant Iskandar again administered Dilantin to Solebo. (Trial Tr. 51.) In administering Dilantin to Solebo on this day, Iskandar knew that Solebo had previously missed seven doses of Dilantin. (Trial Tr. 52-53.) Iskandar also knew that it was important for Solebo to receive his medication, and that it was important to tell a Physician that Solebo had missed seven days of medication. (Trial Tr. 54.) Iskandar also knew that seizures could cause death or serious permanent injuries. (Trial Tr. 54.) Despite this knowledge, Iskandar did not remember informing the Physicians about the missed doses, (Trial Tr. 53), or having any discussions with Solebo about him missing his medication, (Trial Tr. 54-55). Furthermore, nothing in Solebo's medical chart would have indicated that Iskandar discussed this with either Dr. Hoffman or Dr. Nowakowski because it was not the practice of the physician assistants to note such discussions in the medical charts. (Trial Tr. 53-54.)

129. Despite the fact that Solebo missed seven doses of Dilantin in February 2007, a Physician never reviewed his February 2007 MAR. (Jt. Ex. 1 at 790; Trial Tr. 534.)

130. Although Dr. Hoffman met with Solebo on February 12 and Solebo was a "no-

49

show" on the pill line on the two prior days, (Jt. Ex. 1 at 790), Dr. Hoffman testified that he did not recall speaking to Solebo in February 2007 about missing his doses of Dilantin, (Trial Tr. 457). Nor did Dr. Nowakowski recall having any discussions with Solebo in February 2007 regarding the importance of taking his medication. (Trial Tr. 519.) Nothing in Solebo's medical chart indicates that any discussions were had with him in February 2007 about the importance of taking his Dilantin every day. (Jt. Ex. 1 at 810-11; Trial Tr. 519.) Furthermore, Dr. Nowakowski did not recall any discussions in February 2007 with any of the physician assistants or anyone else that worked on the pill line regarding Solebo's missed doses of medication. (Trial Tr. 519-20.) Although Dr. Hoffman testified that the MCC personnel attending the morning meetings discussed inmates who missed their medication, he did not recall any discussions about Solebo missing his medication in February 2007. (Trial Tr. 459.)

### H. March 2007

131.    In March 2007, Solebo was to take four 100-milligram capsules of Dilantin by mouth each evening on the pill line, pursuant to the prescription entered by Dr. Hoffman. (Jt. Ex. 1 at 788; Trial Tr. 46-47.) The only medication Solebo was receiving on the pill line during this month was Dilantin. (Trial Tr. 54.) That month, Solebo missed a total of eight doses of medication. (Jt. Ex. 1 at 788; Trial Tr. 535.) Specifically, Solebo's March 2007 MAR reflects that he was a "no-show" on the pill line and missed three consecutive doses on March 23, 24, and 25, (Trial Tr. 535, 537, Aruiza Dep. 70), and additional doses on March 4, 10, 11, 18, and 31, (Jt. Ex. 1 at 788; Aruiza Dep. 67-69).

132.    On March 12 and 13, 2007, Physician Assistant Aruiza administered Dilantin to Solebo and in doing so, was aware that Solebo had not received his Dilantin on March 4, 10, and

50

11. (Aruiza Dep. 68-69.)

133. On March 14, 2007, Physician Assistant Iskandar administered Dilantin to Solebo and in doing so, knew that Solebo had missed his Dilantin on March 4, 10, and 11. (Trial Tr. 47-48.) Iskandar testified that it was his practice to inform the Physicians of this type of information at the next daily meeting. (Trial Tr. 48.)

134. On March 19 and 20, 2007, Physician Assistant Aruiza administered Dilantin to Solebo and in doing so, was aware that Solebo had not received his Dilantin on March 4, 10, 11, and 18. (Aruiza Dep. 69-70.)

135. On Friday, March 23, 2007, Dr. Nowakowski was out. (Pl.'s Ex. Y at 3.) Solebo missed three consecutive doses of medication on March 23, 24, and 25. (Jt. Ex. 1 at 788; Trial Tr. 535, 537.) Dr. Nowakowski testified that missing those three consecutive doses may have drawn her attention, but it was not enough for her to make an administrative note in Solebo's medical chart; otherwise, she would have done so. (Trial Tr. 535-36.)

