seizure. (Trial Tr. 354.)

177.    Of the ten diagnoses from the autopsy, the most abnormal was the finding of cardiomegaly, i.e., an enlarged heart weighing 610 grams. (Trial Tr. 369; *see also* Trial Tr. 353.) Owing to the size of Solebo's heart, a cardiac event would have been in Dr. Jones' differential diagnoses for cause of death. (Trial Tr. 356, 369-370.) In that instance, a typical mechanism of death is a fatal arrhythmia. (Trial Tr. 369-71.) Had Solebo suffered an immediate cardiac event, such as a cardiac arrhythmia, however, he would have died quickly and his brain would not have had time to swell. (Trial Tr. 354, 356.) Thus, the finding of cerebral edema was the linchpin to her opinion that Solebo died of a fatal seizure and not of a heart-related illness, such as a fatal cardiac arrhythmia. (Trial Tr. 356, 386.)

178.    Dr. Jones also opined, to a reasonable degree of medical certainty, that Solebo's mechanism of death was more consistent with asphyxia than with cardiac arrest, especially because Solebo had cerebral edema and anoxia. (Trial Tr. 349.) Dr. Jones explained that the breathing pattern of a person who is actively seizing is frequently strenuous. (Trial Tr. 351.) After a seizure has ended, a person's respiratory rate will frequently drop precipitously such that the person is not breathing adequately and can asphyxiate. (Trial Tr. 352.) According to Dr. Jones, at some point Solebo's breathing got slower and more laborious and then eventually stopped. (Trial Tr. 352.) Thus, Dr. Jones opined, to a reasonable degree of medical certainty, that a seizure ultimately caused Solebo's death. (Trial Tr. 352.)

179.    Dr. Jones also testified that Solebo's enlarged heart could have made him more susceptible to having a fatal seizure. (Trial Tr. 354-55.) For instance, Dr. Jones explained that if Solebo's seizures were triggered by a reduction in the flow of oxygen to his brain, then Solebo

could have had a cardiac event, such as an arrhythmia, that lowered the oxygen flow to his brain and then triggered a seizure, thereby resulting in his death. (Trial Tr. 354-55.) Dr. Jones made clear, however, that while she could speculate as to what role Solebo's enlarged heart played in his seizure, as a result of the physical findings at his autopsy she was certain that Solebo did in fact suffer a fatal seizure. (Trial Tr. 353.)

180. On cross-examination, Dr. Jones testified that in cases where the only finding is an enlarged heart and it is not enlarged for a specific reason, such as hypertension, pathologists describe that as hypertrophic cardiomyopathy ("HCM"). (Trial Tr. 370-71.) Thus, the finding of an enlarged heart would suggest that HCM could be a possible cause of death. (Trial Tr. 375-76.) On cross-examination, Defendant posited a theory that Solebo's cause of death was due to HCM. (Trial Tr. 371.) Under Defendant's theory, the mechanism of death could have been a heart arrhythmia precipitating a seizure-like episode or some kind of syncope or loss of consciousness with monoclonic activity leading to death. (*See* Trial Tr. 372.) Dr. Jones made it clear that a death by either of these mechanisms would only be consistent if there were a period of time that would allow the anoxic changes in the brain and the cerebral edema to occur, which is more likely to happen in a true seizure than in seizure-like activity precipitated by an arrhythmia. (Trial Tr. 373.) Dr. Jones also reiterated that cerebral edema is not usually seen in an acute cardiac arrest. (Trial Tr. 373-74.)

181. On redirect examination, Dr. Jones opined, to a reasonable degree of medical certainty, that Solebo did not die of HCM and that none of the possibilities posited by Defendant were the actual cause of death. (Trial Tr. 385.) Dr. Jones also explained that HCM is not listed as a secondary cause of death in this particular instance because when performing the autopsy

68

with all the information she had, and based on all of the findings at autopsy, her opinion was and is that he died as a result of seizure disorder. (Trial Tr. 386.)

### B.  Solebo's toxicology report

182.  Dr. Jones also ordered a toxicology report for Solebo to detect whether there were any drugs, medications, recreational materials or poisons in his body. (*See* Trial Tr. 343, 379.) Solebo's toxicology report raised a red flag because it showed that the level of Dilantin in his blood at the time of his death was negative. (Pl.'s Ex. M at 6; Trial Tr. 344.) A negative Dilantin level indicates either that there was no Dilantin in Solebo's blood or that the level was below the laboratory's level of detection,[5] and that Solebo was definitely sub-therapeutic. (Trial Tr. 347.) If Solebo had a therapeutic level of Dilantin in his blood at the time of death, or if he had a sub-therapeutic level of 7 µg/ml or 8 µg/ml, it would have been detected on the toxicology report. (Trial Tr. 347-48.) Dr. Jones opined that the negative result was significant because if a person is supposed to be taking medication that is known to prevent seizures, then a negative result on the toxicology report indicates that the person was not taking the medication, or was not taking the medication as prescribed, and that the medication was not present in a therapeutic level therefore, making the person more susceptible to having a seizure. (Trial Tr. 346, 385.)

183.  On cross-examination, Dr. Jones testified that although she was able to conclude that Solebo's cause of death was seizure disorder from the autopsy itself, the toxicology report supported the cause of death in that Solebo's Dilantin level was definitely sub-therapeutic. (Trial Tr. 380.) Dr. Jones also testified that in reviewing Solebo's medical records, it seemed to her

---

[5] Although Dr. Jones did not know what the laboratory's level of detection for Dilantin was, she testified that it could be .5 µg/ml or .25 µg/ml. (*See* Trial Tr. 385.)

that his seizure-like activity was not occurring when he was taking his Dilantin and was in the therapeutic range. (Trial Tr. 380.)

## VI.    The Experts

### A.    Dr. Holtzman

184.    Dr. Steven Holtzman testified for the Plaintiff. Dr. Holtzman is a physician currently licensed to practice medicine in the State of Texas. (Trial Tr. 203.) He graduated from the University of Illinois in 1967, and from the Chicago Medical School in 1971, and has since practiced as a physician. (Trial Tr. 203-04.) Dr. Holtzman completed a residency program in general surgery at the University of Illinois in Chicago and became board certified in general surgery; his certification expires in 2020. (Trial Tr. 204.) As part of his residency program, he entered graduate school at the University of Illinois and obtained a Ph.D. in biochemistry in about 1977. (Trial Tr. 204.) At the time of trial, Dr. Holtzman was the medical director of the emergency room in Harlingen, Texas. (Trial Tr. 203, 205.) As an emergency room physician, Dr. Holtzman sees patients who present to the emergency room with a number of emergency problems, including neurological problems such as seizures. (Trial 205-06.) His specific training relates to emergency room care only. (Trial Tr. 261-62.) Dr. Holtzman also works as a medical expert consultant and has testified over one hundred times as a retained expert at various trials. (Trial Tr. 209, 263-64.)

185.    Dr. Holtzman has cared for, diagnosed, and treated between 500 and 1,000 patients who have had seizures. (Trial Tr. 223.) Although Dr. Holtzman does not typically encounter recurring patients as an emergency room physician, he has seen the continuum of problems that patients have over the course of seizure disorder. (Trial Tr. 223-24, 259-60.) Dr.

70

Holtzman summarized his opinions as follows: Solebo suffered from seizure disorder; he had a seizure on May 1, 2007, that proximately caused his death; and he suffered a fatal seizure because the MCC and its staff failed to provide adequate and timely medical care. (Trial Tr. 213.)

