2012 Tr. 18.) At the time of Solebo's death, Plaintiff was not employed and was living with Solebo's mother. (June 4, 2012 Tr. 18.)

251.    When asked to describe how Solebo's death has affected her, Plaintiff testified that she sometimes feels like a failure and like she has been cheated. (June 4, 2012 Tr. 18.) On some days, Plaintiff feels as if she can make it through and that everything is going to be okay, but on other days, she cannot get out of bed and function. (June 4, 2012 Tr. 18.) Plaintiff also testified that she has a hard time dealing with people because she feels like anybody can be taken away from her. (June 4, 2012 Tr. 18.) Plaintiff always thought that she would have a long marriage with children, and in her words, "to have that taken away is just–it's hard to face every day." (June 4, 2012 Tr. 18.) Plaintiff did not intend to be a single parent when she married Solebo. (June 4, 2012 Tr. 18.)

252.    After Solebo passed away, Plaintiff could not look at her daughter for a period of time "[b]ecause she looked so much like him that it was almost like looking at a ghost every day." (June 4, 2012 Tr. 21.) Plaintiff testified that it was hard for her to deal with emotionally. (June 4, 2012 Tr. 21-22.) At times, she could not look at her daughter, could not hold her, and could not do anything for her because she looked like him. (June 4, 2012 Tr. 21-22.) Plaintiff relied heavily on the help of her mother as well as Solebo's mother during this time. (June 4, 2012 Tr. 22.)

253.    According to Plaintiff, it took about two years for her to feel like her life was getting back to normal. (June 4, 2012 Tr. 22.) On cross-examination, Plaintiff testified that she saw a psychiatrist to treat her emotional distress at the Erie Family Health Facility. (June 4, 2012 Tr. 27.) Although she was prescribed medication, she refused it. (June 4, 2012 Tr. 27.) At her

deposition, however, Plaintiff testified that she had not sought medical treatment for depression, that she had not seen a psychiatrist because of the lengthy waiting period, and that she had not been prescribed any medications. (June 4, 2012 Tr. 27-28.)

254.     Plaintiff testified that she has explained to her daughter that her father is in heaven. (June 4, 2012 Tr. 22.) Her daughter talks to her father every night when she says her prayers. (June 4, 2012 Tr. 22.) Plaintiff testified that her daughter does not remember visiting her father, but that she talks about it with her so much that her daughter thinks she remembers. (June 4, 2012 Tr. 23.) Her daughter is inquisitive and asks Plaintiff questions about her father such as whether he is going to come back from heaven, how they met, how long they lived together, and how long she was in Plaintiff's stomach before Solebo passed away. (June 4, 2012 Tr. 23.) Her daughter wants to know everything about her father. (June 4, 2012 Tr. 23.) Plaintiff testified that her daughter is barely beginning to grasp her father's death, as evidenced by the questions she asks, such as why her dad cannot pick her up from school or why he cannot come down from heaven to join the family for holidays. (June 4, 2012 Tr. 23.)

255.     Plaintiff maintains a close relationship with Solebo's mother and intends to continue doing so. (June 4, 2012 Tr. 24-25.) Plaintiff's daughter has a close relationship with Plaintiff's parents and Solebo's mother. (June 4, 2012 Tr. 24.) For example, Plaintiff's parents and Solebo's mother attended Jadesola's recent graduation. (June 4, 2012 Tr. 24.)

256.     At the time of trial, Plaintiff was employed full-time as a Customer Account Executive at a call center for Comcast. (June 4, 2012 Tr. 6-7.) Plaintiff did not have any plans to remarry at the time of trial and she plans to continue working. (June 4, 2012 Tr. 25.) Plaintiff also testified that no one currently lives with her and her daughter. (June 4, 2012 Tr. 25.)

Plaintiff testified that her daughter, Jadesola, lives with her, that she takes care of her, and that Jadesola is about to begin Kindergarten. (June 4, 2012 Tr. 6.)

257.    Dr. Holtzman testified that the survival rate of patients newly diagnosed with seizure disorder, such as Solebo, is lower as compared to people who do not have seizures. (Trial Tr. 256.) As those patients live longer, however, their mortality rate is approximately the same as people who do not have seizures. (Trial Tr. 256.) Dr. Holtzman testified, to a reasonable degree of medical certainty, that Solebo's life expectancy was approximately 48 years. (Trial Tr. 256.) In Dr. Holtzman's opinion, Solebo was in good health and he did not suffer from sustained hypertension. (Trial Tr. 287.)

258.    Dr. Curlin also testified as to life expectancy. Dr. Curlin testified that Solebo's life expectancy would be significantly lower than the average person his age. (Trial Tr. 653.) The first basis for Dr. Curlin's opinion was the fact that Solebo had HCM, which carries with it an increased risk of death, (Trial Tr. 653), and which over time progresses to congestive heart failure and eventually to end-stage heart failure, (Trial Tr. 653). The second basis for Dr. Curlin's opinion was that Solebo was morbidly obese, which is associated with an increased risk of death between two and twelve times that of the normal population. (Trial Tr. 653.) Dr. Curlin also opined that Solebo had a history of smoking. (Trial Tr. 653.) Assuming that Solebo had seizure disorder, Dr. Curlin testified that Solebo would not be able to reduce his susceptibility to SUDEP by taking epileptic drugs. (Trial Tr. 654.)

259.    Finally, photographs were admitted and received into evidence including a photograph of Solebo and Plaintiff eating out at a dinner, and a photograph of them with their family members on their wedding day. (Pl.'s Ex. P.) Photographs of their daughter at about six

102

months of age, age three, and age five were also admitted and received into evidence. (June 4, 2012 Tr. 19-21; Pl.'s Ex. Z.)

## CONCLUSIONS OF LAW

### I.     Legal Standards

1.      Plaintiff brings this action against the United States pursuant to the FTCA, 28 U.S.C. §§ 1346(b), 2671 *et seq*. The FTCA "was designed primarily to remove the sovereign immunity of the United States from suits in tort and, with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances." *Richards v. United States*, 369 U.S. 1, 6 (1962); *accord Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1296-97 (7th Cir. 1991) (The FTCA "effects a limited waiver of sovereign immunity for the United States."). The FTCA provides a remedy for "personal injury or death caused by the negligent or wrongful act or omission" of Government employees while acting within the scope of their employment. 28 U.S.C. § 1346(b)(1). The Act imposes liability "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Morisch v. United States*, 653 F.3d 522, 530 (7th Cir. 2011) (quoting 28 U.S.C. § 1346(b)(1) (internal quotation marks omitted)); *accord Massey v. United States*, 312 F.3d 272, 280 (7th Cir. 2002). In other words, "the FTCA incorporates the substantive law of the state where the tortious act or omission occurred." *Midwest Knitting Mills, Inc.*, 950 F.2d at 1297. In this instance, Solebo died while in custody at the MCC, which is located in Chicago, Illinois. Thus, the cause of action arose in Illinois, and Illinois State law governs.