136. The following week, from Monday, March 26 through Friday, March 30, 2007, Dr. Hoffman was on leave and was not present at the MCC. (Pl.'s Ex. Y at 2.) Dr. Hoffman did not return to the MCC at any point in time prior to Solebo's death. (Pl.'s Ex. Y at 2.) On March 26 and 27, 2007, Physician Assistant Aruiza again administered Dilantin to Solebo and in doing so, he had the MAR in front of him and could see that Solebo had not received his Dilantin on March 4, 10, 11, 18, 23, 24, and 25. (Aruiza Dep. 70-72.)

137. On March 28, 2007, Physician Assistant Iskandar administered Dilantin to Solebo. (Trial Tr. 48.) In administering Dilantin to Solebo on that day, Iskandar had the MAR in front of him and therefore, he knew that Solebo had missed his Dilantin on March 4, 10, 11, 18,

51

23, 24, and 25. (Trial Tr. 48-49; Jt. Ex. 1 at 788.) At trial, Iskandar testified that it was his practice to inform the Physicians of this type of information at the next daily meeting. (Trial Tr. 49.) Iskandar testified that he did this because he knew it was important for Solebo to take his medication and he knew that the Physicians needed to be informed that Solebo had missed his medication. (Trial Tr. 49.)

138.    On March 31, 2007, Solebo was again a "no-show" on the pill line and missed his medication. (Jt. Ex. 1 at 788.)

139.    Physician Assistant Velasquez testified at trial that Solebo missing his medication on specific days in March 2007 was the type of matter discussed during the endorsement meetings in March 2007 because it was important to share this type of information with the Physicians. (Trial Tr. 76-77.) Nevertheless, she could not recall whether she brought up the fact that Solebo missed his medication during the daily endorsement or close-out meetings in March 2007. (Trial Tr. 76.) Physician Assistant Velasquez also could not recall any meetings with medical personnel at the MCC in March 2007 in which the issue of Solebo missing his medication was discussed. (Trial Tr. 92.) Nor did Physician Assistant Aruiza make any recommendations to the Physicians regarding the care, treatment or testing of Solebo as a result of his interactions with him on the pill line. (Aruiza Dep. 98-99.) Dr. Nowakowski could not recall any discussions in March 2007 with any of the physician assistants or anyone else that worked on the pill line regarding Solebo's missed doses of medication in March 2007. (Trial Tr. 519-20.)

140.    Nothing in Solebo's medical chart indicates that a Physician or physician assistant had discussions with Solebo or counseled him in March 2007 about him taking his medication.

52

(Jt. Ex. 1 at 810-11; Trial Tr. 55, 519.)  Dr. Nowakowski did not personally recall any discussions she had with Solebo in March 2007 regarding the importance of taking his medication. (Trial Tr. 519.)  In addition, Physician Assistants Velasquez and Iskandar could not recall speaking to Solebo in March 2007 about missing his medication. (Trial Tr. 45, 55, 92.) Nurse Wagner also did not recall ever having a conversation with Solebo about missing multiple days of Dilantin in 2007, nor did he recall talking to Dr. Hoffman or Dr. Nowakowski about Solebo missing his Dilantin. (Trial Tr. 779.)

141.    At no point in time in March 2007 did any MCC personnel draw Solebo's blood to obtain or test his Dilantin level. (*See* Trial Tr. 126; 515-16.)

I.    **April 2007**

142.    On April 1, 2007, Eric Wilson became the MCC warden. (Trial Tr. 694.)  Dr. Hoffman was on a leave of absence and not present at the MCC the entire month of April 2007. (Pl.'s Ex. Y at 2; Trial Tr. 698-99.)  In Dr. Hoffman's absence, Dr. Nowakowski was the MCC's acting Clinical Director that month. (Trial Tr. 144, 482-83.)  After assuming his position as warden, Wilson did not have any meetings with Dr. Hoffman or Dr. Nowakowski in April 2007. (Trial Tr. 700-01.)  In addition, Warden Wilson did not review or have discussions with any medical personnel regarding the system that the MCC Laboratory had in place for following up with the Rochester Lab on laboratory tests and results. (Trial Tr. 707-09.)  According to him, MCC medical personnel had the responsibility of following up on laboratory tests and results. (Trial Tr. 708.)  Warden Wilson also knew that there was only one physician, Dr. Nowakowski, at the MCC during that month and that when she was absent, a physician was not present at the MCC. (Trial Tr. 700.)