### 1.    Testimony on seizure disorder

186.    Dr. Holtzman testified that seizure disorder is defined by the International Anti-Epileptic Society, in part, as "a brain disorder that causes an enduring predisposition to degenerate seizures." (Trial Tr. 213.) Dr. Holtzman also explained that seizures are caused by abnormal electrical activity in the brain and manifest in different ways. (Trial Tr. 214.) For instance, seizure-like activity (which must be present when diagnosing a person with seizure disorder) may include violent convulsions of a person's extremities, loss of consciousness, incontinence, salivation, and lip smacking. (Trial Tr. 215-16.)

187.    According to Dr. Holtzman, a diagnosis of seizure disorder may be made after a person experiences two or more seizures that are unprovoked and separated by more than 24 hours. (Trial Tr. 214, 216.) Physicians base a diagnosis of seizure disorder on a patient examination, the patient's history, any observer input, and the results of neurological examinations. (Trial Tr. 216, 219.) In addition, a diagnosis of seizure disorder is bolstered when a patient who is thought to have seizures is treated with anti-seizure medication and the treatment is effective in that the patient ceases to have seizures for a long period of time. (Trial Tr. 219.) On cross-examination, Dr. Holtzman conceded that a physician might prescribe anti-seizure medication even in the absence of definitive tests that confirm seizure disorder. (Trial Tr. 267.)

188.    Although a patient's history as provided by a patient to a physician is very

71

important in diagnosing seizure disorder, (Trial Tr. 219-20), Dr. Holtzman testified that the most important factor in diagnosing seizure disorder is talking to an observer who witnessed the seizure, (Trial Tr. 216-17). Dr. Holtzman explained that anyone can be an observer because the physician is interested in the description of the seizure-like activity. (Trial Tr. 217.) Dr. Holtzman agreed that while a layperson is not qualified to diagnose a seizure, (Trial Tr. 264, 316), a layperson who witnesses a seizure is competent to report that information to a health care professional. (Trial Tr. 316.) Dr. Holtzman clarified that one does not have to be a physician, nurse, or physician assistant to relay seizure activity that he or she personally observed to a health care professional. (Trial Tr. 317.)

189.    With respect to test results, Dr. Holtzman testified that CT scans of the head, MRIs, and EEGs are useful in diagnosing seizure disorder. (Trial Tr. 217-18.) Dr. Holtzman noted, however, that EEGs in patients with seizure disorder are frequently normal and that it may be important for a physician to provoke a seizure to obtain a reliable result. (Trial Tr. 218-219.) According to Dr. Holtzman, most patients who are diagnosed with seizures lack an abnormal CT scan, MRI, and EEG. (Trial Tr. 218-19.)

190.    Dr. Holtzman testified that both of Solebo's CT scans and EEGs were normal. (Trial Tr. 286-87.) Dr. Holtzman also testified that an MRI being performed on Solebo was reasonable and necessary medical treatment, (Trial Tr. 228), and that an MRI might have shown some abnormality in Solebo's brain that would have confirmed that he had epilepsy, (Trial Tr. 229).

191.    Dr. Holtzman offered his opinion to a reasonable degree of medical certainty, that Solebo suffered from seizure disorder while he was at the MCC. (Trial Tr. 225-27.) The

primary basis for his opinion was that the doctors who treated and examined Solebo believed that

he suffered from seizure disorder and they documented this belief in his medical records. (Trial

Tr. 225-26, 268.) Specifically, Dr. Holtzman pointed out that the Kankakee health care

personnel who examined Solebo thought he had experienced a seizure and that the MCC

Physicians and physician assistants also thought he had seizure disorder. (Trial Tr. 226.)

Although there was no firsthand account from anybody who observed Solebo having a seizure,

(Trial Tr. 285), Dr. Holtzman noted that Solebo was seen by two cellmates in Kankakee who

documented a similar story about Solebo having a seizure, (Trial Tr. 226; *see also* Jt. Ex. 3 at 18,

24). Dr. Holtzman testified that, based on his review of Solebo's medical records, he did not

have any doubt in his opinion that the medical providers at the MCC believed Solebo had seizure

disorder based upon what they wrote in their charts, their deposition testimony, and the fact that

they treated the seizure disorder. (Trial Tr. 232-33.) Lastly, Dr. Holtzman noted that Dr. Jones

concluded that he died from seizure disorder. (Trial Tr. 226.)

192.    Dr. Holtzman's second basis for his opinion that Solebo had seizure disorder lies

in the fact that while Solebo was taking anti-seizure medication he did not have any seizures.

(Trial Tr. 226, 278-79.) Dr. Holtzman testified that when Solebo stopped taking his anti-seizure

medication, his risk of having a seizure quadrupled, and after not taking his anti-seizure

medication for four days, he had a fatal seizure. (Trial Tr. 227.) All of these different aspects led

Dr. Holtzman to believe, to a reasonable degree of medical certainty, that Solebo had seizure

disorder. (Trial Tr. 227.)

193.    On cross-examination, Dr. Holtzman did not dispute that the assessment on

Solebo's Kankakee medical records did not reveal anything other than questionable seizures,

(*See* Trial Tr. 278), or that the MCC Physicians assessed Solebo as having "possible seizure disorder," (*See* Trial Tr. 283). Nevertheless, Dr. Holtzman opined, to a reasonable degree of medical certainty, that the two events at Kankakee that were described as seizure activity, specifically the February 17 and May 24 episodes, were reliable evidence by which a physician could diagnose seizure disorder in Solebo. (Trial Tr. 271-72, 276, 318.)

### 2. Testimony on cause of death

194. Dr. Holtzman also opined that Solebo died of seizure disorder and, more specifically, that Solebo died from Sudden Unexpected Death From Epilepsy ("SUDEP"). (Trial Tr. 234, 236.) Dr. Holtzman based his opinion on the fact that Solebo suffered from seizure disorder and Dr. Jones' conclusion that Solebo's cause of death was seizure disorder. (Trial Tr. 234-35.) According to Dr. Holtzman, the physical findings at autopsy of the bite mark and cerebral edema, and the finding of a nontherapeutic level of Dilantin in Solebo's body were consistent with SUDEP. (Trial Tr. 236-37, 238.)

195. Dr. Holtzman testified that about ten percent of patients who have seizures will eventually die from SUDEP. (Trial Tr. 236, 290.) Dr. Holtzman also testified that the majority of patients that experience SUDEP have subtherapeutic levels of anti-seizure medication. (Trial Tr. 322.) In offering this testimony, Dr. Holtzman relied on a study that demonstrated certain characteristics of patients with SUDEP. (*See* Trial Tr. 323.) Characteristics of patients with SUDEP include dying in the prone position and on a bed, being young, having a subtherapeutic level of Dilantin, as well as having cerebral edema. (Trial Tr. 236-38.) Dr. Holtzman opined that, more likely than not, taking anti-seizure medication substantially and significantly reduces a person's risk of having a seizure and of dying from a seizure or SUDEP. (Trial Tr. 237.) He

testified that while it is possible for a person to have a fatal seizure even when the person is taking anti-seizure medication, anti-epileptic drugs, such as Dilantin, reduce a person's risk of having a seizure. (Trial Tr. 237, 322). Therefore, the fact that Solebo had an undetectable level of Dilantin at the time of his death greatly increased his chances of having a seizure and contributed to his death from a seizure. (Trial Tr. 235-36, 322.)