2.      As an initial matter, this Court notes that prior to bringing an action pursuant to

103

the FTCA, a plaintiff must have exhausted her administrative remedies. Specifically, a plaintiff "shall have first presented the claim to the appropriate Federal agency and [the plaintiff's] claim shall have been finally denied by the agency in writing . . . ." 28 U.S.C. § 2675(a). The Federal agency's failure "to make final disposition of a claim within six months after it is filed" is considered a final denial of the claim. *Id.* Prior to filing her suit, Plaintiff filed a Claim for Damage, Injury, or Death with the MCC. (R. 101, Fifth Am. Compl. ¶ 22.) It is undisputed that the MCC failed to make a final disposition of Plaintiff's claim within six months, and therefore its failure is deemed a final denial of her claim. *See* 28 U.S.C. § 2675. Accordingly, Plaintiff exhausted her administrative remedies as required by the FTCA.

3.     Plaintiff contends that Solebo's death was caused by the negligent and wrongful acts and omissions of the MCC's physicians, staff, supervisors, employees, agents and apparent agents, including but not limited to Dr. Hoffman. (R. 1, Fifth Am. Compl. at 2-8.) Plaintiff further contends that if the United States were a private person it would be liable under the Illinois Wrongful Death Act for Solebo's death because of the negligent acts of the MCC's employees, and it is therefore liable under the FTCA. (*Id.* at 1-2, 10-11.)

4.     The Illinois Wrongful Death Act provides a cause of action, "[w]henever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof." 740 Ill. Comp. Stat. 180/1; *Williams v. Manchester*, 888 N.E.2d 1, 10 (Ill. 2008) ("An injury resulting from the wrongful act, neglect, or default of another gives the victim, if she survives the injury, a right of action; if the victim dies, the [Wrongful Death] Act transfers the right of action to the victim's personal representative.").

104

"A wrongful death action covers the time after death and addresses the injury suffered by the next of kin due to the loss of the deceased rather than the injuries personally suffered by the deceased prior to death." *Wyness v. Armstrong World Indus., Inc.*, 546 N.E.2d 568, 571 (Ill. 1989). The action allows a surviving spouse and the next of kin "to recover damages for their own loss based on the wrongful actions of another," and "is premised on the deceased's potential, at the time of death, to initiate an action for injury." *Id.* at 571-72 (citing *Biddy v. Blue Bird Air Serv.*, 30 N.E.2d 14, 18 (Ill. 1940); *Mooney v. City of Chi.*, 88 N.E. 194, 196 (Ill. 1909)); *see also Carter v. SSC Odin Operating Co.*, 976 N.E.2d 344, 354 (Ill. 2012) (noting that a wrongful death action is brought for the benefit of the surviving spouse and next of kin who are the true parties in interest). Because the "action is derived from the decedent's cause of action, and is limited to what the decedent's cause of action against the defendant would have been had the decedent lived," the Illinois Supreme Court has said that the Illinois Wrongful Death Act "incorporates into the statutory right of action the familiar concepts of tort liability,—negligence, contributory negligence, and the like." *Williams*, 888 N.E.2d at 12 (quoting *Welch v. Davis*, 101 N.E.2d 547, 548 (Ill. 1951)) (internal quotation marks omitted). Here, Plaintiff bases her wrongful death action on the alleged medical negligence of the MCC personnel in caring for Solebo. (R. 101, Fifth Am. Compl. at 2-8.) In addition, Plaintiff's complaint contains allegations of negligence based on the failure to counsel Solebo about the risks of not taking medication that he was prescribed. (R. 101, Fifth Am. Compl. at 5.)

     5.     Under Illinois law, to prevail in a medical negligence case,[10] a plaintiff must

---

[10] Under Illinois law, medical negligence is the same cause of action as medical malpractice. *Wipf v. Kowalski*, 519 F.3d 380, 384 (7th Cir. 2008) (citing *Jinkins v. Evangelical Hosps. Corp.*, 783 N.E.2d 123, 126-27 (Ill. App. Ct. 1st Dist. 2002)).

establish (1) the proper standard of care against which a physician's conduct is measured, (2) a

negligent failure to comply with the applicable standard of care, and (3) a resulting injury

proximately caused by the physician's lack of skill or care. *Sullivan v. Edward Hosp.*, 806

N.E.2d 645, 653 (Ill. 2004) (identifying elements of "a negligence medical malpractice case");

*Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000) (listing elements of an "action for medical

negligence"); *Purtill v. Hess*, 489 N.E.2d 867, 872 (Ill. 1986) (same). Generally, the plaintiff

bears the burden of proving all three elements through the testimony of medical experts.

*Wilbourn v. Cavalenes*, 923 N.E.2d 937, 949 (Ill. App. Ct. 1st Dist. 2010); *Bergman v. Kelsey*,

873 N.E.2d 486, 500 (Ill. App. Ct. 1st Dist. 2007) ("A plaintiff must generally prove the elements

of a medical negligence cause of action through medical expert testimony.") (citing *Knauerhaze

v. Nelson*, 836 N.E.2d 640, 652 (Ill. App. Ct. 1st Dist. 2005)); *cf. Purtill*, 489 N.E.2d at 872

("Unless the physician's negligence is so grossly apparent or the treatment so common as to be

within the everyday knowledge of a layperson, expert medical testimony is required to establish

the standard of care and the defendant physician's deviation from that standard."); *see also Wipf

v. Kowalski*, 519 F.3d 380, 384 (7th Cir. 2008) ("Generally, these elements must be established

through expert testimony."). The Seventh Circuit has held that Illinois' rule that a plaintiff must

present expert testimony to establish medical negligence is not a procedural rule governed by the

federal law of procedure and evidence, but rather is substantive and is therefore "part of the

Illinois law of medical malpractice incorporated into the federal law of [FTCA actions] by 28

U.S.C. §§ 1346(b) and 2674." *Murrey v. United States*, 73 F.3d 1448, 1456 (7th Cir. 1996);

*accord Gipson v. United States*, 631 F.3d 448, 452 (7th Cir. 2011) (discussing the holding in

*Murrey*, 73 F.3d at 1456). Thus, Illinois' rule requiring a plaintiff to present expert testimony is

binding on this Court.

6. In a medical negligence action that raises a lack of informed consent, "[t]he elements of the informed consent action parallel those of an ordinary malpractice claim." *Roberts v. Patel*, 620 F. Supp. 323, 325 (N.D. Ill. 1985). A plaintiff must establish that the physician had a duty to disclose material risks, that the physician failed to disclose such risks, that as a direct and proximate result of the physician's failure to disclose, the patient consented to treatment she otherwise would not have consented to, and that the plaintiff was injured by the treatment. *Coryell v. Smith*, 653 N.E.2d 1317, 1319 (Ill. App. Ct. 3d Dist. 1995) (citing *Roberts*, 620 F. Supp. at 325.) The purpose behind the doctrine of informed consent "is to afford the patient the ability to make an informed, intelligent decision regarding medical treatment he is to receive." *Roberts*, 620 F. Supp. at 325.

7. Plaintiff contends that the MCC committed no fewer than seventeen wrongful acts or omissions, including: failing to provide Solebo with proper and adequate medical attention; failing to properly and adequately counsel Solebo about the risks caused by a failure to take his prescribed Dilantin; failing to recognize Solebo's non-therapeutic levels of Dilantin; failing to monitor Solebo's condition; failing to follow MCC policies, procedures, rules, and regulations for administering medication to Solebo; and failing to involuntarily administer Dilantin to Solebo. (R. 101, Fifth Am. Compl. at 5-7.)