143.    On April 2, 2007, Dr. Nowakowski reviewed Solebo's MAR for March 2007. (Jt. Ex. 1 at 788; Trial Tr. 535-36.) Dr. Nowakowski did not view the fact that Solebo had missed three consecutive doses of Dilantin in late March, and a total of eight doses of Dilantin in March 2007, as an emergency, and she did not take any action in response to that information. (Trial Tr. 558.)

144.    In April 2007, Solebo was to take four 100-milligram capsules of Dilantin by mouth each evening on the pill line, pursuant to a prescription entered by Dr. Hoffman. (Jt. Ex. 1 at 786; Trial Tr. 47, 128-29; Aruiza Dep. 59.) The only medication Solebo was receiving on the pill line during this month was Dilantin. (Trial Tr. 54, 129.) In April 2007, Solebo's MAR reflects that he missed 13 of his 30 doses of Dilantin on the pill line. (Jt. Ex. 1 at 786; Trial Tr. 538.) Specifically, Solebo's MAR reflects that he was a "no-show" on the pill line on April 1, 2, 5, 7, 8, 14, 15, 21, 22, 28, 29, and 30, (Jt. Ex. 1 at 786; Aruiza Dep. 62-63, 66-67; *see also* Trial Tr. 558-59), and that Solebo refused his medication on April 27, (Jt. Ex. 1 at 786). During the month, a copy of Solebo's MAR was kept on the medication cart. (Trial Tr. 37.) If Dr. Nowakowski had wanted to review his MAR that month, she could have gone to the medication cart to do so. (Trial Tr. 46.)

145.    On Monday, April 9 and Tuesday, April 10, 2007, Physician Assistant Aruiza administered Dilantin to Solebo on the pill line. (Aruiza Dep. 60, 62; Jt. Ex. 1 at 786.) In administering Dilantin to Solebo on these days, Aruiza was aware that Solebo had not received his medication on April 1, 2, 5, 7, and 8. (Aruiza Dep. 62-63.)

146.    On Monday, April 16 and Tuesday, April 17, 2007, Physician Assistant Aruiza again administered Dilantin to Solebo on the pill line. (Aruiza Dep. 63.) In administering

Dilantin to Solebo on this day, Aruiza was aware that Solebo had not received his medication on April 1, 2, 5, 7, 8, 14, and 15. (Aruiza Dep. 63.)

147.    On April 18, 2007, Dr. Nowakowski was out and was not physically present at the MCC. (Pl.'s Ex. Y at 3; Trial Tr. 489-90.) That evening, Physician Assistant Iskandar administered Dilantin to Solebo. (Jt. Ex. 1 at 786; Trial Tr. 44.) In administering Dilantin to Solebo, he could see that Solebo had missed his doses of Dilantin on April 7, 8, 14, and 15. (Trial Tr. 43.) Iskandar testified that it was his practice to inform the Physicians about this type of issue at the next daily meeting because he knew it was important for Solebo to take his anti-seizure medication. (Trial Tr. 43.) Iskandar testified that he knew it was important so that Solebo would not have any serious permanent injury. (Trial Tr. 43.) Iskandar also knew it was important to inform the Physicians about these missed doses. (Trial Tr. 44.)

148.    On Monday, April 23, 2007, Physician Assistant Aruiza again administered Dilantin to Solebo on the pill line. (Aruiza Dep. 64.) In administering Dilantin to Solebo on this day, Aruiza was aware that Solebo had not received his medication on April 1, 2, 5, 7, 8, 14, 15, 21, and 22. (Aruiza Dep. 64.)

149.    On Tuesday, April 24, 2007, Solebo underwent an EEG that Dr. Hoffman had ordered on February 12, 2007. (Jt. Ex. 1 at 820; Jt. Ex. 2 at 12.) The EEG summary provides, in part, "no seizure activity," and the conclusion is "normal wake and drowsy record." (Jt. Ex. 1 at 820; Jt. Ex. 2 at 12.) This EEG scan was normal. (Trial Tr. 286-87.)