196.    On cross-examination, Dr. Holtzman explained that subtherapeutic Dilantin levels are part of the syndrome of SUDEP. (Trial Tr. 291.) Dr. Holtzman agreed that a therapeutic range is defined as the range of drug concentration that is associated with the best achievable response in a given person. (Trial Tr. 297.) Generally, the therapeutic range for Dilantin is between 10 µg/ml and 20 µg/ml. (Trial Tr. 235, 292-93.) For some patients, an optimal therapeutic level might lie outside of the range between 10 µg/ml and 20 µg/ml, but treating physicians always want to keep a patient's Dilantin level at 10 µg/ml or higher. (Trial Tr. 295.)

197.    Because Solebo had not been taking Dilantin for four days, Dr. Holtzman knew that his Dilantin level was subtherapeutic. (Trial Tr. 322.) This was confirmed by the autopsy findings. (Trial Tr. 322.)

198.    Dr. Holtzman testified that patients with HCM experience shortness of breath, chest pain, heart palpitations, fainting, dizziness, and also have heart murmurs. (Trial Tr. 241.) Dr. Holtzman pointed out that none of these symptoms were documented in Solebo's Kankakee or MCC medical records. (Trial Tr. 241, 243.) In addition, Dr. Holtzman pointed out that while Solebo had an enlarged heart, other organs, such as his spleen and liver, were also enlarged. (Trial Tr. 241.) Dr. Holtzman also testified that most people would not mistake fainting and shortness of breath with a seizure. (Trial Tr. 242.)

75

### 3.    Testimony on standard of care

199.    Dr. Holtzman first testified that the standard of care in a prison institution is the same as the standard of care outside of a prison institution. (Trial Tr. 212; 263.) Dr. Holtzman also testified that the standard of care dictates that the MCC Physicians were responsible for the care and treatment provided by the MCC physician assistants because they worked under the auspices of the Physicians. (Trial Tr. 233-34.) Therefore, Dr. Holtzman testified that Solebo was under the care of the MCC Physicians upon his arrival at the MCC, and it is not relevant that Solebo was seen by a physician assistant rather than a Physician because the Physicians had the final say in Solebo's care. (Trial Tr. 233.)

200.    Dr. Holtzman testified that the standard of care for treating a patient with seizure disorder requires physicians to conduct examinations, (Trial Tr. 245), to review the patient's medical records and inquire into why a patient might not be taking his medication, (Trial Tr. 245-46), to obtain laboratory results and draw blood in order to monitor levels of anti-seizure medication in a patient's blood, (Trial Tr. 247-48), and to counsel a patient about the risks and benefits of taking or not taking his medication, (Trial Tr. 249-50).

201.    With respect to the frequency of the examinations, Dr. Holtzman testified that in this case, monthly evaluations should have been conducted for Solebo because he was classified as a Care Level 3 patient. (Trial Tr. 245.) MCC policy explicitly provides that a Care Level 3 patient should be seen on a daily to monthly basis. (Pl.'s Ex. Q.) On cross-examination, Dr. Holtzman testified that a patient who is on anti-seizure medication and has not had a seizure for an extended period of time does not need to be seen on a frequent basis and would not need drug monitoring, assuming there are no seizures, there is no change in medication, he is not

76

experiencing any effects, he is completely asymptomatic, and he is compliant with his medications. (Trial Tr. 288.)

202.    Dr. Holtzman also testified that the standard of care required the MCC Physicians to review Solebo's medical records, specifically the MARs. (Trial Tr. 245-46.) The standard of care also required the MCC Physicians to counsel Solebo about his medication and inquire into why he was not taking his medication. (Trial Tr. 245-46.) Dr. Holtzman also testified that he would expect a reasonably well-qualified physician, according to the standard of care, to inquire into the reasons a patient stopped taking his medication, such as whether the patient was experiencing any side effects from the medication, during a physical examination. (Trial Tr. 246.)

203.    Dr. Holtzman testified that the standard of care required the MCC Physicians to obtain blood draws and to follow up on the corresponding laboratory results in order to monitor Solebo's Dilantin level. (Trial Tr. 247-48, 325.) If a blood draw revealed a sub-therapeutic level of Dilantin, Dr. Holtzman testified that the standard of care required the MCC Physicians to counsel Solebo about why he had a sub-therapeutic level. (Trial Tr. 254-55.)

204.    Dr. Holtzman testified that physicians have a duty to explain the risks and benefits of medication to a patient. (Trial Tr. 250.) According to Dr. Holtzman, a physician should consult a patient about the risk of not taking his anti-seizure medication because the risk of not taking the medication could be fatal and could cause a seizure. (Trial Tr. 248-49.) Thus, the MCC Physicians had a duty to tell Solebo that if he did not take his medication, he was at risk of having a seizure. (Trial Tr. 249.) Because seizure disorder carries with it a risk of great bodily injury and a risk of death, (Trial Tr. 255), Dr. Holtzman testified that the MCC Physicians and

personnel also had a duty and obligation under the standard of care to inform Solebo that if he did not take his Dilantin, he could die, (Trial Tr. 249). Dr. Holtzman did not agree that it would cause Solebo great anxiety if he were told that a failure to take his anti-seizure medication could result in death. (Trial Tr. 249.)

205.    Finally, Dr. Holtzman also testified that if Solebo refused to take his medication, the standard of care required the MCC Physicians to administer Solebo's medication involuntarily. (Trial Tr. 251.) For example, Dr. Holtzman suggested that the MCC Physicians could have sprinkled anti-seizure medication on Solebo's vanilla ice cream. (Trial Tr. 251, 326). Such testimony is not credible, however, especially when considered alongside Dr. Curlin's testimony on the most fundamental medical ethics principle of respect for persons. This Court therefore discounts this portion of Dr. Holtzman's testimony.

### 4.    Testimony on breach of the standard of care and proximate cause

206.    Dr. Holtzman also offered his opinion, to a reasonable degree of medical certainty, that Solebo had a fatal seizure because the MCC, through its employees, failed to provide Solebo with timely and adequate medical care. (Trial Tr. 243.) The primary basis for Dr. Holtzman's opinion was that Solebo should have been counseled as to his noncompliance with his medication, but the MCC Physicians failed to do so. (Trial Tr. 243-44.) Specifically, Dr. Holtzman pointed out that one of the reasons the MCC Physicians were unable to consult Solebo was because they did not know he was noncompliant. (Trial Tr. 243-44.) As Dr. Holtzman pointed out, neither Dr. Hoffman nor Dr. Nowakowski was present at the MCC during critical time periods in March, April, and May. (Trial Tr. 244.) In addition, Solebo did not receive monthly examinations as required by the standard of care and the MCC's internal

policies. (Trial Tr. 245.) Had Solebo been examined on a monthly basis, Dr. Hoffman and Dr. Nowakowski would have also been required to review Solebo's MARs and to talk to Solebo about how he was doing with his medication. (Trial Tr. 245-46.) Neither Dr. Hoffman nor Dr. Nowakowski reviewed Solebo's MARs, as they were obligated to do, during critical time periods to determine whether Solebo was compliant with his medication. (Trial Tr. 244, 246.) Dr. Holtzman also pointed out that none of the physician assistants informed the Physicians that Solebo was not taking his medication. (Trial Tr. 244.) Had the MCC Physicians been aware that Solebo was noncompliant, they should have consulted with him, asked him why he was not taking his Dilantin, and informed him that by not taking his medicine he increased the risk of having a seizure. (Trial Tr. 244-45.) According to Dr. Holtzman, Solebo should have been consulted about the risk of not taking his anti-seizure medicine because the risk of not taking it could be fatal. (Trial Tr. 248-49.) Finally, Dr. Holtzman testified, on the basis of his review of the records, that Solebo would have taken his medicine had he received proper counseling. (Trial Tr. 251-52.)