8. During closing arguments, the Government argued that there were five reasons why Plaintiff had not met her burden of proof. (Trial Tr. 823-24.) According to the Government, the first issue that negates Plaintiff's claims is whether Solebo had seizure disorder. (*Id.*) The second issue is whether Solebo's death was caused by his seizure disorder; the third

107

issue is whether his failure to take his medications was the reason he died of seizure disorder. (*Id.*) The fourth issue is whether the BOP was responsible for Solebo's failure to take his medication. (*Id.*) And, the fifth issue is whether Solebo is more than 50% at fault and therefore barred from recovery under Illinois' comparative negligence laws. (*Id.*) This Court addresses each issue in turn.

## II. Whether Solebo had seizure disorder

9.      The parties have presented this Court with a "battle of the experts" on the issue of whether Solebo had seizure disorder. Plaintiff offered the testimony of one expert witness, Dr. Holtzman, who opined that Solebo did suffer from a seizure disorder. (Trial Tr. 225-27.) On the other hand, the Government offered the testimony of two expert witnesses, Dr. Curlin and Dr. Ebersole, who opined that Solebo did not suffer from seizure disorder. (Trial Tr. 572, 735.) In the case of dueling experts, the fact finder must "determine what weight and credibility to give the testimony of each expert and physician." *Gicla v. United States*, 572 F.3d 407, 414 (7th Cir. 2009) (affirming district court's factual findings and its credibility assessments where they were well-supported by the record and concluding that the court had not committed an error); *accord Morisch*, 653 F.3d at 529 ("In a case of dueling experts, such as this one, 'it is left to the trier of fact, not the reviewing court, to decide how to weigh the competing expert testimony.'") (quoting *Wipf*, 519 F.3d at 385; citing *Gicla*, 572 F.3d at 414); *Livermore v. Amax Coal Co.*, 297 F.3d 668, 672 (7th Cir. 2002) (where an ALJ gave more weight to the opinions of experts who were more qualified and whose opinions were more specific and well-supported, the ALJ's finding was held to be supported by substantial evidence upon review); *see also Campbell v. United States*, 904 F.2d 1188, 1193 (7th Cir. 1990) ("[T]he trier of fact is to determine the weight to be

given to the testimony of expert medical witnesses, and [the Seventh circuit] will defer to the credibility assessments made by the trier of fact.") (internal quotation marks omitted) (quoting *Payne v. United States*, 711 F.2d 73, 76 (7th Cir. 1983)). This is because the "trial judge is in the best position to judge the credibility of witnesses who offer conflicting testimony." *Morisch*, 653 F.3d at 529 (quoting *Spurgin-Dienst v. United States*, 359 F.3d 451, 453 (7th Cir. 2004) (internal quotation marks omitted)).

10. This Court concludes that all of the evidence and testimony presented at trial establishes that it was more probable than not that Solebo had seizure disorder. In reaching this result this Court finds Dr. Holtzman's testimony to be overwhelmingly credible and credits his expert opinion that Solebo had seizure disorder. Although Dr. Holtzman has not followed a patient throughout the course of his treatment for seizure disorder, he testified that he has treated the continuum of problems presented by seizure disorder patients. Dr. Holtzman's testimony was clear, and he supported his opinions with detailed explanations that were reasonable. This Court also considers Dr. Jones' testimony that Solebo died from seizure disorder. This Court finds her testimony to be fully credible. Although Dr. Jones was not called as an expert witness, she was subpoenaed to testify at trial and was therefore the only objective medical witness who testified. In addition, despite this Court's rulings that would have allowed the Government's designated pathologist to testify, (Trial Tr. 614-15), the Government elected not to call its designated pathologist at trial. Thus, Dr. Jones was the only pathologist to testify at trial. On the whole, this Court finds that Dr. Jones was the most credible medical witness, and that Dr. Holtzman was the second most credible medical witness.

11. As a preliminary matter, all three experts agreed that a patient's history, as

109

provided by a patient to a physician, is very important in diagnosing seizure disorder. (Trial Tr. 219-20, 663, 750.) Solebo's medical history indicates that his first seizure occurred on February 17, 2006, and that he was treated in an emergency room for this episode. Following Solebo's visit to the emergency room, Dr. Long examined Solebo and described his assessment at that time as loss of consciousness accompanied with shaking activity. Dr. Long's medical judgment was that Solebo had experienced a seizure as his notes clearly instruct that if Solebo had further seizures, empiric Dilantin should be commenced. Solebo's second seizure occurred on May 24, 2006. Solebo reported to a Kankakee physician assistant that he woke up on the floor and that his cellmate told him that he was shaking. Solebo immediately requested that he be put back on Dilantin. Dr. Holtzman opined, to a reasonable degree of medical certainty, that the February 17 and May 24 episodes at Kankakee were reliable evidence by which a physician could diagnose seizure disorder in Solebo. (Trial Tr. 271-72, 276, 318.)

12.     Significantly, the Kankakee medical records document that both episodes were witnessed by Solebo's cellmates. Dr. Holtzman testified that anyone can be an observer, and that for a diagnosis of seizure disorder to be valid, a physician does not need to witness a seizure. Dr. Curlin agreed that everyone is qualified to report what they see. Notably, Dr. Hoffman testified that a primary care doctor generally diagnoses seizure disorder by taking the history from the patient and an observer, or both. (Trial Tr. 443.) Dr. Hoffman also testified that it absolutely does not have to be a physician who witnesses a seizure, (Trial Tr. 442-43), which is entirely consistent with Dr. Holtzman's testimony. Again, this Court finds Dr. Holtzman's testimony overwhelmingly credible.

13.     By contrast, Dr. Ebersole testified that a physician can only diagnose seizure

110

disorder if the physician witnesses the episode. When pressed on this testimony, Dr. Ebersole was adamant that even where a licensed nurse observes a person having multiple seizures, such observations are not enough for a physician to conclude that the person has seizure disorder. This testimony is incredible and contrary to Dr. Holtzman's testimony, which this Court fully credits, and also contrary to Dr. Hoffman's testimony who attested to the fact that it absolutely does not have to be a physician who witnesses a patient having a seizure in order to diagnose a patient with seizure disorder. (Trial Tr. 442-43.) In Dr. Ebersole's view, unless there is a long-term EEG that records a seizure or a physician or appropriately trained nurse is able to witness seizures in a person, there can be no valid diagnosis of seizure disorder. This testimony is simply not worthy of credence. Accordingly, this Court discredits Dr. Ebersole's testimony as to how to diagnose seizure disorder.

14.     Between May 2006 and April 2007, Solebo took Dilantin and during that time, he did not have another seizure. As Dr. Jones noted, Solebo's seizure-like activity was not occurring when he was taking Dilantin and was in the therapeutic range. In late April 2007, Solebo missed successive doses of Dilantin. Dr. Jones' testimony was unequivocal that, in light of her findings at autopsy, Solebo had a third and fatal seizure on May 1, 2007. (Trial Tr. 383.) Solebo's autopsy showed that he had a bite mark on the left tip of his tongue, cerebral anoxia, and cerebral edema, all of which are consistent with having a fatal seizure. On cross-examination, Dr. Jones's testimony was unshaken; she testified that the anoxic changes and cerebral edema she found in Solebo's brain are more likely to occur in a true seizure than in a seizure-like episode that is precipitated by a cardiac arrhythmia. Because Solebo experienced two or more unprovoked seizures 24 hours apart, this Court concludes that Solebo had seizure

111

disorder.