150.    On the evening of April 24, 2007, Physician Assistant Carrera administered Dilantin to Solebo on the pill line. (Jt. Ex. 1 at 786; Trial Tr. 129.) Carrera testified that she did not talk to Solebo in April 2007 about why he missed his medication on the pill line, nor did she

55

learn from anyone why Solebo missed his medication. (Trial Tr. 128.) Thus, Carrera did not

know why Solebo missed his medication on the pill line in April 2007. (Trial Tr. 128.) If an

inmate did not appear on the pill line for a number of days to receive his prescribed medication,

Physician Assistant Carrera testified that it was her practice to make a note on the inmate's

medical chart so that a Physician reviewing the inmate's medical chart was aware of what was

going on with the patient. (Trial Tr. 129-30.) Carrera testified that if she had a concern about

Solebo missing his medication, she also could have easily contacted a Physician in April 2007 to

discuss the issue with them. (Trial Tr. 130.) Nevertheless, Carrera did not recall having any

discussions with any Physician about Solebo missing his medication, nor did she recall any

meetings she had with any Physician about Solebo missing medication in April 2007. (Trial Tr.

131-132.)

      151.    On Wednesday, April 25, 2007, Dr. Nowakowski was at the MCC for a half-day

and did not return to the MCC until Wednesday, May 2, 2007. (Pl.'s Ex. Y at 3; Trial Tr. 489-

91.) On the days that Dr. Nowakowski was out, a Physician was not present at the MCC. (Trial

Tr. 719-720.) At trial, Dr. Nowakowski did not recall having any contact with the MCC during

these particular days. (Trial Tr. 491.) Warden Wilson also testified at trial that he was not aware

of the dates that Dr. Nowakowski was out in April 2007. (Trial Tr. 718-719.) On the days that

Dr. Nowakowski was absent in April 2007, Warden Wilson did not take any additional action to

bring in additional physicians. (Trial Tr. 719.) Warden Wilson testified, however, that he was

not required to bring a doctor in to the MCC from a different BOP institution. (Trial Tr. 720.)

      152.    On Thursday, April 26, 2007, Physician Assistant Iskandar administered Dilantin

to Solebo; in doing so, he could see that Solebo had missed his doses of medication on April 7, 8,

14, 15, 21, and 22. (Trial Tr. 44.) Iskandar testified that he knew at this time that it was important for Solebo's health to take his anti-seizure medication. (Trial Tr. 44-45.) Iskandar also testified that it was his practice to tell the Physician at the next daily meeting, assuming a Physician was present, that Solebo had missed his doses of anti-seizure medication on those dates in April. (Trial Tr. 45.) Notably, Dr. Nowakowski testified at trial that on days when she was not at the MCC, such as the week prior to Solebo's death, a daily meeting did not take place. (Trial Tr. 542.) Additionally, Iskandar did not recall speaking to Solebo in April 2007 about his missed doses of medication. (Trial Tr. 45.)

153. On Friday, April 27, 2007, the pill line was administered in housing Unit 17E at 9:28 p.m. (Pl.'s Ex. B at 143.) Solebo's MAR reflects that he refused his medication that evening. (Jt. Ex. 1 at 786.) Although Solebo's refusal was not documented in the Unit 17E Logbook, Officer Blanco specifically recalled Solebo refusing his medication this time. (Pl.'s Ex. B at 143; Blanco Dep. 28, 30.) Officer Blanco walked up to a section of Unit 17E where a group of inmates, including Solebo, was gathered around a television and told them that the pill line was here. (Blanco Dep. 29.) According to Officer Blanco, Solebo did not want to get up from his seat and he told Blanco that he did not want his medication, at which point Blanco told Solebo that the pill line was "down there." (Blanco Dep. 29.) Solebo got upset, stood up, and walked over to the railing and yelled to the person distributing medication on the pill line, "I'm refusing." (Blanco Dep. 29-31.) Solebo then walked past Blanco and sat back down. (Blanco Dep. 30.) Blanco testified that he was not aware of a physician assistant speaking with Solebo on this day. (Blanco Dep. 32.) Other than this single occurrence, Blanco was not aware of any other days that Solebo missed the pill line or refused to take his medication. (Blanco Dep. 37.)

Additionally, Blanco did not have any discussions with Solebo at any time before he died about the importance of taking his medication. (Blanco Dep. 37-38.)