207.    Dr. Holtzman also pointed out that although Dr. Hoffman ordered a blood draw on December 26, 2006, and Solebo's blood was drawn on February 1, 2007, laboratory results for that blood draw were never returned to the MCC. (Trial Tr. 247-28.) Thus, the very last Dilantin level that the MCC personnel obtained for Solebo was from December 2006, when Solebo's Dilantin level was at 11 µg/ml. (Trial Tr. 247.) Dr. Holtzman testified that a Dilantin level obtained by a blood draw would have revealed whether or not Solebo's blood was in the therapeutic range for Dilantin and, most importantly, whether or not he was compliant with his medication in case the doctors were not performing their duty of reading the monthly MARs.

(Trial Tr. 248.) Dr. Holtzman opined, to a reasonable degree of medical certainty, that Solebo was definitively subtherapeutic at the end of April. (Trial Tr. 253-54.) A blood draw taken around this time would have definitively told the MCC Physicians what Solebo's Dilantin level was. (Trial Tr. 254.) Had an MCC Physician been made aware on April 30, while Solebo was alive, that Solebo had not taken his medication the last four days of April, they should have counseled him about why his Dilantin level was zero μg/ml. (Trial Tr. 253-54.) But, Dr. Holtzman agreed that it was impossible for the Physicians to make that determination if they did not know that Solebo had missed his medication. (Trial Tr. 254.)

208.  Dr. Holtzman believed, to a reasonable degree of medical certainty, that Solebo not taking his medication from April 27 through April 30 increased his risk of death from a seizure. (Trial Tr. 255.) Dr. Holtzman also believed, to a reasonable degree of medical certainty, that if Solebo had received his medication on those dates, he would not have died on May 1, 2007. (Trial Tr. 255.)

209.  In sum, Dr. Holtzman testified that through examinations, a review of Solebo's medical records, and blood draws, the MCC personnel knew or should have known that Solebo's Dilantin level was reaching nontherapeutic levels. (Trial Tr. 248.)

**B.  Dr. Curlin**

210.  Dr. Farr Curlin was the Defendant's first expert witness to testify at trial. Dr. Curlin is board certified by the American Board of Internal Medicine with a subspecialty certification in hospice and palliative medicine. (Trial Tr. 565.) He obtained an undergraduate degree at the University of North Carolina and a medical degree in 1998 at the University of North Carolina Medical School. (Trial Tr. 561.) He completed his internal medicine residency

80

in 2001 at the University of Chicago Hospital. (Trial Tr. 561.) From 2001 to 2003, he

participated in the Robert Wood Johnson Clinical Scholars Program, which is a research training

program. (Trial Tr. 561-562, 564.) From 2003 to 2004, he was a fellow at the MacLean Center

for Clinical Medical Ethics at the University of Chicago, which is a program focused on the

moral and ethical dimensions of the practice of medicine. (Trial Tr. 562, 565.) During and after

his fellowship, he practiced outpatient primary care internal medicine at the University of

Chicago Clinics on a part-time basis. (Trial Tr. 562.) Since his fellowship, he has been a part of

the faculty in ethics and he lectures on medical ethics. (Trial Tr. 563, 566.) At the time of trial,

Dr. Curlin was employed at the University of Chicago as an associate professor of medicine and

was also the associate medical director for Horizon Hospice. (Trial Tr. 561-62.) Through his

role with Horizon Hospice, he saw hospice patients in their home. (Trial Tr. 562.) In sum, Dr.

Curlin's area of expertise is on hospice care, ethical issues, and general internal medicine. (Trial

Tr. 658.) Prior to this case, Dr. Curlin had never been retained as an expert witness. (Trial Tr.

571.)

### 1. Testimony on seizure disorder

211. Dr. Curlin opined that Solebo did not have seizure disorder because his autopsy

showed that he had HCM, and in his opinion, there was no definitive evidence that Solebo had

seizure disorder. (Trial Tr. 572.) According to Dr. Curlin, a definitive diagnosis of seizure

disorder can only be made on one of two bases. (Trial Tr. 572.) First, a diagnosis of seizure

disorder may be made on the basis of an expert who witnesses a person having a seizure on more

than one occasion. (Trial Tr. 572-73.) Second, a diagnosis of seizure disorder may be made

where the person has an EEG showing that the person has epileptiform activity. (Trial Tr. 572-

73.) Nevertheless, Dr. Curlin testified that an EEG of a person with seizure disorder could be normal and that EEGs are almost never performed when a person is actively seizing. (Trial Tr. 677.) According to Dr. Curlin, Solebo's Kankakee medical records only demonstrated that Solebo had a "questionable seizure disorder." (Trial Tr. 577, 582.) With regards to the February 23, 2006 episode, Dr. Curlin testified that while the roommate's account that he saw Solebo shaking during the episode could not be a basis on which a physician could reasonably diagnose seizure disorder, it could add to the physician's certainty that the person had a seizure. (Trial Tr. 579-80; Jt. Ex. 3 at 24.)

212. On direct examination, Dr. Curlin also testified that when a person has had "episodes that may be seizures" and has been injured as a result, and a physician believes that there is "a high enough threshold," then the physician may treat the person empirically, meaning that the patient is treated for a possible or likely diagnosis. (Trial Tr. 577-78.) On cross-examination, however, Dr. Curlin testified that once a person has two episodes that a physician "ha[s] a reasonable degree of certainty were seizures, then it is appropriate to start treating for a seizure disorder." (Trial Tr. 664.) Dr. Curlin also testified that it was reasonable for the Kankakee physicians to treat Solebo for a possible seizure disorder. (Trial Tr. 583, 663-64.) Although Dr. Curlin opined that it was reasonable for the Kankakee physicians to treat Solebo for seizure disorder, (Trial Tr. 663), he was not willing to concede that Solebo had two documented seizures at Kankakee, (Trial Tr. 664).

213. On cross-examination, Dr. Curlin also testified that he could not rule out with certainty the possibility that Solebo had seizure disorder, and that it was controlled at the MCC because he was compliant with his medication. (Trial Tr. 656.) Dr. Curlin opined that if Solebo

had seizure disorder, he was therapeutic as a result of the medication he was given until March or April 2007. (Trial Tr. 670-71.) Dr. Curlin agreed that in March or April 2007, when Solebo began missing more doses of his medication, he would have started to become subtherapeutic. (Trial Tr. 671.) Dr. Curlin then conceded that if Solebo had seizure disorder, in March and April 2007, not taking his medication could have contributed to him having another seizure. (Trial Tr. 671.) Dr. Curlin also agreed that seizures could result in death and that a person could die of a fatal arrhythmia following a seizure. (Trial Tr. 671-72.) Finally, Dr. Curlin also agreed that everyone is qualified to report what they see to a physician who is diagnosing seizure disorder. (Trial Tr. 663.)

### 2. Testimony on cause of death

214. Dr. Curlin also gave unconvincing testimony as to Solebo's cause of death at trial. Dr. Curlin, who is neither a cardiologist nor pathologist, opined, to a reasonable degree of medical certainty, that Solebo did not die of seizure disorder, (Trial Tr. 598, 686), and that his cause of death was HCM, with the mechanism of death being a cardiac arrhythmia, (Trial Tr. 588). Dr. Curlin testified that Solebo died of HCM because there are objective findings to support that Solebo had HCM. (Trial Tr. 598.) Dr. Curlin testified that the only type of death that Solebo could have suffered from seizure disorder was SUDEP, but that SUDEP is uncommon. (Trial Tr. 598.) Dr. Curlin testified that the reason he believed that Solebo died of HCM as opposed to seizure disorder was because the likelihood of Solebo dying from HCM was much higher than the likelihood of Solebo dying from seizure disorder. (Trial Tr. 598-99.) Dr. Curlin based his opinion on a number of general statistical studies. (*See* Trial Tr. 598, 608-611.)