15.     This Court finds the testimony of Dr. Curlin and Dr. Ebersole incredible and unreliable as both of them were significantly impeached during trial. Dr. Curlin's testimony is unreliable for a number of reasons. On cross-examination, Dr. Curlin testified that once a person has two episodes that a physician "ha[s] a *reasonable degree of certainty were seizures*, then it is appropriate to start treating for a seizure disorder." (Trial Tr. 664) (emphasis added). Dr. Curlin also testified that it was reasonable for the Kankakee physicians to treat Solebo for a possible seizure disorder. Nevertheless, Dr. Curlin was not willing to concede that Solebo had two documented seizures at Kankakee. Dr. Curlin's testimony is contradictory. If it was reasonable for the Kankakee physicians to treat Solebo for seizure disorder, they must had a reasonable degree of certainty that Solebo's two episodes were indeed seizures and not merely "possible seizures."

16.     Dr. Curlin also testified that after Solebo was transferred to the MCC, the MCC Physicians did not have a basis on which to diagnose Solebo with seizure disorder because "all they had was his report that . . . he had a seizure disorder, and they knew he was taking Dilantin." (Trial Tr. 583.) Although Dr. Curlin's testimony that the MCC Physicians did not have Solebo's Kankakee medical records is technically accurate, it overlooks the fact that not a single MCC employee made any attempt to obtain Solebo's Kankakee medical records, which could have been useful in definitively diagnosing Solebo with seizure disorder while he was at the MCC. Dr. Curlin's testimony on this point also discounts the fact that when Solebo presented to the MCC, he was taking Dilantin, an anti-seizure medication requiring a prescription and not merely an over-the-counter drug like Tylenol. As Dr. Nowakowski testified, she had never written a

112

prescription for a controlled substance, such as Dilantin, when it was not medically necessary for a patient. (Trial Tr. 526.) Dr. Curlin's statement is also at odds with his testimony that a patient's history, as provided by the patient, is very important to the patient's diagnosis. (Trial Tr. 663.)

17. In addition, there is a significant fit problem that exists with regard to both of the Government's experts, but more so with Dr. Curlin. Dr. Curlin is a general internal medicine practitioner whose area of expertise is in medical ethics and hospice issues and not in the treatment of seizure disorders. Despite the fact that he is neither a cardiologist or pathologist, and despite his limited training in treating and diagnosing HCM, Dr. Curlin offered his speculative and unreliable opinion that Solebo died of HCM. He offered this opinion despite the fact that nothing in Solebo's medical records mentioned anything about a heart-related illness. In Dr. Curlin's own words, the basis for his opinion as to cause of death was simply, "it's the math," (Trial Tr. 684), because the statistical studies he relied upon reflect that HCM poses a higher risk of death than SUDEP. While this Court understands Dr. Curlin's testimony about the statistical studies, this Court ultimately looks at what happened to Solebo on the basis of the evidence in the record and the expert testimony. This Court concludes that Solebo was on the outer edges of a bell curve because he was a person who suffered from seizure disorder who also happened to have cardiomegaly, and his death was ultimately caused by the rare combination of seizure disorder and his cardiomegaly.

18. Dr. Ebersole's testimony is not credible because of his failure to appropriately consider Solebo's medical history and because, as discussed above, his standards for making a valid diagnosis of epilepsy or seizure disorder are incredible. Ultimately, his testimony begins

113

from the premise that Solebo did not have seizure disorder. In addition, Dr. Ebersole's testimony as to cause of death was contrary to what he said at his deposition, and he was therefore the victim of a critical impeachment on cross-examination. When asked at his deposition whether he was able to provide an opinion on Solebo's cause of death, to a reasonable degree of medical certainty, Dr. Ebersole answered unequivocally, "no."[11] (Trial Tr. 754-55.) Although the Government tried to rehabilitate Dr. Ebersole on redirect examination, this Court finds that this is a classic impeachment, which leaves Dr. Ebersole's trial testimony with fundamental problems.

19.     Finally, this Court asked Dr. Ebersole whether it was appropriate to interpret Solebo's medical records as demonstrating that Solebo's seizures were controlled when he was on Dilantin, but when he stopped taking Dilantin he experienced seizures; and ultimately in April 2007, when Solebo failed to take Dilantin for four continuous days, he subsequently died on May 1. (Trial Tr. 762.) Dr. Ebersole testified that if he thought Solebo had seizure disorder, then such a reading of the medical records was "right on." (Trial Tr. 762.) Nonetheless, Dr. Ebersole testified that he did not believe that Solebo had seizure disorder and that it was simply coincidental that after four days of not taking his medication, Solebo's heart condition suddenly presented itself on May 1, and that just happened to be the day that Solebo died. (Trial Tr. 763.) This testimony is incredible because once this Court credits Dr. Holtzman's and Dr. Jones' testimonies, all the evidence in the record establishes by a preponderance of the evidence that

---

[11] Dr. Ebersole's deposition testimony, as read into the trial transcript, reads as follows:
> Question: So you are—so are you able to tell me to a reasonable
> degree of medical certainty more probably true than not true what Mr.
> Solebo's cause of death actually was?
> Answer: No.

(Trial Tr. 754-55.)

Solebo had seizure disorder.

## III.  Whether the MCC was negligent in treating Solebo's seizure disorder

### A.    Standard of Care

20.    Having concluded that Solebo suffered from seizure disorder, this Court turns to the standard of care for treating seizure disorder.[12]  In medical negligence cases, "the standard of care is the relevant inquiry by which we judge a physician's actions." *Neade*, 739 N.E.2d at 502. To establish the standard of care required in a particular set of circumstances, a plaintiff must present expert medical testimony unless the physician's negligence is grossly apparent or the treatment lies within the common knowledge of a layperson. *Purtill*, 489 N.E.2d at 872; *accord Hardnick v. United States*, No. 07 C 1330, 2009 WL 1810106, at *7 (N.D. Ill. July 1, 2009) (Dow, J.).  Under a standard of care analysis, a defendant physician "will be held to 'the reasonable skill which a physician in good standing in the community would use in a similar case.'" *Neade*, 739 N.E.2d at 502 (quoting *Newell v. Corres*, 466 N.E.2d 1085, 1094 (Ill. 1984)); *accord Purtill*, 489 N.E.2d at 872 (stating that the standard of care against which a defendant's conduct is measured is "that degree of knowledge, skill, and care which a reasonably well-qualified physician in the same or similar community would bring to a similar case under

---

[12]  Were this an ordinary negligence case, as opposed to a medical negligence case, 18 U.S.C. § 4042 would establish a statutory duty of care owed by the MCC to Solebo. *United States v. Muniz*, 347 U.S. 150, 165 (1963) ("[T]he duty of care owed by the Bureau of Prisons to federal prisoners is fixed by 18 U.S.C. § 4042, independent of an inconsistent state rule."); *Parrott v. United States*, 536 F.3d 629, 637 (7th Cir. 2008) ("[Section] 4042 describes a duty of care for persons in federal custody.")  Under § 4402, the BOP has the duty, *inter alia*, to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise; [and] . . . the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States."  18 U.S.C. § 4042(a)(2)-(3).