154. On Saturday, April 28, 2007, the pill line was administered in housing Unit 17E at 8:40 p.m. (Pl.'s Ex. B at 144-45; Blanco Dep. 48.) Solebo's MAR reflects that he was a "no-show" on the pill line this evening and did not receive his Dilantin. (Jt. Ex. 1 at 786.)

155. On Sunday, April 29, 2007, Solebo's MAR reflects that he was a "no-show" on the pill line and did not receive his Dilantin. (Jt. Ex. 1 at 786.)

156. On Monday, April 30, 2007, both Dr. Hoffman and Dr. Nowakowski were on leave and were not physically present at the MCC. (Pl.'s Ex. Y at 2-3; Trial Tr. 489-90.) From April 30 until May 4, 2007, Warden Wilson was at a warden training conference and was not physically present at the MCC. (Trial Tr. 699.) On the evening of April 30, 2007, the pill line took place on the 7th Floor and was administered by Physician Assistant Aruiza. (Trial Tr. 181-83 185; Pl.'s Ex. B at 148.) Solebo's MAR reflects that Solebo was a "no-show" on the pill line this evening and did not receive his medication. (Jt. Ex. 1 at 786; Aruiza Dep. 66-67.) According to Officer Cannon, however, Solebo was one of three inmates who refused to go to the pill line. (Trial Tr. 181, 185; Pl.'s Ex. B at 148.) Although Solebo told Officer Cannon that he was not going to go to the pill line that evening, he did not tell Cannon why he was refusing nor did Cannon ask why. (Trial Tr. 182.) Officer Cannon testified that it was not part of his job to talk to Solebo about the importance of taking his medication; therefore, he did not discuss this issue Solebo. (Trial Tr. 182.) After speaking to Solebo, Officer Cannon contacted Aruiza to let him know that Solebo refused his medication. (Trial Tr. 183, 185, 187.) Cannon also contacted his supervisor, Lieutenant Finley, and informed him that Solebo and other inmates were refusing

their medication that evening. (Trial Tr. 183.) Lieutenant Finley did not instruct Cannon to do anything to encourage Solebo to take his medication. (Trial Tr. 183.) Cannon did not contact a Physician that evening to let them know that Solebo was refusing to take his medication. (Trial Tr. 184.)

157.    Officer Cannon testified that there were occasions when an inmate on housing Unit 17E changed his mind about receiving his medication. (Trial Tr. 188.) Neither Cannon or a physician assistant refused to accommodate the inmate on such occasions. (Trial Tr. 188.) Additionally, although there were occasions in 2007 when a physician assistant came up to the housing unit and spoke to an inmate after being notified by Cannon via a telephone call that the inmate was refusing his medication, Physician Assistant Aruiza did not do this on April 30, 2007. (Trial Tr. 189.) Neither a Physician or physician assistant came up to Solebo's housing unit to speak to Solebo about him not taking his medication. (Trial Tr. 183-84, 89.)

158.    Other than putting his initials on the MAR, Physician Assistant Aruiza did not have contact with any Physician or physician assistants regarding the dates in April 2007 that Solebo had missed his medication. (Aruiza Dep. 65-66.) Indeed, he did not with anybody about Solebo missing his medication on those dates. (Aruiza Dep. 66.) During the month of April 2007, Aruiza testified that he did not have any daily meetings with the Physicians regarding the inmates he gave medication to on the pill line. (Aruiza Dep. 66.) In April 2007, Aruiza did not make any recommendations regarding the care, treatment or testing of Solebo as a result of his interactions with him on the pill line. (Aruiza Dep. 99.)

159.    Physician Assistant Velasquez testified that Solebo missing his medication during the month of April 2007 probably would have been discussed during the daily endorsement or

close-out meetings. (Trial Tr. 76.) According to her, it would have been brought up during those meetings because it was important for the Physicians to know that an inmate had missed his medication. (Trial Tr. 76.) Nevertheless, Velasquez could not recall any meetings with MCC medical personnel in April 2007 about Solebo missing his medication. (Trial Tr. 92.) Velasquez also could not recall any discussions or meetings that she had in April 2007 with Solebo about him missing his medication. (Trial Tr. 91-92.) Again, Dr. Nowakowski testified at trial that when she was not present at the MCC the week prior to Solebo's death, a daily meeting did not take place. (Trial Tr. 542.)