215. Dr. Curlin's testimony on cross-examination did not fare well. Dr. Curlin first

conceded that the only training he had in diagnosing and treating HCM was the training he received as an internist and his reading of the literature. (Trial Tr. 673.) Dr. Curlin next testified that if an autopsy had not been performed, he would not have been able to render his opinions regarding HCM. (Trial Tr. 681-82.) He also conceded that Solebo's medical charts prior to his death did not contain a single reference to HCM, that there were no factors while Solebo was alive to diagnose him with HCM other than an enlarged heart, which was not detected while he was alive, and that there were no documented arrhythmias. (Trial Tr. 657, 674.) Although Dr. Curlin testified that Solebo's episodes of losing consciousness were consistent with arrhythmias, he conceded that they were also consistent with seizures. (Trial Tr. 657, 674-75.)

216. Dr. Curlin also testified that the basis for his opinions that Solebo died of HCM as opposed to SUDEP was simply "it's the math." (Trial Tr. 684.) According to Dr. Curlin, HCM posed a higher risk of death than SUDEP. (Trial Tr. 683.) Nonetheless, Dr. Curlin conceded that simply because statistics say a person is more likely to die of cause A over B, it is not necessarily the case that the person will die of cause A. (Trial Tr. 684.) When asked whether it was possible that Solebo died due to a seizure or seizure disorder, Dr. Curlin testified, "I can't with a hundred percent certainty rule that out." (Trial Tr. 598.) Furthermore, on cross-examination, Dr. Curlin was impeached, as he had previously testified at his deposition that it was his opinion that there was no way to know to a reasonable degree of medical certainty whether Solebo died of seizure

84

disorder or a heart ailment.[6]  (Trial Tr. 690-93.)

217.     Given the overall inconsistencies in Dr. Curlin's testimony regarding Solebo's

cause of death, this Court cannot credit his medical conclusions, as they are primarily based on

general statistical studies that have been used to reach broad, unfounded and speculative

conclusions about Solebo's cause of death.

### 3.     Testimony on standard of care

218.     Dr. Curlin testified that the most fundamental medical ethics principle is the

principle of respect for persons.  (Trial Tr. 612.)  According to Dr. Curlin, this principle divides

into two separate moral requirements: First, the requirement to acknowledge autonomy, meaning

the ability to make one's own choices, and second, the requirement to protect those with

diminished autonomy.  (Trial Tr. 613.)  With respect to the first moral requirement, respect for

persons requires that people be given the opportunity to choose what should or should not happen

to them.  (Trial Tr. 613.)  With respect to the second moral requirement, Dr. Curlin testified that

whenever patients have diminished autonomy, such as prisoners, their freedoms are limited and

this principle becomes even more sensitive.  (Trial Tr. 613.)  In those circumstances, physicians

have to be particularly careful not to violate a patient's freedom to refuse medical treatment.

(Trial Tr. 613, 629-30.)  Thus, Dr. Curlin testified that it is absolutely unacceptable to force a

---

[6] Dr. Curlin's deposition testimony, as read into the trial transcript reads as follows:
> Question: So it's your opinion here today that Mr. Solebo died of a
> heart-related ailment and not of a seizure disorder?
> Answer: It is my opinion that's more likely.  The truth is, we don't
> know and there's no way to know.  It's my opinion that there's no
> way to know to a reasonable degree of medical certainty whether he
> died of–which one he died of.

(Trial Tr. 692-93.)

85

mentally competent patient to take medication that he refuses and that the MCC Physicians did not have the option of forcing Solebo to take his anti-seizure medication. (Trial Tr. 613, 627-28.)

219.    On direct examination, Dr. Curlin testified that when prescribing medication, a physician's responsibility is to give a reasonable amount of information so that the patient can come to what is called "informed consent." (Trial Tr. 613-14.) Patients should be given the information they need to understand the benefits of the medication, the purpose for which the medication is being prescribed, the risks of taking the medication, and that the patient is free to say yes or no. (Trial Tr. 613-14, 620.) Dr. Curlin also testified that, based on Solebo's visit to the Neurology CCC on November 30, 2006, he was certain that Solebo knew that Dilantin was for seizure disorder. (Trial Tr. 625.)

220.    Dr. Curlin also testified that when a physician initially prescribes Dilantin to a patient, the standard of care requires the physician to inform the patient about the risks of Dilantin's side effects, which include tremors, nausea, slurred speech, and gingival hyperplasia. (Trial Tr. 664-65.) Dr. Curlin testified that he would also tell seizure patients that they are at risk of injury. (Trial Tr. 665.) Although Dr. Curlin acknowledged that seizure disorder carries with it a risk of death, (Trial Tr. 665-66), he testified that the standard of care did not impose a duty on the MCC Physicians to warn Solebo that he could die if he did not take his medication, (Trial Tr. 630). Dr. Curlin reasoned that the MCC Physicians did not have such a duty because, in his words, "medications do not prevent . . . [SUDEP]." (Trial Tr. 630.) Dr. Curlin testified that the risk of death is so low that it is not recommended that a physician inform the patient of that risk because it potentially adds unwarranted anxiety. (Trial Tr. 630.) Dr. Curlin testified that he customarily does not advise his patients that they have a risk of death from SUDEP because the

risk is extraordinarily small and nothing can be done to reliably prevent SUDEP. (Trial Tr. 630-31.)

221.    On cross-examination, Dr. Curlin's direct testimony was again directly undermined. Dr. Curlin agreed that seizure disorder carries with it a risk of death. (Trial Tr. 666.) And, at his deposition, Dr. Curlin had testified that the only thing a patient could do to prevent his risk of death from seizure disorder was to take his medication.[7] (Trial Tr. 666.) At trial, however, Dr. Curlin was only willing to concede that while it was a reasonable hypothesis that medication reduces someone's risk of death from seizure disorder, he did not know that it had "been shown to be the case." (Trial Tr. 667.) According to Dr. Curlin, while it is true that the purpose of anti-seizure medication is to reduce the likelihood that a patient will have further seizures, "that's not death." (Trial Tr. 667.) Additionally, although Dr. Curlin agreed that anti-seizure medication lessens the chance of having seizures and the potential for complications from those seizures, he did not agree that it was "as simple as taking the medication reduces the chances of dying from a seizure." (Trial Tr. 667.) At his deposition, however, Dr. Curlin had testified that it was that simple; that taking anti-seizure medication lessened a person's chances of dying from a seizure. (Trial Tr. 668.) Dr. Curlin testified that the basis for his opinion was that while medication did not reduce the risk of SUDEP, it did reduce the risk of dying from seizure disorder. (Trial Tr. 668.) Dr. Curlin also conceded that if the medication did not have a function, no one would prescribe it. (Trial Tr. 669.) Dr. Curlin further conceded that people who adhere to their medication reduce their risk of future seizures by percentages. (Trial Tr. 669.)

---

[7] The trial transcript reflects that at his deposition, Dr. Curlin testified that "[t]here is nothing we can do to prevent risk of death from a seizure disorder except to take your medicines, and that's it." (Trial Tr. 666.)