115

similar circumstances"). "If a physician deviates from the standard of care and that deviation proximately causes injury to a patient, the physician is liable for damages caused by his medical negligence." *Neade*, 739 N.E.2d at 502; *accord Hardnick*, 2009 WL 1810106, at *7 ("To prevail, a medical malpractice plaintiff must show that the doctor failed to do something that a reasonably careful physician would do, or did something that a reasonably careful physician would not have done, under circumstances similar to those shown by the evidence in the case.").

21.     When testifying physicians present only conflicting opinions as to what the correct technique should have been, "the Illinois Supreme Court has held that 'the plaintiff has failed to present sufficient evidence of a standard of care in the medical community to submit the case to the [trier of fact].'" *Donais v. United States*, 232 F.3d 595, 599-600 (7th Cir. 2000) (citing *Walski v. Tiesenga*, 381 N.E.2d 279, 285 (Ill. 1978)) (affirming judgment for defendant and concluding that "[b]ecause of the uncertainty of both expert witnesses in determining the applicable standard of care, [plaintiff] failed to establish a prima facie case"). "It is insufficient for plaintiff to establish a *prima facie* case merely to present testimony of another physician that he would have acted differently from the defendant, since medicine is not an exact science." *Walski*, 381 N.E.2d at 285 (affirming directed verdict for defendants where plaintiff's medical expert only testified that he would have acted differently and failed to testify that there was a generally accepted medical standard of care that defendant failed to follow).

22.     Furthermore, to establish the standard of care in a medical negligence action that raises the issue of lack of informed consent, a plaintiff must establish that prior to administering medical treatment, the physician should have informed the patient of the "diagnosis, the general nature of the contemplated procedure, the risks involved, the prospects of success, the prognosis

if the procedure is not performed and alternative medical treatment." *Coryell*, 653 N.E.2d at 1321 (quoting *Roberts*, 620 F. Supp. at 325) (internal quotation marks omitted).

23.     Here, again, the parties have presented this Court with a "battle of the experts." In the case of dueling experts, the fact finder must "determine what weight and credibility to give the testimony of each expert and physician." *Gicla*, 572 F.3d at 414; *see also Campbell*, 904 F.2d at 1192 ("[T]he trier of fact is to determine the weight to be given to the testimony of expert medical witnesses, and [the Seventh Circuit] will defer to the credibility assessments made by the trier of fact." (quoting *Payne*, 711 F.2d at 76) (internal quotation marks omitted)). On the whole, this Court finds Dr. Holtzman's testimony to be the most reliable, except for his testimony that the MCC Physicians should have forcibly or involuntarily administered Dilantin to Solebo. On the latter point, this Court finds that Dr. Curlin's testimony on whether a physician should force medication is credible.

24.     Based on a review of the expert testimony and the evidence in this case, this Court concludes that the standard of care for treating Solebo's seizure disorder required MCC medical personnel, including the Physicians and physician assistants, to examine Solebo on a monthly basis. As Dr. Holtzman explained, shortly after arriving at the MCC in October 2006, Solebo's care level at the MCC was elevated from a Care Level 1 to a Care Level 3, signifying that Solebo required care for an unstable, complex, and chronic condition and required examinations on a daily to monthly basis. Dr. Holtzman's testimony is not simply testimony that he would have acted differently than MCC medical personnel, nor is it inconsistent with the testimony of Dr. Curlin, who testified that the frequency of visits could range from once a month to once every six months, and conceded that the appropriate frequency of visits is highly variable.

117

25.     The standard of care also required MCC medical personnel, including the Physicians and physician assistants, to review Solebo's medical records, including his MARs. The standard of care further required MCC medical personnel, including the Physicians and physician assistants, to draw Solebo's blood for the purpose of monitoring the level of anti-seizure medication in his blood and to obtain the corresponding laboratory results. Dr. Holtzman's testimony on these points was not disputed.

26.     Most importantly, the standard of care required MCC medical personnel, including the Physicians and physician assistants, to inform Solebo about the risks and benefits of taking and not taking Dilantin and to counsel Solebo about his medication. It is axiomatic that "[b]efore one can make a reasoned decision regarding medication, it is first necessary to be informed about the risks and benefits of the proposed course of medication." *In re Christopher P.*, 795 N.E.2d 323, (Ill. App. Ct. 5th Dist. 2003) (quoting *In re Edward*, 698 N.E.2d 186, 188 (Ill. App. Ct. 2d Dist. 1998) (internal quotation marks omitted)). Both Dr. Holtzman and Dr. Curlin testified about the concept of informed consent and the need to counsel a patient when he stops taking his prescribed medication. Informed consent requires a physician to meet with a patient and inform him about the realistic risks associated with not taking his medication. Indeed, even Dr. Curlin testified that a physician should provide patients with the information they need to understand the benefits of the medication they are prescribed, the purpose for which the medication is being prescribed, the risks involved in taking the medication, and that the patient is free to say yes or no. Because seizure disorder carries with it a risk of injury and death, a physician should also inform a patient who is taking anti-epileptic medication about these risks. Here, the standard of care required MCC medical personnel, including the Physicians and

118

physician assistants, to meet with Solebo, ask him why he was not taking his medication and inform him of the realistic risks associated with not taking his prescribed Dilantin. Those risks included the risk of future seizures, which in turn carry with them a risk of great bodily injury and death. Thus, the standard of care required MCC medical personnel to inform Solebo that if he did not take his anti-seizure medication, he could be injured or he could die. Finally, the standard of care also required MCC medical personnel to inquire into the reasons that Solebo stopped taking his medication.

### B.   Breach of the standard of care

27.    Once the standard of care has been established, a plaintiff must then show that, "judged in the light of these standards, the doctor was unskillful or negligent and that his want of skill or care caused the injury to the plaintiff." *Walski*, 381 N.E.2d at 282 (citing *Borowski v. Von Solbrig*, 328 N.E.2d 301, 305 (1975)). To establish that a physician breached the standard of care, the plaintiff must show, through expert testimony, that an injury occurred and that such an injury "does not ordinarily occur in the normal course of events without negligence." *Lawrence v. Rubio*, 406 N.E.2d 946, 951 (Ill. App. Ct. 5th Dist. 1980) (citing *Sanders v. Frost*, 251 N.E.2d 105, 107 (Ill. App. Ct. 5th Dist. 1969)). "Mere proof that the defendant doctor made a mistake or that his treatment harmed plaintiff is no evidence of lack of skill or negligence." *Id.* (citing *Sanders*, 251 N.E.2d at 107); *Gray v. United States*, No. 08-cv-116-JPG, 2010 WL 1540117, at * 3 (N.D. Ill. Apr. 11, 2010) ("[I]t is not enough to show that the physician made a mistake or that the plaintiff suffered harm because of the physician's mistake.") (citing *Lawrence*, 406 N.E.2d at 951). The question of whether a physician deviated from the standard of care is a fact-specific inquiry in which case law provides little guidance. *Liebig-Grigsby v. United States*, No. 00 C

119

4922, 2003 WL 1090272, at * 11 (N.D. Ill. Mar. 11, 2003); *Borowski*, 328 N.E.2d at 305.