160.    Prior to Solebo's death, Dr. Nowakowski was never made aware of the fact that Solebo missed 13 of his 30 doses of Dilantin in April and nothing in Solebo's medical chart reflects that any physician assistant brought this to her attention. (Trial Tr. 538.) Based on her clinical experience as a physician, Dr. Nowakowski testified that given the quantity of missed doses, it was quite possible that Solebo's Dilantin was not at a therapeutic level. (Trial Tr. 538-39.) But, this possibility could not be confirmed until she saw the laboratory results of a blood draw. (Trial Tr. 538-39.) Blood draws had been ordered but had not been received since December 2006. (Trial Tr. 539.)

161.    Had Dr. Nowakowski been made aware of the facts in the April 2007 MAR, she testified that she would have certainly had Solebo evaluated within the week. (Trial Tr. 539, 559.) She would have checked his Dilantin level, reviewed everything in his medical chart, and performed a physical exam. (Trial Tr. 539.) Obtaining a history from Solebo and finding out "what was going on in terms of him missing his medication" would have been equally as important as a physical exam because the April 2007 MAR suggested that Solebo's Dilantin

60

level might be low. (Trial Tr. 539-40.) But, Dr. Nowakowski needed a laboratory test to confirm this suspicion. (Trial Tr. 540.) At no time in April 2007 did any MCC personnel draw Solebo's blood to obtain or test Solebo's Dilantin level. (*See* Trial Tr. 126. 515-16.)

162. Neither Dr. Hoffman nor Dr. Nowakowski reviewed Solebo's April 2007 MAR prior to his death. (Jt. Ex. 1 at 786; Trial Tr. 537.) Dr. Nowakowski did not recall having any contact with the MCC during the last week of Solebo's life. (Trial Tr. 491.)

163. Nothing in Solebo's medical chart indicates that anyone had any discussions with Solebo in April 2007 about him taking his medication. (Jt. Ex. 1 at 810-11; Trial Tr. 519.) Dr. Nowakowski did not personally recall any discussions she had with Solebo in April 2007 regarding the importance of taking his medication. (Trial Tr. 519.) Nor did she recall any discussions in April 2007 with any of the physician assistants or anyone else that worked on the pill line regarding Solebo's missed doses of medication. (Trial Tr. 519-20.)

**J.    May 2007**

164. In the early morning of May 1, 2007, Solebo was found dead in his cell. (R. 93, Proposed Pretrial Order, Ex. A: Stip. of Uncontested Facts ¶ 2.) Both Dr. Hoffman and Dr. Nowakowski were on leave on this day. (Pl.'s Ex. Y at 2-3.) Warden Wilson was also out. (Trial Tr. 699.) Assistant HSA Lamping responded to a call for assistance on the MCC's 17th floor. (Trial Tr. 151; Jt. Ex. 1 at 811.) She found Solebo face down in his cell; he was unresponsive with rigor mortis. (Jt. Ex. 1 at 811; Trial Tr. 151, 153-54.)

165. The Cook County coroner, Dr. Nancy Jones, personally went to the MCC and viewed Solebo's body. (Trial Tr. 344; Pl.'s Ex. M at 1.) She pronounced Solebo dead, and his body was transported to the Cook County coroner's office. (Pl.'s Ex. A at 58; Trial Tr. 151-52.)

At the MCC, non-medical MCC personnel told Dr. Jones that Solebo had been diagnosed with and was being treated for seizure disorder. (Trial Tr. 344; 361). At trial, Dr. Jones clarified that although this information was useful, pathologists such as herself can conclude that a person died from seizure disorder if they find intramuscular hemorrhages of the tongue and cerebral edema and anoxia during an autopsy. (Trial Tr. 344-45.) The MCC personnel also provided her with copies of Solebo's medical records, which she testified indicated that he was diagnosed with seizure disorder. (Trial Tr. 361.) Dr. Jones did not speak with Dr. Hoffman or Dr. Nowakowski. (Trial Tr. 361-62.)

166.    On May 1, 2007, Assistant HSA Lamping prepared a report ("Lamping Report") on Solebo's death. (Pl.'s Ex. A at 58; Trial Tr. 150.) The Lamping Report provided, in part, "The 23 year old inmate arrived at MCC Chicago on 2-26-2007 with a history of Grand Mal seizures and was seen 2-12-2007 for his chronic care clinic." (Pl.'s Ex. A at 58; Trial Tr. 152.) Lamping based the information in the Lamping Report on her personal knowledge, a review of Solebo's medical chart, and clinical information provided to her by a Physician or one of the other clinicians at the MCC. (Trial Tr. 150-52.)