222.     Dr. Curlin also testified on direct examination that if a patient like Solebo did not want to take his medication, it would be reasonable to tell him, "why don't you not take them and we'll follow it, and I want you to let me know first thing if you have a seizure." (Trial Tr. 637.) Dr. Curlin testified that if Solebo had told him that he did not want to take his medication, Dr. Curlin would have advised Solebo that if he had seizure disorder, he may suffer a seizure that he could avoid by taking the medication, but that it was reasonable to try a period off the medications. (Trial Tr. 637.)

223.     Dr. Curlin next testified that the usual practice of competent internists following patients for seizure disorder in terms of frequency of clinic visits is highly variable, depending on whether the patient continues to have seizures and whether they tolerate their medication. (Trial Tr. 640.) According to him, for a patient who is not having seizures and who is not reporting problems with their medications, the frequency of clinic visits could range from once a month to once at every six months, or less frequently. (Trial Tr. 640.) Dr. Curlin testified that Solebo fell into this category and that the usual practice of competent internists taking blood levels of patients with seizure disorder is to order tests only when the physician can use the information to change what the physician is doing in some way. (Trial Tr. 640.)

224.     Dr. Curlin next testified that drug levels are typically obtained after a person is initially given his medication to obtain a reference point. (Trial Tr. 640.) Thereafter, drugs levels are obtained to gauge patient's levels if the patient has recurrent seizures, if there has been an increase or decrease in the medication, or if the physician anticipates changing the medications. (Trial Tr. 640.) Nonetheless, Dr. Curlin testified that the fact that Dr. Hoffman raised Solebo's does of Dilantin in December 2006 did not obligate him to conduct another

Dilantin level test. (Trial Tr. 641.) Dr. Curlin disagreed that Dr. Hoffman should have done

something immediately after Solebo's February 12, 2007 visit to the Neurology CCC to obtain a

laboratory result for his Dilantin level because there was "no pressing reason to get a lab result,"

(Trial Tr. 643), and it would not have changed what the MCC Physicians could have done, (Trial

Tr. 644). Dr. Curlin did agree, however, that a laboratory result for Solebo's Dilantin level could

have been useful for Solebo's future care. (Trial Tr. 644-45.)

225.    Dr. Curlin also opined that engaging in discussions with a patient who is not

adherent to his medications does not increase the likelihood that the patient will take his

medications. (Trial Tr. 646.) Dr. Curlin based his opinion on various statistical studies. (Trial

Tr. 646-47.) Dr. Curlin also believed that Solebo would not have been susceptible to

motivational counseling. (Trial Tr. 652.)

226.    In light of Dr. Curlin's inconsistent testimony on whether medication may reduce

a person's risk of death from seizure disorder, this Court discredits his testimony that the

standard of care did not require the MCC Physicians to inform Solebo that he could die from

seizure disorder. For the same reasons, this Court discredits his testimony that although taking

medication reduces a patient's risk of dying from seizure disorder, it does not reduce the risk of

dying from SUDEP.

### C.    Dr. Ebersole

227.    Dr. John Ebersole was the Defendant's second expert witness. Dr. Ebersole is a

professor of neurology at the University of Chicago. (Trial Tr. 728.) Dr. Ebersole completed his

medical school training at Yale University School of Medicine. (Trial Tr. 728.) He later did a

three-year residency in neurology at Yale University ("Yale"), and between 1978 and 2000, he

89

was on the faculty at Yale. (Trial Tr. 728.) Since 2000, he has been a professor at the University

of Chicago, director of the Adult Epilepsy Center, and director of the Clinical Neurophysiology

Laboratories there. (Trial Tr. 728-729; *see also* Def.'s Ex. 19.) Dr. Ebersole's clinical specialty

in neurology is epilepsy diagnosis and treatment. (Trial Tr. 729.) In his capacity as a professor,

he cares for patients, teaches, and conducts research. (Trial Tr. 730.) With respect to patient

care, he is responsible for the evaluation and treatment of inpatients in the Adult Epilepsy

Monitoring Unit. (Trial Tr. 730.) Dr. Ebersole has an epilepsy clinic where he sees outpatients

weekly and reads EEGs two days a week. (Trial Tr. 730.) With respect to his teaching duties, he

is responsible for teaching fellows, that is to say, physicians who have finished their residency

and are receiving extra education in clinical neurophysiology and epilepsy. (Trial Tr. 730.) He

also conducts clinical neurophysiology research and tries to determine ways to better analyze

electroencephalography in order to help patients with epilepsy. (Trial Tr. 730.) In his clinical

practice, Dr. Ebersole is responsible for the diagnosis, care, and evaluation of patients in the

Epilepsy Monitoring Unit four months a year. (Trial Tr. 730.) He typically has four patients a

week in the monitoring unit. (Trial Tr. 730-31.) He has epilepsy clinic two days a week and sees

approximately 25 patients with epilepsy weekly. (Trial Tr. 731.) Over the course of his career,

Dr. Ebersole has treated or diagnosed thousands of patients with seizure disorder or possible

diagnoses of seizure disorder. (Trial Tr. 731-32.)

### 1.    Testimony on seizure disorder

228.    Dr. Ebersole defined seizure disorder as a disorder of chronic recurrent seizures.

(Trial Tr. 729.) Dr. Ebersole defined a seizure as a brief period of time, lasting a minute or two,

sometimes longer, when the normal control functions in the brain go awry resulting in excessive,

uncontrolled, excitatory activity in the brain. (Trial Tr. 732.) Dr. Ebersole testified that two events is considered the standard threshold for a clinical diagnosis of possible seizure disorder. (Trial Tr. 751.) Dr. Ebersole testified that a patient's history, i.e., his subjective complaint, is very important in diagnosing seizure disorder because it is an intermittent disorder, meaning that a person is completely normal between seizures. (Trial Tr. 732, 750.) According to Dr. Ebersole, history encompasses past medical history, family history, and the patient's past history in terms of the characteristics of the seizures. (Trial Tr. 732-33.)

229.    Dr. Ebersole opined, to a reasonable degree of medical certainty, that Solebo did not have seizure disorder. (Trial Tr. 735.) Dr. Ebersole first based his opinion on the fact that Solebo had normal EEGs and CT scans. (Trial Tr. 735.) Dr. Ebersole also based his opinion on the fact that Solebo did not have a history of seizure disorder prior to his stay at Kankakee, and in Dr. Ebersole's words, "why would he all of a sudden develop seizures de novo in Kankakee without any past history?" (Trial Tr. 736.) On cross-examination, however, Dr. Ebersole conceded that a patient can have a normal EEGs and CT scans and still suffer from seizure disorder, (Trial Tr. 748, 752), and that at some point a patient with seizure disorder has to have their first episode, and that can be at age 7, 23, and even age 50 or 60. (Trial Tr. 752-53.) Dr. Ebersole also testified that there were no clear descriptions of the episodes in Solebo's medical records and some "sketchy statements by cellmates that there was some shaking." (Trial Tr. 736.) According to Dr. Ebersole, it was therefore difficult to say that this was a seizure and not a different type of episode resulting in loss of consciousness. (Trial Tr. 736.)

230.    On cross-examination, Dr. Ebersole also testified that there were only two ways to diagnose a person with seizure disorder: (1) through an actual recording of seizure activity taken

during a long-term EEG; and (2) by a physician witnessing a seizure. (Trial Tr. 750.) With

respect to the first basis, Dr. Ebersole testified that a long-term EEG involves monitoring a

patient from several days to over a week, usually off medications, to see if there are any brain-

wave abnormalities and to see if a seizure can be induced and recorded. (Trial Tr. 749.)