28.     Based on a review of the expert testimony and the evidence in this case, this Court

concludes that the MCC breached the appropriate standard of care for treating Solebo's seizure

disorder. Again, the standard of care required MCC medical personnel, including the MCC

Physicians and physician assistants, to examine Solebo on a monthly basis. As Dr. Holtzman

testified, however, such evaluations were not conducted, and the MCC therefore breached the

standard of care. (Trial Tr. 245-46.) When Solebo first presented to the MCC, Physician

Assistant Aruiza ordered that Solebo be seen in the Neurology CCC for his seizure disorder by

September 18, 2006. Nevertheless, the first time Solebo was seen in the Neurology CCC was

over three months after he initially arrived at the MCC, on November 30, 2006. Solebo's last

visit to the Neurology CCC was in February 2007. The record is clear that although Dr.

Nowakowski was the Acting Clinical Director and the only physician on the MCC's premises

after mid-March 2007, she never saw or examined Solebo and she never rendered any medical

treatment to Solebo. (Trial Tr. 484). Had Solebo been examined, Dr. Holtzman testified that the

MCC Physicians could have spoken to him to find out whether he was taking his medication and

why he was not taking his medication on a consistent basis. (Trial Tr. 244-46.) The MCC

Physicians failed to do so, however, and they were therefore not aware that Solebo was not

compliant with his medication.

29.     The standard of care also required MCC medical personnel to review Solebo's

medical records. The evidence is clear that the MCC personnel failed to make any efforts to

retrieve Solebo's Kankakee medical records while they were treating Solebo. These records are

absolutely vital. Solebo presented to the MCC with a history of seizure disorder and a

prescription for Dilantin, an anti-seizure medication. Yet the MCC Physicians and physician assistants who treated Solebo failed to submit a request for these records. *See Hardnick*, 2009 WL 1810106, at *10 (concluding that where the standard of care required a reasonably careful physician to undertake a more careful assessment than typical during the decedent's examination, the physician deviated from the standard of care in failing to attempt to access decedent's readily available medical records from prior emergency room visit). Instead, the MCC medical personnel simply continued Solebo's prescription for Dilantin, and in fact, Dr. Hoffman later increased the dosage that Solebo was prescribed. If Dr. Hoffman had any suspicions about Solebo's medical history, he could have easily requested the Kankakee medical records from Kankakee; yet he did not attempt to do so.

30.     The evidence is also undisputed that the MCC Physicians were derelict in their duty to review the medical records they actually possessed, specifically the MARs, and to then meet with Solebo in light of the information they derived from those MARs. Although the MARs were kept on the medication cart during the month and were available for the MCC Physicians to review, they consistently failed to do so. An MCC Physician never reviewed Solebo's MARs for December 2006, January 2007, and February 2007. While Dr. Nowakowski eventually reviewed the MAR from March 2007, she did so several weeks after Solebo had a period in which he missed multiple doses of his medication. Most importantly, an MCC Physician never reviewed the critical MAR for April 2007. Because Dr. Nowakowski failed to review Solebo's April 2007 MAR, she was never aware, prior to Solebo's death, that Solebo had missed nearly half of his doses of Dilantin in April 2007. Furthermore, no one informed Dr. Nowakowski that Solebo had missed multiple doses of his medication despite the fact that the

Physicians were supposed to conduct daily meetings twice a day to discuss matters such as an inmate missing his medication. Dr. Nowakowski did not recall having any discussions with the physician assistants or any other MCC personnel about Solebo missing his medication in February 2007, March 2007, or April 2007. Similarly, Dr. Hoffman did not recall having such discussions in February 2007. Had Dr. Nowakowski known that Solebo was not taking his medication, she then should have consulted Solebo about the risks and benefits of taking and not taking his medication. Dr. Holtzman testified that a reasonable physician would consult a patient about the risks of not taking his anti-seizure medication because the risk of not taking the medication could be fatal. (Trial Tr. 248-49.) Dr. Holtzman opined that not only did Solebo not receive a proper consultation by the MCC Physicians or staff, including the MCC physician assistants, about the risks and benefits of taking Dilantin, he simply never had such a consultation. (Trial Tr. 327.)

31. Furthermore, there was a complete disregard of the MCC's written policies. Despite internal policies dictating that inmates were supposed to sign Refusal Forms when refusing medication, which in turn were supposed to be placed in their medical charts, Dr. Nowakowski admitted at trial that the Refusal Forms were not used for medication refusal. Nor were the incident report forms used when an inmate refused to report to the pill line, as the A & O Handbook warned new inmates. Had the Refusal Forms been completed, there would have been a record in Solebo's medical chart documenting his missed medication on a day-to-day basis. And, as Dr. Nowakowski admitted at trial, had the Refusal Forms or incident reports been included in the inmates' medical charts, it would have been easy to track whether a patient missed his medications.

122

32. The standard of care also required the MCC personnel to monitor the Dilantin level in Solebo's blood by obtaining blood draws and following up on the corresponding laboratory results. The MCC breached the standard of care when it failed to obtain the laboratory results of Solebo's blood draw from February 1, 2007. (Trial Tr. 247.) On December 26, 2006, Dr. Hoffman ordered that Solebo's Dilantin levels be monitored via blood draws. Although Dr. Hoffman ordered this laboratory test, a blood draw pursuant to Dr. Hoffman's order was never performed. In December 2006, Dr. Nowakowski also ordered a laboratory test, and a blood draw to fulfill this order was obtained on February 1, 2007. Unfortunately, the blood sample was placed in the wrong type of tube prior to being shipped to the Rochester Lab. The Rochester Lab informed the MCC of the problem with the blood specimen via the February 3 Report; however, an MCC Physician never saw the February 3 Report prior to Solebo's death because it had been placed in a file cabinet, rather than in Solebo's medical chart. Although Dr. Hoffman met with Solebo in the Neurology CCC on February 12, 2007, and was aware that the MCC had not yet received the laboratory results for Solebo's February 1, 2007 blood draw, he did not follow up to try to obtain the laboratory results nor attempt to order a STAT lab. Indeed, no one at the MCC made any effort to ascertain the status of the results of that blood draw. Thus, as Dr. Holtzman pointed out, the last Dilantin level that the MCC medical personnel obtained for Solebo was from December 2006, when his level was 11 µg/ml. (Trial Tr. 247.) Dr. Holtzman testified that a Dilantin level obtained by a blood draw between December 2006 and May 1, 2007, would have revealed whether or not Solebo's Dilantin level was therapeutic and, most importantly, whether he was compliant with his medication in case the doctors were not reviewing the MARs. (Trial Tr. 248.)

123

33.     Dr. Holtzman testified, to a reasonable degree of medical certainty, that Solebo's Dilantin level became subtherapeutic in April 2007 because of Solebo's failure to take his Dilantin. (Trial Tr. 253-54.) According to Dr. Holtzman, had a blood draw been taken in April that revealed a subtherapeutic or zero µg/ml level of Dilantin, the standard of care required the MCC Physicians to counsel Solebo about why his levels were zero µg/ml and to institute treatment urgently. (Trial Tr. 254.) Thus, MCC medical personnel, including the Physicians and physician assistants, breached the standard of care in obtaining blood draws from Solebo and following up on the corresponding laboratory results in order to monitor his Dilantin level.