167.    On May 2, 2007, a letter under Warden Wilson's name was sent to Plaintiff. (Pl.'s Ex. A at 193; Trial Tr. 713.) Warden Wilson informed Plaintiff that her husband was pronounced dead by the Cook County Medical Examiner in Chicago on May 1, 2007. (Pl.'s Ex. A at 193; Trial Tr. 713.) The letter further stated: "The Cook County Medical Examiner's preliminary findings reveal the death was caused by a seizure disorder." (Pl.'s Ex. A at 193; Trial Tr. 713-14.) The letter was signed by James Henry, the associate warden, on Warden Wilson's behalf because Wilson was out of town that day. (Pl.'s Ex. A at 193; Trial Tr. 714.)

62

Warden Wilson knew the letter was to be mailed out to Plaintiff, and he gave his approval to do so. (Trial Tr. 714.) That same day, a second letter was sent under Warden Wilson's name and at his request to Judge Ruben Castillo. (Pl.'s Ex. A at 194; Trial Tr. 714-15.) The first paragraph of that letter provides: "This is to advise you of the death of Habib Solebo. Mr. Solebo was pronounced dead on May 1, 2007, by the Cook County medical examiner. Preliminary findings indicate Mr. Solebo died of a seizure disorder." (Pl.'s Ex. A at 194; Trial Tr. 715.) At trial, Warden Wilson testified that the letters were standard notices that were sent from the MCC and that he was following the rules in effect regarding inmate death notices. (Trial Tr. 715.) In both letters, Warden Wilson indicated that the cause of death was seizure disorder. (Trial Tr. 716; Pl.'s Ex. A at 193-94.)

168. On May 8, 2007, the Rochester Lab faxed to the MCC an "On Demand Report" informing the MCC that the blood specimen for Solebo was unacceptable because it was placed in the wrong type of tube. (Pl.'s Ex. A at 639; Trial Tr. 776.) Specifically, the On Demand Report indicated that the "Test requires specimen in aliquot tube." (Pl.'s Ex. A at 639.) The On Demand Report made it clear that a Dilantin level for Solebo would not be forthcoming. (Trial Tr. 516.)

**K.  June 2007**

169. On June 21, 2007, the MCC prepared a Multi-Level Mortality Review ("Mortality Review") of Solebo's death, (Pl.'s Ex. A at 84-92; Trial Tr. 148), wherein the cause of death was listed as "seizures." (Pl.'s Ex. A at 84; Trial Tr. 148.) The Mortality Review also noted that the only admitting and past diagnoses for Solebo were "seizures." (Pl.'s Ex. A at 84; Trial Tr. 147-48.) Dr. Paul Harvey, the MCC Clinical Director on July 6, 2007, signed the Mortality Review

63

on July 6, 2007. (Trial Tr. 149.)

## V.    The autopsy and toxicology report

170.    Dr. Jones performed an autopsy on Solebo's body on May 1, 2007, the same day that he passed away. (Trial Tr. 341.) In May 2007, Dr. Jones was one of three final candidates in contention for Chief Medical Examiner. (Trial Tr. 335.) She became the Chief Medical Examiner for Cook County on August 5, 2007, and held this position at the time of trial. (Trial Tr. 330, 335.)

171.    Dr. Jones graduated in 1982 from the Chicago Medical School, which is part of Rosalind Franklin University of Medicine and Science. (Trial Tr. 331.) She completed a two-year residency in anatomic pathology and a second two-year residency in clinical pathology, both at the University of Chicago. (Trial Tr. 331.) Dr. Jones then did a one-year fellowship in forensic pathology at the Robert J. Stein Institute of Forensic Medicine at the Cook County Medical Examiner's Office. (Trial Tr. 331.) Dr. Jones has held a permanent license to practice medicine in the State of Illinois since 1983 and is board certified in anatomic, clinical and forensic pathology. (Trial Tr. 333.) After leaving the University of Chicago, she started her fellowship at the Medical Examiner's Office, completed one year of training and was hired full-time as a staff forensic pathologist in July 1987; she has been with the Medical Examiner's Office ever since. (Trial Tr. 333.) Dr. Jones is also a professor of pathology at the Chicago Medical School, where she teaches both general and forensic pathology. (Trial Tr. 334.) Over the course of her career, she has performed over 10,000 autopsies. (Trial Tr. 336.) She testified at trial pursuant to a subpoena, (Trial Tr. 331), and was the only pathologist to testify at trial.