Nonetheless, only if a seizure is recorded will a long-term EEG definitively show whether

someone has seizure disorder. (Trial Tr. 749.) In addition, Dr. Ebersole did not have any

knowledge of a long-term EEG ever being performed in a prison. (Trial Tr. 750.)

231.    With respect to the second basis, Dr. Ebersole was adamant that only the

eyewitness account of a physician was a sufficient basis on which to base a diagnosis of seizure

disorder. (Trial Tr. 750-51.) When pressed about whether a diagnosis of seizure disorder could

be made on the basis of a nurse witnessing a person undergo a seizure five times, Dr. Ebersole

testified that "[i]t would depend on the training of the nurse."[8]  In other words, where a licensed

nurse observes a person having multiple seizures, such history is not enough for Dr. Ebersole to

conclude that the person has seizure disorder. According to Dr. Ebersole, the word of a cellmate

---

[8]  The trial transcript reads:

> Q: You believe that recording seizure activity in that long-term EEG
> or a doctor actually witnessing a seizure is the only way to
> definitively make a diagnosis of epilepsy. Is that true?
> Answer: Correct.
> Question: So if the nurse sees someone having a seizure five times,
> you would still consider that possible seizure disorder and not an
> actual seizure disorder or epilepsy, is that correct?
> Answer: It would depend on the training of the nurse.
> Question: But I think you indicated in your previous testimony that
> the word of a cellmate or a layperson is not good enough. Is that
> correct?
> Answer: It's not good enough.  These people aren't trained to
> differentiate seizures from other episodes of loss of consciousness.

(Trial Tr. 750-51.)

or layperson was also not good enough.  (Trial Tr. 751.)

232.    Because Dr. Ebersole concluded that Solebo did not have seizure disorder, he also opined, to a reasonable degree of medical certainty, that the MCC Physicians unnecessarily prescribed Solebo anti-seizure medication.  (Trial Tr. 753.)  In addition, Dr. Ebersole opined that because Solebo did not need anti-seizure medication, it did not make a difference if Solebo missed taking his prescribed doses of Dilantin.  (Trial Tr. 753.)  Finally, Dr. Ebersole gave his opinion as to whether it was necessary to obtain a blood draw in February 2007 to test Solebo's Dilantin level.  (Trial Tr. 737.)  According to Dr. Ebersole, because Solebo did not have any episodes of loss of consciousness while he was at the MCC, there was no clinical reason that the Dilantin level had to be redone when he had a level of 11 µg/ml in December 2006.  (737-38.)

### 2.    Testimony on cause of death

233.    At trial, Dr. Ebersole also testified as to cause of death.  Dr. Ebersole first testified that the risk of death from a seizure is infinitesimal.  (Trial Tr. 739.)  Dr. Ebersole next opined, to a reasonable degree of medical certainty, that Solebo did not die from SUDEP.  (Trial Tr. 741.)  The basis for his opinion was that Solebo did not fit the picture of a person who is at risk of dying from SUDEP, insofar that he was not an intractable epileptic.  (Trial Tr. 741.)  Dr. Ebersole also found it significant that Solebo was not alone when he died and, according to Dr. Ebersole, most cases of SUDEP occur when a person is sleeping alone.  (Trial Tr. 741-42.)  Dr. Ebersole explained that SUDEP is associated with a grand mal convulsive seizure which involves lots of shaking and noise and therefore, in his view, it would be difficult for somebody on the bunk above a person who is convulsing not to wake up and notice this.  (Trial Tr. 742.)  Dr. Ebersole also testified that there was no evidence from the autopsy that supported a diagnosis

93

of seizure disorder or SUDEP. (Trial Tr. 742.) According to Dr. Ebersole, such evidence would include a finding of a structural abnormality in Solebo's brain. (Trial Tr. 743.) In addition, Dr. Ebersole testified that he personally felt that Solebo did not have seizure disorder, "so he couldn't have died of SUDEP." (Trial Tr. 745.) Therefore, Dr. Ebersole opined that the only other probable cause of death for Solebo was cardiopulmonary compromise of some sort. (Trial Tr. 745.) The basis for his opinion that Solebo had a cardiac event was that Solebo's autopsy had the abnormal finding of an enlarged heart, i.e., cardiomegaly. (Trial Tr. 746.) Dr. Ebersole is neither a cardiologist or pathologist, and this Court accordingly does not credit his opinion on Habib's cause of death.

### 3. Dr. Ebersole's testimony on standard of care

234. Dr. Ebersole testified that it is the standard practice to obtain blood levels periodically if a patient is doing well and to obtain blood levels more often if a patient is doing poorly. (Trial Tr. 737.) Specifically, he testified that it is standard practice to obtain a blood level once a year or, at most, twice a year, in those patients who are not having seizures. (Trial Tr. 737.) Dr. Ebersole also testified that if a person is having seizures while they are receiving a reasonable dose of medication, then it is standard practice to obtain a blood level right away. (Trial Tr. 737.)

235. Dr. Ebersole testified that standard practice does not require physicians to warn a patient that he will die if he does not take his anti-convulsant medications. (Trial Tr. 744.) Dr. Ebersole testified that the main reason for this is that the likelihood of dying is so rare that a warning is not indicated and that such a warning would tend to scare patients more than anything else. (Trial Tr. 744.)

## VII.  Damages Testimony

236.   Solebo was born in Nigeria to Nigerian parents and was a Nigerian citizen. (Damages Hr'g Stip. ¶ 5.)  He immigrated to the United States with his mother when he was five years old.  (Def.'s Ex. 22 at 2; *see also* Damages Hr'g Stip. ¶ 5.)  Solebo was not a citizen of the United States and did not have a green card.  (Damages Hr'g Stip. ¶ 5.)  Although Plaintiff did not know that Solebo was in the United States illegally until after she married him, (June 4, 2012 Tr. 33), she testified that they had long-term plans to move to Nigeria.  (June 4, 2012 Tr. 36.)

237.   Solebo attended school through the 12th grade and received a diploma.  (Def.'s Ex. 22 at 2.)  Up until the day of his arrest, he was enrolled in courses at Harold Washington College.  (Def.'s Ex. 22 at 2; *see also* June 4, 2012 Tr. 9, 26.)  Plaintiff testified that he was studying nursing.  (June 4, 2012 Tr. 9-10.)

238.   Plaintiff met Solebo in the Fall of 2003, and the two became friends.  (June 4, 2012 Tr. 9, 25.)  Plaintiff and Solebo were friends for about one year before they began to date; they dated for approximately one year before they married in a civil ceremony on October 4, 2005.  (June 4, 2012 Tr. 2, 9, 25.)  At the time of their marriage, Plaintiff was 20 years old and Solebo was 22 years old.  (June 4, 2012 Tr. 9.)  Plaintiff described the day as a very happy day for her because she was marrying her best friend.  (June 4, 2012 Tr. 2.)  Plaintiff explained that Solebo was her best friend because he genuinely wanted the best for her.  (June 4, 2012 Tr. 11.)  Solebo listened to her and gave her unbiased opinions and she "just genuinely trusted any and everything that he said."  (June 4, 2012 Tr. 11.)

239.   Prior to their marriage, they lived separate and apart from one another.  (June 4, 2012 Tr. 10.)  After they married, they shared an apartment with Solebo's mother.  (June 4, 2012

Tr. 10, 25-26.)  Prior to their marriage, Solebo worked with his mother in home health care for two months.  (June 4, 2012 Tr. 26.)  Other than this job, Plaintiff testified that she was not aware of any other paid employment positions that Solebo had held.  (June 4, 2012 Tr. 26.)  Plaintiff also testified that Solebo's mother paid the rent on the apartment that all three shared and that Solebo's mother supported him financially.  (June 4, 2012 Tr. 26.)