34.     Finally, the standard of care also required the MCC Physicians to talk to Solebo about his medication, to ask him why he was not taking his medication, and to counsel him about his noncompliance. (Trial Tr. 243-46.) This Court concludes that the MCC breached the standard of care in treating Solebo's seizure disorder by failing to inform Solebo of the risks associated with his failure to take his anti-seizure medication. There is absolutely no evidence that anyone at the MCC had any discussions with Solebo during critical time periods to inform him of the importance of taking his medication and the risks he was taking by not doing so. In short, the MCC personnel simply failed to disclose to Solebo any risks associated with failing to take his Dilantin. Dr. Holtzman pointed out that no one ever counseled Solebo to ask him why he was starting to miss more doses of his medication, (Trial Tr. 248), and that there are no records of any sort of discussion that the MCC personnel had with Solebo regarding the risks or benefits of taking his medication, (Trial Tr. 325). After Solebo's visit with Dr. Hoffman on February 12, 2007, Solebo was never counseled and there were no other scheduled visits with Solebo. It is undisputed that Dr. Hoffman and Dr. Nowakowski were not physically present at

124

the MCC during critical time periods in April 2007, and thus a physician was not available to speak with Solebo. Dr. Hoffman did not make himself available over the telephone while he was out; while Dr. Nowakowski testified that she made herself available by telephone, there is no testimony in the record that anyone at the MCC ever called her to inform her that Solebo was not taking his Dilantin. And, as Dr. Nowakowski conceded, nothing in Solebo's medical charts in March 2007, April 2007, or on May 1, 2007 documented any discussions with Solebo regarding taking his medication. (Trial Tr. 519-20.) Indeed, Dr. Nowakowski did not recall having any discussions with Solebo in February, March, or April 2007 regarding the importance of taking his medication. (Trial Tr. 519.) Nor did she recall any discussions with the physician assistants, or with anyone who worked on the pill line, regarding Solebo missing doses of medication in February, March, or April 2007. (Trial Tr. 519-20.)

35. As Dr. Holtzman testified, through monthly examinations, a review of Solebo's medical records, and through the blood draws, the MCC personnel knew or should have known that Solebo was becoming nontherapeutic in terms of his Dilantin intake. (Trial Tr. 248.) All of these failures were negligent—not mere mistakes—and they ultimately led to Solebo's fatal seizure on May 1, 2007.

### C. Proximate cause

36. This Court must next inquire into whether the Government's breaches of the standard of care proximately caused the injury for which Plaintiff seeks damages. In Illinois, proximate cause is defined as "a cause that, in the natural or ordinary course of events, produced the plaintiff's injury. It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury." Ill. Pattern Jury Instr. Civ. 15.01. Under

Illinois law, the question of whether a physician's conduct was a proximate cause of the plaintiff's injuries is a question of fact for the trier of fact to decide. *Campbell*, 904 F.2d at 1193 (citing *Borowski*, 328 N.E.2d at 305; *Kaplan v. Berger*, 539 N.E.2d 1267, 1273 (Ill. App. Ct. 2d Dist. 1989)). "[O]nly rarely are the facts so clear that the court can resolve the issue as a matter of law." *Palay v. United States*, 349 F.3d 418, 432-33 (7th Cir. 2003) (citing *Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 615 (7th Cir. 2002); *First Springfield Bank & Trust v. Galman*, 720 N.E.2d 1068, 1071 (Ill. 1999); *Felty v. New Berlin Transit, Inc.*, 374 N.E.2d 203, 205 (Ill. 1978)). Proximate cause "must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Morisch*, 653 F.3d at 531 (quoting *Johnson v. Loyola Univ. Med. Ctr.*, 893 N.E.2d 267, 272 (Ill. App. Ct. 1st Dist. 2008) (internal quotation marks omitted)); *see also Walton v. Dirkes*, 903 N.E.2d 18, 20 (Ill. App. Ct. 1st Dist. 2009). Proximate cause is not established where the "the injury would have occurred even in the absence of that act [or] omission." *Hardnick*, 2009 WL 1810106, at * 11 (citing *Campbell*, 904 F.2d at 1193-94). Rather, "[a] plaintiff must establish that it is more probably true than not true that the defendant's negligence was a proximate cause of the injury." *Johnson*, 893 N.E.2d at 272 (citing *Borowski*, 328 N.E.2d at 305); *see also Hardnick*, 2009 WL 1810106, at * 11 ("Plaintiff must show by a preponderance of the evidence that Defendant's failure to comply with the applicable standard of care caused or contributed to the injury giving rise to Plaintiff's cause of action.") (citing *Wise v. St. Mary's Hosp.*, 381 N.E.2d 809, 811-12 (Ill. App. Ct. 5th Dist. Dist. 1978); *Kasongo v. United States*, 523 F. Supp. 2d 759, 802 (N.D. Ill. 2007) (defining causation inquiry as whether "the defendant's breach of the applicable standard of care more probably than not caused [the plaintiff's] injury")).

37.     To establish proximate cause, the plaintiff must show cause in fact and legal

cause. *Bergman*, 873 N.E.2d at 500 (citing *Hooper v. Cnty. of Cook*, 851 N.E.2d 663 (Ill.

2006)); *see also Palay*, 349 F.3d at 432 ("Under Illinois law, proximate cause consists of two

elements: cause in fact and legal cause.") (citing *Evans v. Shannon*, 776 N.E.2d 1184, 1190 (Ill.

2002)).  The Illinois Supreme Court has stated that "[c]ause in fact exists where there is a

reasonable certainty that a defendant's acts caused the injury or damage." *Evans*, 776 N.E.2d at

1190 (quoting *Galman*, 720 N.E.2d at 1072) (internal quotation marks omitted).  If a defendant's

negligent conduct "is a material element and a substantial factor in bringing about the injury,"

then cause in fact is established. *Id.*  Further, "a defendant's conduct is a material element and a

substantial factor in bringing about an injury if, absent that conduct, the injury would not have

occurred." *Id.*  Thus, in deciding whether cause in fact exists, this Court must first ask "whether

the injury would have occurred absent the defendant's conduct.'" *City of Chi. v. Beretta U.S.A.

Corp.*, 821 N.E.2d 1099, 1127 (Ill. 2004) (citing *Lee v. Chi. Transit Authority*, 605 N.E.2d 493,

502-03 (Ill. 1992)).  When multiple factors may have combined to cause the injury, the inquiry

remains the same, and this Court asks "whether the defendant's conduct was a material element

and a substantial factor in bringing about the injury." *Id.* (citing *Lee*, 605 N.E.2d at 503).

Furthermore, cause in fact may be established through a "lost chance" or "loss of chance" theory

whereby the defendant's negligent conduct "deprived the plaintiff of a chance to survive or

recover from a health problem, or where the malpractice has lessened the effectiveness of the

treatment or increased the risk of an unfavorable outcome to the plaintiff." *Holston v. Mem'l

Hosp.*, 679 N.E.2d 1202, 1209 (Ill. 1997); *Scardina v. Nam*, 775 N.E.2d 16, 24 (Ill. App. Ct. 1st

Dist. 2002) (noting that the loss of chance "doctrine is not a separate theory of recovery but,

127

rather, a concept that factors into the proximate cause analysis"); *Lambie v. Schneider*, 713

N.E.2d 603, 609 (Ill. App. Ct. 4th Dist. 1999) ("While the 'lost chance' doctrine eliminates a

problem of demonstrating 'cause in fact,' it does not eliminate the requirement that the plaintiff

prove defendant's conduct was the legal cause of his injury.") (citing *Holston*, 679 N.E.2d at

1213).