172.    Dr. Jones explained that an autopsy is a detailed, complete external examination

64

coupled with an internal examination of a person's organs and a review of their medical history. (Trial Tr. 336.) One main purpose of an autopsy is to determine cause of death. (Trial Tr. 338.) Dr. Jones explained that a *cause of death* can result from any number of things, such as, in Solebo's case, seizure disorder, or in other cases, gunshot or stab wounds. (Trial Tr. 349-50.) A *mechanism of death*, on the other hand, is the actual physiologic change that takes place in an individual, such as respiratory arrest, cardiac arrest, or exsanguination. (Trial Tr. 349.) Finally, *manner of death* is defined by the circumstances surrounding an individual's death, such as natural, accident, homicide, suicide, or undetermined. (Trial Tr. 350.)

### A. Solebo's autopsy

173. As a result of the autopsy, Dr. Jones opined, to a reasonable degree of medical certainty, that Solebo's cause of death was seizure disorder, (Trial Tr. 341-42; 351-53, 386; Pl's Ex. M at 1-5), and that his manner of death was natural, (Trial Tr. 351). Dr. Jones based her opinion on the physical evidence she found at his autopsy and Solebo's clinical history of seizure disorder. (Trial Tr. 345, 359-60.) Dr. Jones also noted that according to his medical records, Solebo's seizures occurred while he was sleeping and that Solebo went to bed one night and was found dead the next morning in his bed. (Trial Tr. 345.) Dr. Jones testified that even if she had been told that Solebo's clinical history was one of only "possible or questionable seizures," she probably would not have reached a different conclusion regarding his cause of death because the physical findings at autopsy supported the cause of death as being a seizure. (Trial Tr. 366-68.)

174. Dr. Jones listed the following diagnoses on the autopsy report: (1) Clinical history of seizure disorder; (2) Pulmonary congestion and edema; (3) Hepatosplenomegaly, meaning an enlarged liver and spleen, (Trial Tr. 374); (4) Acute congestion of the visceral organs; (5)

65

Marked cardiomegaly (610 grams) with concentric left ventricular hypertorphy; (6) Chronic passive congestion of the liver; (7) Mild cerebral edema; (8) Focal hemorrhage of the soft tissues over the isthmus of the left side of the thyroid gland consistent with body position when found; (9) Rare petechial hemorrhages of the sclerae with scleral injection consistent with the position of the body when found; (10) Small intramuscular hemorrhage of the tongue. (Pl.'s Ex. M at 4-5.) Of the ten diagnoses, the most important for her conclusion that Solebo died as a result of seizure disorder were: (a) his clinical history of seizure disorder; (b) the intramuscular hemorrhage, i.e., the bite mark, of his tongue; and (c) the cerebral edema, i.e., swelling of the brain. (Trial Tr. 360-61; *see also* Trial Tr. 348, 353; *see also* Pl.'s Ex. M at 4-5.)

175.     The bite mark was significant to Dr. Jones because it is more probably true than not true that a bite mark is associated with a seizure. (Trial Tr. 348-49.) Dr. Jones testified that individuals who experience a seizure frequently bite their tongues, (Trial Tr. 345), and therefore, intramuscular hemorrhages of the tongue are very common in people who die from seizure disorders. (Trial Tr. 348-349.)

176.     The finding of cerebral edema was also significant to Dr. Jones because it indicated that Solebo survived for a period of time long enough for his brain to swell and that there was blood flow to his brain for a period of time. (Trial Tr. 354.) Dr. Jones explained that the brain does not have time to swell when a person suffers an immediate cardiac event, and therefore cerebral edema is usually not seen in a person who dies from an acute cardiac arrest. (Trial Tr. 354.) In addition, Dr. Jones testified that an anoxic brain, meaning a brain that has been starved of oxygen, (Trial Tr. 349), has a dusky appearance, (Trial Tr. 354). In her experience, the dusky appearance of a brain is usually found in somebody who has had a fatal

66