240.     While they were newlywed, between October 2005 and January 2006, Plaintiff testified that she and Solebo were "happy, living together, still getting to know one another in a married sense, living with one another."  (June 4, 2012 Tr. 10-11.)  She described their relationship as follows: "Excellent.  I loved him.  We loved each other.  I think it was a pretty good relationship."  (June 4, 2012 Tr. 11.)  During this time period, she and Solebo spent time together by going out to eat, going to the movies or the park, or taking walks.  (June 4, 2012 Tr. 11.)  Plaintiff and Solebo discussed having children, which they both wanted to do.  (June 4, 2012 Tr. 11.)  Solebo wanted to have at least five children.  (June 4, 2012 Tr. 11.)

241.     On cross-examination, Plaintiff testified that less than a month into her marriage, on November 2, 2005, when she was 20 years old, she called the Chicago Police Department to the apartment she shared with Solebo after they had a fight.  (June 4, 2012 Tr. 29, 35.)  Plaintiff told the responding police officer that Solebo had punched her in the face, and Solebo was arrested that day.  (June 4, 2012 Tr. 29.)  As a result of this incident, Plaintiff signed a criminal complaint[9] charging Solebo with domestic battery.  (June 4, 2012 Tr. 29-31; Def.'s Ex. 6, Misdemeanor Compl. at 668.)  Plaintiff's signature appears under a sentence that reads, "The

---

[9] Although the Court admitted the criminal complaint that was signed by Plaintiff into evidence, it excluded the arrest report.  (June 4, 2012 Tr. 39.)

complainant, being first duly sworn on oath, deposes and says that he/she read the foregoing complaint by him/her subscribed and that the same is true." (Def.'s Ex. 6, Misdemeanor Compl. at 668.) At trial, however, Plaintiff testified that Solebo did not in fact punch her in the face and that she had lied to the responding police officer on the day of the incident. (June 4, 2012 Tr. 31.) On re-direct examination, Plaintiff testified that she and Solebo were watching television when they got into an argument and he broke her phone. (June 4, 2012 Tr. 34.) Plaintiff called the police to retaliate against him. (June 4, 2012 Tr. 34.) Plaintiff acknowledged that she had made a mistake, but testified that it was the only way she knew to get back at Solebo at the time because she was "young" and "stupid." (June 4, 2012 Tr. 34.) Plaintiff also testified that Solebo never struck her. (June 4, 2012 Tr. 34.) After the incident, they got Plaintiff a new phone and made up, and the incident was forgotten. (June 4, 2012 Tr. 35.)

242.    At the end of November 2005, Plaintiff began to live with her father on a part-time basis. (June 4, 2012 Tr. 32.) According to Plaintiff, she stayed with her father or other family members after she was married for convenience or safety's sake, but it did not have anything to do with her relationship with Solebo. (June 4, 2012 Tr. 35.) Plaintiff testified that there was nothing unusual with her staying at her father's once in a while. (June 4, 2012 Tr. 36.)

243.    Plaintiff and Solebo were living together at the time of Solebo's arrest. (June 4, 2012 Tr. 12.) Plaintiff testified that Solebo did not take any prescription medications at any point in time during which she knew him. (June 4, 2012 Tr. 12.) Plaintiff also testified that during their marriage and before Solebo's arrest, Solebo did not have any health issues or problems, nor was he under the care of any doctor, to her knowledge. (June 4, 2012 Tr. 12.)

244.    Solebo was arrested on January 25, 2006, during an undercover investigation in

97

which he delivered heroin to an undercover officer. (Stip. Ex., Arrest and Interview of Habib Solebo 01/25/06 at 7; Damages Hr'g Stip. ¶¶ 3-4; Def.'s Ex. 18, Photos 6, 9.) At the time of his death, Solebo was awaiting trial on charges of conspiracy to distribute and to possess heroin, distribution of heroin, and possession with intent to distribute and distribution of heroin. (Def.'s Ex. 8, Indictment at 1-3, *United States v. Solebo and Mustapher*, No. 06 CR 61 (N.D. Ill. Feb. 23, 2006).) Plaintiff testified that she did not realize Solebo was dealing in heroin before he was arrested and that she was surprised about the basis for his arrest. (June 4, 2012 Tr. 33.)

245. On March 1, 2006, Special Agent Robert Nicodemus lodged an Immigration Detainer - Notice of Action ("Detainer") with the MCC. (Def.'s Ex. 2 at 469.) The Detainer notified the MCC that the Immigration and Naturalization Service ("INS") had initiated an investigation to determine whether Solebo was subject to removal from the United States. (*Id.*) The Detainer required that the MCC detain Solebo for 48 hours to allow adequate time for the INS to assume custody over him. (*Id.*) The INS requested that the MCC notify the Department of Homeland Security of Solebo's release in advance or in the event of his death or transfer to another institution. (*Id.*)

246. Shortly after Solebo was arrested, Plaintiff learned that she was pregnant. (June 4, 2012 Tr. 12.) Plaintiff told Solebo that she was pregnant, and they were both happy with this news. (June 4, 2012 Tr. 13.) Plaintiff testified that there was never any doubt that she would have the baby and continue her marriage with Solebo. (June 4, 2012 Tr. 12.)

247. Plaintiff testified that she visited Solebo in prison every available visiting day that she could make during the length of his incarceration. (June 4, 2012 Tr. 13-14.) At Kankakee, visits were every other week, so Plaintiff saw Solebo every two weeks. (June 4, 2012 Tr. 14.)

The main topic of conversation during their visits was her pregnancy. (June 4, 2012 Tr. 14.) While Solebo was incarcerated at Kankakee, Plaintiff spoke to Solebo on the telephone if not every day, then every other day. (June 4, 2012 Tr. 14.)

248.    After Solebo was transferred to the MCC, Plaintiff visited him every visiting day she could and spoke to Solebo on the telephone if not every day, then every other day. (June 4, 2012 Tr. 15.) At the MCC, visits occurred every week, but every other week there were two visiting days. (June 4, 2012 Tr. 15.) Plaintiff did not visit if she was sick due to her pregnancy and she did not visit immediately after Jadesola's birth. (June 4, 2012 Tr. 15.) Solebo met Jadesola within a week of her birth and was very happy to see her. (June 4, 2012 Tr. 16.) Over the following months, Plaintiff and Jadesola continued to visit Solebo. (June 4, 2012 Tr. 16.)

249.    Solebo selected their daughter's name, Jadesola, which means with blessings. (June 4, 2012 Tr. 16-17.) Plaintiff testified that Solebo selected that name because he felt he was very blessed to have his first daughter. (June 4, 2012 Tr. 17.) Plaintiff spoke to Solebo right after giving birth and before completing their daughter's birth certificate. (June 4, 2012 Tr. 16.) Their daughter's middle name, Yurianna, is derived from Solebo's middle name, which is Olayuri. (June 4, 2012 Tr. 16.) Solebo did not have any other children, to Plaintiff's knowledge. (June 4, 2012 Tr. 17.) During the first few months of Jadesola's life, Plaintiff took her daughter to visit Solebo every visiting day that Plaintiff herself could make. (June 4, 2012 Tr. 17.) When Plaintiff could not make a visit, Solebo's mother took Jadesola to visit Solebo. (June 4, 2012 Tr. 17.)

250.    On May 1, 2007, the MCC Warden told Plaintiff over the phone that Solebo had died. (June 4, 2012 Tr. 17.) Jadesola was six months old at the time of Solebo's death. (June 4,