      38.     Legal cause, by contrast, "presents a question of foreseeability." *Bergman*, 873

N.E.2d at 500; *Palay*, 349 F.3d at 432. To establish legal cause, a plaintiff must demonstrate that

"an injury was foreseeable as the type of harm that a reasonable person would expect to see as a

likely result of his or her conduct." *Bergman*, 873 N.E.2d at 500 (citing *Knauerhaze*, 836 N.E.2d

at 651-52); *Morisch*, 653 F.3d at 531. "Under Illinois law, so long as the defendant could have

foreseen that his negligence would result in some type of injury, the precise nature or method of

injury need not have been foreseeable." *Palay*, 349 F.3d at 434 (citing *Enis v. Ba-Call Bldg.*

*Corp.*, 639 F.2d 359, 362 (7th Cir. 1980); *Neering v. Ill. Central R.R. Co.*, 50 N.E.2d 497, 503

(Ill. 1943); *Colonial Inn Motor Lodge, Inc. v. Gay*, 680 N.E.2d 407, 413 (Ill. App. Ct. 2d Dist.

1997)).

      39.     Furthermore, to establish proximate cause in a medical negligence action that

raises the issue of lack of informed consent, expert testimony is not required. *See Coryell*, 653

N.E.2d at 1321 ("[W]hat is required to prove the element of proximate causation in an action

based upon a physician's failure to disclose differs significantly from what is required to prove

that same element in an 'ordinary' malpractice action."); *but see Mansmith v. Hameeduddin*, 860

N.E.2d 395, 411 (Ill. App. Ct. 1st Dist. 2006) (disagreeing with statement in *Coryell* that a

plaintiff in an informed consent case is not required to present expert testimony to establish

128

proximate cause). Instead, in assessing whether proximate cause exists, Illinois courts employ an objective standard, i.e., what a prudent person in the plaintiff's position would have decided if the plaintiff had been adequately informed. *Taylor v. Cnty. of Cook*, 957 N.E.2d 413, 433 (Ill. App. Ct. 1st Dist. 2011); *Smith v. Marvin*, 880 N.E.2d 1023, 1031 (Ill. App. Ct. 3d Dist. 2008); *Guebard v. Jabaay*, 452 N.E.2d 751, 757 (Ill. App. Ct. 2d Dist. 1983); *see also Coryell*, 653 N.E.2d at 1320 (noting that the appropriate question is: "Would a reasonably prudent person in the plaintiff's position, after being properly informed, have nonetheless proceeded with the proposed treatment?"). Whether "any alleged undisclosed information would have altered the plaintiff's decision to undergo the proposed treatment had it been disclosed" is a question of fact for the trier of fact to determine. *Coryell*, 653 N.E.2d at 1321; *Smith*, 880 N.E.2d at 1031; *see also Guebard*, 452 N.E.2d at 758 (If disclosure would have caused a reasonable person in the position of the patient to refuse the medical treatment, then a causal connection is shown.).

40.     This Court concludes that as a result of the MCC personnel's failures and breaches of the standard of care in treating Solebo's seizure disorder, the MCC personnel proximately caused Solebo's injury and death on May 1, 2007. Dr. Holtzman opined, to a reasonable degree of medical certainty, that Solebo had a fatal seizure because the MCC, through its employees, failed to provide him with timely and adequate medical care for his seizure disorder.

41.     Dr. Holtzman's testimony establishes that the MCC's failures were substantial factors in bringing about Solebo's fatal seizure on May 1, 2007. As Dr. Holtzman explained, the MCC personnel should have known that Solebo's Dilantin level was becoming nontherapeutic through monthly examinations, a review of his medical records, and regular blood draws. As a

result of the MCC personnel's failure to adhere to the standard of care, however, they were simply unaware that Solebo was not compliant with taking his anti-seizure medication and that his Dilantin level was therefore approaching a nontherapeutic level. Dr. Holtzman also testified that Solebo was definitely subtherapeutic at the end of April, and a blood draw conducted around that time would have revealed this. Because the MCC Physicians did not know that Solebo was noncompliant, however, it was impossible for them to counsel Solebo about the importance of taking his medication or about the risks of failing to do so—they therefore failed to counsel him. Dr. Holtzman further opined, on the basis of his review of the records in this case, that Solebo would have taken his anti-seizure medication had he received appropriate counseling. Furthermore, Dr. Holtzman opined that Solebo's failure to take his medication increased his risk of death from a seizure, and had Solebo received his medication during the last few days of April, he would not have died from a fatal seizure on May 1, 2007. Dr. Holtzman's testimony establishes that the MCC's failures were substantial factors in bringing about Solebo's fatal seizure. Dr. Holtzman's testimony also establishes that it was foreseeable to the MCC personnel that a patient who was not taking his medication was more likely to have a seizure than a patient who was taking his anti-seizure medication. As Dr. Holtzman explained, anti-seizure medication like Dilantin substantially reduces a person's risk of having a seizure and of dying from a seizure.

42.      In sum, Dr. Holtzman's testimony that the MCC personnel's negligent failures lessened the effectiveness of Solebo's treatment for seizure disorder and increased his risk of harm sufficiently establishes a causal connection to establish proximate cause. Illinois courts have held similar expert testimony sufficient to establish proximate cause in past medical negligence cases. For example, in *Walton*, 903 N.E.2d at 26-27, the plaintiff's expert testified

that the defendant's failure to order a blood count test resulted in a delayed diagnosis of leukemia and lessened the effectiveness of the treatment the decedent received. The plaintiff's expert further testified that had a complete blood count been performed, the blood count would have been abnormal, and that upon the finding of an abnormal blood count, he would have received specific treatments that would have prolonged the decedent's life. *Id.* at 23-24. The *Walton* court found that the expert testimony regarding how a diagnosis and treatment would have resulted from a complete blood count provided a sufficient causal connection to establish proximate cause. *Id.* at 27. Similarly, in *Johnson v. Loyola University Medical Center*, 893 N.E.2d at 268-69, the decedent was transported to a hospital where he was initially monitored after he suffered a cardiac arrest. A few days later, the decedent was moved to a floor where he was not subject to continuous monitoring, and he subsequently suffered a second cardiac arrest that caused irreversible brain damage; he subsequently died. *Id.* An Illinois appellate court reversed the trial court's grant of judgment notwithstanding the verdict to the defendants where the plaintiff's expert presented testimony that the defendants' failure to monitor the decedent was the proximate cause of his injuries. *Id.* at 272. Specifically, the plaintiff's expert had testified that with adequate monitoring, hospital staff would have intervened earlier than they did, and had they done so the decedent would not have suffered the irreversible brain damage that ultimately led to his death. *Id.* at 272-73. In addition, in *Liebig-Grigsby v. United States*, No. 00 C 4922, 2003 WL 1090272, at *13 (N.D. Ill. Mar. 11, 2003), a medical negligence case brought under the FTCA, the court applied the lost chance doctrine and found that the plaintiff had established proximate cause where the plaintiff's physicians "failed to comprehensively treat and assess [the plaintiff's] condition" and as a result failed to consider the appropriate treatment. In *Liebig-*

131