*Grigsby*, 2003 WL 1090272, at *13, had the physicians met the standard of care they would have advised the plaintiff to have a surgery that would have given plaintiff a good chance of avoiding her paralysis. Similarly, here, had the MCC personnel complied with the standard of care, they would have been able to counsel Solebo about taking his medication; because they were not even aware that Solebo was not taking his medication as prescribed, however, it was impossible for them to counsel Solebo. Therefore, this Court finds that Dr. Holtzman's testimony establishes that it was more probably true than not true that the MCC personnel's negligent failure to consult Solebo after February 2007, to obtain the results of a blood draw, and to appropriately monitor whether Solebo was taking the prescribed medication to treat his seizure disorder lessened the effectiveness of the medical treatment Solebo received and increased his risk of harm.

43.     During closing arguments, the Government argued that it is a fallacy to say that because two things are temporally related, there is a cause-and-effect relationship between them. (Trial Tr. 837.) The Government argued that Solebo's death on May 1, 2007, was simply coincidental with his failure to take his Dilantin as prescribed. (Trial Tr. 838-39.) Contrary to the Government's argument, this Court has not merely relied on the temporal sequence of events to reach its proximate cause finding. As both Dr. Holtzman and Dr. Jones testified, the evidence demonstrates that when Solebo was actually taking his medication, he stopped seizing. In fact, Dr. Curlin conceded on cross-examination that if Solebo had seizure disorder, then not taking his medication in March and April of 2007 could have contributed to him having another seizure. (Trial Tr. 671.) Furthermore, Illinois courts have found that where an expert testifies that there is a causal connection between two events because of their temporal proximity, such testimony is sufficient to establish proximate cause. In *Wartalski v. JSB Construction*, 892 N.E.2d 122, 129

132

(Ill. App. Ct. 1st Dist. 2008), an Illinois appellate court specifically recognized that contrary to the defendant's assertions in that case, "a temporal relationship is, in fact, an acceptable basis for an expert's opinion." *See also Valiulis v. Scheffels*, 547 N.E.2d 1289, 1294, 1298 (Ill. App. Ct. 2d Dist. 1989) (where the plaintiff's expert testified that there was causal relationship between the trauma the plaintiff endured and the onset of his multiple sclerosis ("MS") symptoms "because of the close proximity in time" between the events, such "testimony was sufficient evidence that the negligence of [the defendant] was the proximate cause of [the plaintiff's] MS."); *but see Hussung v. Patel*, 861 N.E.2d 678, 685-86 (Ill. App. Ct. 2d Dist. 2007) (finding that there was no factual basis to support an expert physician's conclusions where the plaintiff's treating physicians testified that the relationship between an injection and the plaintiff's subsequent onset of symptoms was speculative). Here, Dr. Holtzman testified, to a reasonable degree of medical certainty, that Solebo's failure to take his medication between April 27 and April 30 increased his risk of death and that if Solebo had received his medication on those dates, he would not have died on May 1. As *Wartalski* and *Valiulis* instruct, such evidence is sufficient to support a finding of proximate cause.

44. Furthermore, while the evidence establishes that Solebo's seizure disorder combined with his cardiomegaly to cause his death, Illinois courts recognize that an injury may have multiple causes. For instance, in *Chambers v. Rush-Presbyterian St. Luke's*, 508 N.E.2d 426, 430 (Ill. App. Ct. 1st Dist. 1987), the appellate court there recognized that "[i]t is fundamental law that in negligence cases, there may be more than one proximate cause of injury and that one is liable for its negligent conduct whether it contributed in whole or in part to the injury as long as proximate cause exists." In *Chambers*, 508 N.E.2d at 431, the medical experts

133

disagreed as to whether the decedent's coma or his cancer caused his death. The plaintiff's expert testified that the defendants' negligence was a proximate cause of the decedent's death and that if the decedent's cancer has been treated earlier, he would have had a good chance of recovering. *Id.* at 431. Under these circumstances, the court held that the trial court properly denied the defendant's motion for a judgment notwithstanding the verdict. *Id.* Thus, although Solebo died as a result of both his seizure disorder and his cardiomegaly, Dr. Holtzman's testimony that the MCC personnel's negligence was a proximate cause of Solebo's fatal seizure is sufficient to sustain the Plaintiff's burden of proof on proximate cause.

45. Where a case involves a lack of informed consent, this Court reiterates that expert testimony is not required to establish proximate cause. *See Coryell*, 653 N.E.2d at 1321. Rather, the inquiry is whether a reasonably prudent person in the same position would have altered his decision about the proposed treatment. *Taylor*, 957 N.E.2d at 433. Here, this Court finds that a prudent person in Solebo's position would have resumed taking his anti-seizure medication after being fully informed of the risks of not taking that medication. Again, as Dr. Holtzman testified, the risk of not taking one's anti-seizure medication increased the risk of having a seizure, which carries with it a risk of great bodily injury or death. The evidence that Solebo would have complied with taking his medication as prescribed after receiving counseling is conclusively found in the Kankakee records. These records demonstrate that Solebo suffered a second seizure after he stopped taking his medication, and on his own accord he then requested that his Dilantin be resumed. Specifically, Solebo wrote, "I was previously on Dilantin medication and was taken off prescription and believe I may have suffered a seizure because of discontinuation of Dilantin. I want to be put back on the medication Dilantin." (Jt. Ex. 3 at 58.) The evidence establishes

134

that Solebo mistakenly and naively believed that because he was not suffering any seizures, he would remain seizure-free. Unfortunately for Solebo and his family, that is not what occurred.

46. In sum, Plaintiff has presented expert testimony that establishes, to a reasonable degree of medical certainty, that it is more probably true than not true that the MCC's negligence was a proximate cause of Solebo's fatal seizure on May 1, 2007.

## IV. Comparative negligence

47. Traditionally, under the doctrine of contributory negligence, a plaintiff was barred from recovering for his injuries in a negligence action if any degree of his negligence contributed to the accident. *Alvis v. Ribar*, 421 N.E.2d 886, 887-88 (Ill. 1981), abrogated by Ill. Rev. Stat. 1991, ch. 110, par. 2-116 (now 735 Ill. Comp. Stat. 5/2-1116), as recognized in *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 593 N.E.2d 522, 527 (Ill. 1992); *Coney v. J.L.G. Indus., Inc.*, 454 N.E.2d 197, 200 (Ill. 1983). In response to the unfairness of that doctrine, the Illinois Supreme Court adopted the doctrine of pure comparative negligence in *Alvis*, 421 N.E.2d at 896-98, and explained that the adoption was demanded by contemporary society because it produced "a more just and socially desirable distribution of loss," *id.* at 893. "The system of pure comparative negligence which [the Illinois Supreme Court] adopted in *Alvis* was intended to apportion damages according to the relative fault of the parties." *Burke*, 593 N.E.2d at 527. In 1986, however, the Illinois legislature adopted a modified version of comparative negligence. *Id.* Section 2-1116 of the Illinois Code of Civil Procedure, 735 Ill. Comp. Stat. 5/2-1116(c), bars a plaintiff whose comparative negligence "is more than 50% of the proximate cause of the injury or damage for which recovery is sought" from recovering damages. *Merca v. Rhodes*, 960 N.E.2d 85, 95 (Ill. App. Ct. 1st Dist. 2011) (citing *Hobart v. Shin*, 705 N.E.2d 907, 910 (Ill.

1998)). Where a plaintiff's comparative negligence "is not more than 50% of the proximate

cause of the injury or damage for which recovery is sought," 735 Ill. Comp. Stat. 5/2-1116(c), a

plaintiff is allowed to recover the proportion of damages that are not attributable to her own fault.

*Torres v. United States*, 953 F. Supp. 1019, 1025 (N.D. Ill. 1997) (applying Illinois law in an

FTCA action). "When there is a showing of contributory negligence on behalf of a plaintiff, the

trier of fact makes the determination as to the percentage of contributory negligence." *Merca*,

930 N.E.2d at 96 (citing *Johnson v. Colley*, 490 N.E.2d 685, 688 (Ill. 1986)).

48. "A plaintiff is contributorily negligent when he or she acts without the degree of

care that a reasonably prudent person would have used for his or her own safety under like

circumstances and that action is a proximate cause of his or her injuries or death." *Id.* at 96

(citing *Basham v. Hunt*, 773 N.E.2d 1213, 1225 (Ill. App. Ct. 1st Dist. 2002)); *Gill v. Foster*, 626

N.E.2d 190, 198 (Ill. 1993) ("In order to prove contributory negligence, a defendant must show

that the plaintiff failed to exercise that degree of care which a reasonably prudent person would

have used for his or her own safety under like circumstances.") (citing *Johnson v. Abbott Labs.,*

*Inc.*, 605 N.E.2d 1098, 1104 (Ill. App. Ct. 2d Dist. 1992)); *see also Arroyo v. United States*, 656

F.3d 663, 673 (7th Cir. 2011) (Posner, J. concurring) ("[C]ontributory or comparative negligence

is failure to take the care that the average person in the plaintiff's position would have taken.").

49. Comparative negligence is a proper affirmative defense in a medical malpractice

case. *Krklus v. Stanley*, 833 N.E.2d 952, 961 (Ill. App. Ct. 1st Dist. 2005). "Illinois courts have

held that comparative negligence applies when the plaintiff's negligence is a legally contributing

cause of his harm if, but only if, it is a substantial factor in bringing about his harm and there is

no rule restricting his responsibility for it." *Id.* at 960 (quoting *Malanowski v. Jabamoni*, 772

136

N.E.2d 967, 973 (Ill. App. Ct. 1st Dist. 2002) (internal quotation marks omitted)). In *Krklus*, defendants introduced evidence that the decedent was negligent in failing to follow his physician's advice to regularly take his blood pressure medication. 833 N.E.2d at 961. The decedent's autopsy revealed that the decedent's cause of death was a hemothorax caused by an aortic dissection. *Id.* at 957. Expert testimony established that had the decedent taken his medication, he would not have developed the aortic dissection. *Id.* at 961-62. Under those circumstances, an Illinois appellate court concluded that the decedent's failure to follow his physician's advice to take his medication, coupled with the decedent's act of subsequently misinforming his physician about his compliance, were the types of substantial factors that brought about his harm. *Id.* at 962 (concluding that the trial court did not err in allowing the defendants to introduce evidence in support of their comparative negligence defense or in instructing the jury that it could consider comparative negligence and affirming the jury verdict in favor of the defendants).

50.     Here, this Court concludes that Solebo failed to take his medication as prescribed. As in *Krklus*, this inaction was a substantial factor in bringing about his fatal seizure. Thus, because of Solebo's repeated decisions to not take the medication made available to him by the MCC personnel on a daily basis, Solebo's contributory fault under applicable Illinois law is 33%. (*See* R. 117, Order on Comparative Fault at 1.) Because his decisions were not made on an informed basis, however, the Government bears 67% of the responsibility because the actions and inactions of the MCC personnel were a proximate cause of Solebo's tort damages. (*Id.*)

## V.     Damages

51.     Lastly, this Court turns to the question of damages. Plaintiff seeks a total of

137

$1,650,000.00 in damages. (R. 93, Proposed Pretrial Order, Ex. M, Pretrial Mem. at 3.) In her pretrial order, Plaintiff stated that she "is making a claim for damages for a loss of consortium, money, loss of society, benefits, money, [sic] goods, services and companionship of [Solebo]," in the amount of $550,000.00. (R. 93, Proposed Pretrial Order, Ex. G, Statement of Damages at 1.) Plaintiff stated that she is also making a Wrongful Death claim on behalf of herself and her daughter "for being deprived of large sums of money and valuable services which [Solebo] would have performed but for his untimely death, as well as suffering loss of society and companionship, loss of money, services, instruction, superintendence of education, benefits and goods, and grief, sorrow and mental suffering as a result as the death of [Solebo]," in the amount of $1,100,000.00. (*Id.*) Thus, Plaintiff seeks a total award of $1,650,000.00. (*Id.*)

52.     During closing arguments in the damages phase of the trial, Plaintiff's counsel clarified that Plaintiff seeks $550,000.00 for herself "for wrongful death, loss of consortium, society and companionship and an award in favor of her daughter of $1.1 million," for a total award of $1,650,000.00 after any reduction by this Court. (June 4, 2012 Tr. 46-48.) In other words, Plaintiff's request of $550,000.00 for loss of consortium is not a request that is separate and independent from her request for damages for wrongful death. This Court treats Plaintiff's clarification as a request to modify the pretrial order. *See Gorlikowski v. Tolbert*, 52 F.3d 1439, 1445 (7th Cir. 1995) ("[W]here a party requests that jury instructions be modified to remedy a variance between a pretrial order and their trial presentation, that request is properly treated as a motion to modify the pretrial order . . . and the trial court's decision is properly reviewed for an abuse of discretion.") (citing *Santiago v. Lykes Bros. S.S. Co., Inc.*, 986 F.2d 423, 427 (11th Cir. 1993) (affirming district court's decision to instruct the jury on a theory that was not mentioned

138

in the pretrial order); *Mankey v. Bennett*, 38 F.3d 353, 359 (7th Cir. 1994)).

53.     Because the purpose of a pretrial order is to clarify the nature of the dispute at issue and inform the parties of precisely what is in controversy, a pretrial order may be modified "only to prevent manifest injustice." *Gorlikowski*, 52 F.3d at 1444 (quoting Fed. R. Civ. P. 16(e)); *see also Harper v. Albert*, 400 F.3d 1052, 1063 (7th Cir. 2005) ("In order for a pretrial order to have any value as a procedural mechanism and to protect against the possibility of either of the parties being taken by surprise at trial, the parties must be held to the issues set forth in that order."). When confronted with such a request, a district court must weigh the possible hardships imposed on the parties and "balance the need for doing justice on the merits between the parties (in spite of errors and oversights of their attorneys) against the need for maintaining orderly and efficient procedural arrangements." *Gorlikowski*, 52 F.3d at 1444 (quoting *Matter of Delagrange*, 820 F.2d 229, 232 (7th Cir. 1987)); *see also Ryan v. Ill. Dep't of Children & Family Servs.*, 185 F.3d 751, 763 (7th Cir. 1999) (instructing district courts to consider factors such as the (1) prejudice or surprise to the nonmoving party; (2) ability of the party to cure the prejudice; (3) extent of the disruption to the orderly and efficient trial of the case or other cases in the court; and (4) bad faith and willfulness in failing to comply with the pretrial order) (citations omitted).

54.     While "[a] cause of action for loss of consortium is a tort action based on an injury to the personal relationship established by the marriage contract," *Brown v. Metzger*, 455 N.E.2d 834, 837 (Ill. App. Ct. 2d Dist. 1983), Illinois law also recognizes loss of consortium as an element of damages under the Wrongful Death Act. *Elliott v. Willis*, 442 N.E.2d 163, 168 (1982). Thus, in Illinois, "any loss of consortium action by [a] surviving spouse [does] not exist separate and apart from an action under the Wrongful Death Act, but rather [is an] element[] for

139

which damages may be recovered in such an action." *Johnson v. Vill. of Libertyville*, 502 N.E.2d 474, 477 (Ill. App. Ct. 2d Dist. 1986), *overruled on other grounds by Mio v. Alberto-Culver Co.*, 715 N.E.2d 309, 313 (Ill. App. Ct. 2d Dist. 1999); *see also Nielsen v. United States*, No. 94 C 383, 1995 WL 88796, at *2 (N.D. Ill. Mar. 1, 1995) ("Illinois law recognizes loss of consortium as an element of damages under the Wrongful Death Act, but not as a separate cause of action in a wrongful death case.") (internal citations omitted). Because loss of consortium may be recovered in a wrongful death action, it cannot be said that Defendant has been prejudiced or surprised by Plaintiff's request. Therefore, to prevent manifest injustice, this Court allows Plaintiff to modify the pretrial order and construes her request to mean that she seeks $550,000.00 on behalf of herself and $1,100,000.00 on behalf of her daughter on the basis of her wrongful death action.

55.     The purpose of the Illinois Wrongful Death Act is to compensate the surviving spouse and next of kin for the pecuniary losses they may have sustained as a result of the death of the decedent. 740 Ill. Comp. Stat. 180/2 (allowing recovery of damages "for the exclusive benefit of the surviving spouse and next of kin of such deceased person"); *Glenn v. Johnson*, 764 N.E.2d 47, 52 (Ill. 2002); *Elliott*, 442 N.E.2d at 168; *Knierim v. Izzo*, 174 N.E.2d 158, 160 (Ill. 1961) (citations omitted). It is intended to provide the surviving spouse and next of kin "the benefits that would have been received from the continued life of the decedent." *Elliott*, 442 N.E.2d at 168. The "phrase 'next of kin,' for purposes of the Wrongful Death Act, are those blood relatives of decedent in existence at decedent's death who would take decedent's property if decedent had died intestate." *In re Estate of Finley*, 601 N.E.2d 95, 101 (Ill. 1992). Thus, a decedent's child is appropriately considered to be the next of kin in Illinois. *Cf. Stephens v.*

*Trinity Med. Ctr.*, 685 N.E.2d 403, 404 (Ill. App. Ct. 3d Dist. 1997) ("The law of this state is well settled that parents are not found to be the next-of-kin under the [Wrongful Death] Act when the decedent is survived by a spouse and children.") In this case, Solebo's next of kin is his daughter. Thus, the persons eligible to recover for Solebo's death under the Wrongful Death Act are Plaintiff as his surviving spouse and their daughter as his next of kin.

56.     Furthermore, the Illinois Supreme Court has stated that where a widow and minor child seek to recover damages under the Wrongful Death Act, "a presumption of pecuniary loss obtains from that relationship, alone." *Hall v. Gillins*, 147 N.E.2d 352, 355 (Ill. 1958). While the rebuttable presumption does not necessarily guarantee recovery, it shifts "the burden of coming forward with proof that the damages are minimal or nonexistent onto the party who created the uncertainty surrounding the damages by causing the wrongful death." *Seef v. Sutkus*, 562 N.E.2d 606, 611 (Ill. App. Ct. 1st Dist. 1990). Thus, there is a presumption that Plaintiff and her daughter, as the widow and minor child of Solebo, respectively, have suffered pecuniary losses as a result of his death.

57.     In its current form, the Illinois Wrongful Death Act allows the trier of fact to "give such damages as [the trier of fact] shall deem a fair and just compensation with reference to the pecuniary injuries resulting from such [wrongful] death, including damages for grief, sorrow, and mental suffering, to the surviving spouse and next of kin of such deceased person." 740 Ill. Comp. Stat. 180/2. Prior to 2007, Illinois courts prohibited wrongful death claimants from recovering damages for grief, sorrow, or mental suffering. *See Watson v. S. Shore Nursing & Rehabilitation Ctr.*, 965 N.E.2d 1200, 1208 (Ill. App. Ct. 1st Dist. 2012) (in a wrongful death suit where decedent died in 2006, damages for grief and mental anguish resulting from the death were

141

not recoverable); *Turner v. Williams*, 762 N.E.2d 70, 77 (Ill. App. Ct. 2d Dist. 2001) (noting that while decedent's sons were "entitled to recover for the pecuniary losses incurred as a result of the death, including money, benefits, goods, services, and society . . . those damages do not include grief or mental anguish resulting from the death."); *Seef*, 562 N.E.2d at 610 (noting that the term "pecuniary" does not "extend to the grief or mental anguish that family members suffer after a wrongful death"); *Elliott*, 442 N.E.2d at 167-68 (distinguishing between damages for emotional distress brought on by the decedent's death and damages for the benefits of companionship that a widow would have enjoyed). In 2007, however, the Illinois Legislature amended the Wrongful Death Act to allow recovery for grief, sorrow, and mental suffering of the decedent's lineal next of kin. *See* 2007 Ill. Legis. Serv. P.A. 95-3 (H.B. 1798) (West). This amendment only applies to causes of action accruing on or after May 31, 2007. *Id.*; 740 Ill. Comp. Stat. 180/2 ("This Amendatory Act of the 95th General Assembly applies to causes of actions accruing on or after its effective date."). "[I]n an ordinary wrongful death action under the FTCA, the federal rule is that the cause of action accrues upon the date of death." *Warrum v. United States*, 427 F.3d 1048, 1051 (7th Cir. 2005) (alterations omitted) (quoting *Fisk v. United States*, 657 F.2d 167, 170 (7th Cir. 1981) (internal quotation marks omitted)). Here, Plaintiff's cause of action accrued on May 1, 2007—the date of Solebo's death. Therefore, because her wrongful death action accrued prior to May 31, 2007, neither she nor her daughter may recover damages for their grief, sorrow and mental suffering.

58.     In addition, although Plaintiff seeks to recover for loss of money, benefits, goods, and services as a result of Solebo's death, the evidence presented at trial does not support an award for any economic losses. Plaintiff testified at trial that prior to getting married, Solebo

worked with his mother for two months, and she was not aware of any paid employment positions that Solebo had other than that job. Plaintiff also testified that Solebo's mother paid the rent on the apartment the three of them shared. Although Solebo was in school at the time of his arrest, Plaintiff did not present any evidence about the number of credits or courses Solebo had completed towards his nursing degree or about any expected earnings Solebo anticipated upon obtaining his degree. Therefore, this Court focuses its analysis only on whether the evidence supports awards for loss of consortium and society to Plaintiff and her daughter.

59.     Plaintiff's request for damages for loss of consortium for herself and damages for loss of society for her daughter are recoverable as "pecuniary losses" in an Illinois Wrongful Death Action. Illinois courts construe the phrase "pecuniary losses" broadly to include loss of companionship, society, and consortium. In *Hall*, the Illinois Supreme Court recognized the broad scope of the phrase "pecuniary injuries," and stated that "deprivation of support as well as deprivation of the companionship, guidance, advice, love and affection" were included in the definition. 147 N.E.2d at 355. The Illinois Supreme Court found additional support for the broad scope of the phrase "pecuniary injures" in earlier cases holding "that in the case of a child the jury may take into account the loss of instruction and moral, physical and intellectual training brought about by the death of the father." *Id.* (citing *Goddard v. Enzler*, 78 N.E. 805, 809 (Ill. 1906); *Ittner Brick Co. v. Ashby*, 64 N.E. 1109, 1110 (Ill. 1902); *Ill. Central R. Co. v. Weldon*, 52 Ill. 290, 294 (Ill. 1869)). More recently, in *Elliott*, the Illinois Supreme Court unequivocally stated that pecuniary injuries include loss of consortium for a widowed spouse. 442 N.E.2d at 168 (citations omitted).

60.     Recognizing that the term "society" eludes precise definition, Illinois courts have

looked to the United States Supreme Court's definition of the term for guidance. The Supreme Court defines the term as encompassing "'a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection.'" *Watson*, 965 N.E.2d at 1208 (quoting *Sea-Land Servs., Inc. v. Gaudet*, 414 U.S. 573, 584-87 (1974)); *see also Hunt v. Chettri*, 510 N.E.2d 1324, 1326 (Ill. App. Ct. 5th Dist. 1990). Illinois courts have used similar terms to define "society," and have stated that it includes loss of the decedent's "companionship, guidance, advice, love, and affection." *Williams v. Rush-Presbyterian St. Luke's Med. Ctr.*, 899 N.E.2d 1241, 1246 (Ill. App. Ct. 1st Dist. 2008) (internal quotation marks omitted) (quoting *Bullard v. Barnes*, 468 N.E.2d 1228, 1232 (Ill. 1984)); *see also Singh v. Air Ill., Inc.*, 520 N.E.2d 852, 858 (Ill. App. Ct. 1st Dist. 1988) (concluding that an instruction defining the term "society" to mean the "mutual benefits that each family member receives from others['] continued existence, including love, affection, care, attention, companionship, comfort, guidance and protection" reflected a generally accepted definition of the term for purposes of a wrongful death action) (citing *Bullard*, 468 N.E.2d at 1232; *Drake v Harrison*, 503 N.E.2d 1072, 1076 (Ill. App. Ct. 5th Dist. 1987)).

61.     Loss of consortium is unique to the marital relationship and encompasses two basic elements of that relationship: "loss of support and loss of society, which includes companionship and sexual intercourse." *Brown v. Metzger*, 470 N.E.2d 302, 304 (Ill. 1984); *see also Malfeo v. Larson*, 567 N.E.2d 364, 426 (Ill. App. Ct. 1990) ("[C]onsortium includes loss of a spouse's companionship, happiness, and society."); *Brown v. Metzger*, 455 N.E.2d 834, 836 (Ill. App. Ct. 2d Dist. 1983) (This loss includes "'material services, elements of companionship, felicity and sexual intercourse, all welded into a conceptualistic unity.'") (quoting *Dini v.*

*Naiditch*, 170 N.E.2d 881, 891 (Ill. 1960)), *aff'd*, 470 N.E.2d 302, 306 (Ill. 1984); *Blagg v. Ill. F.W.D. Truck & Equip. Co.*, 572 N.E.2d 920, 924 (Ill. 1991).

62.     Although both loss of consortium and loss of society are incapable of being measured with precision and particularity, a trier of fact must nevertheless place a monetary value on these items. *See Elliott*, 442 N.E.2d at 168. To ascertain that value, the Seventh Circuit has instructed that a judge should consider damages awards in similar cases. *Arpin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008). In *Arpin*, the Seventh Circuit reversed a $7,000,000.00 award for loss of consortium to the decedent's widow and his children in an FTCA action seeking damages pursuant to the Illinois Wrongful Death Act. *Id.* at 777. In reversing the award, the Seventh Circuit stated that the district court should have considered awards in similar cases, both in Illinois and elsewhere. *Id.* at 776. The Seventh Circuit recognized that "the Supreme Court of Illinois does not require or even encourage such comparisons," and that in an FTCA action, "the damages rules of the state whose law governs the substantive issues in the case bind the federal court [because] damages law is substantive law." *Id.* at 776. The *Arpin* court pointed out, however, that "whether or not to permit comparison evidence in determining the amount of damages to award in a particular case is a matter of procedure rather than substance." *Id.* The Seventh Circuit also noted that "[t]he policy of permitting such comparison evidence is based . . . on the requirement in [Federal Rule of Civil Procedure] 52(a) that judges explain their reasoning." *Id.* at 776-77. Therefore, Illinois' rule that comparable damages awards should not be considered is not binding on "federal courts even in cases such as this where the rule of decision is given by Illinois law." *Id.* at 777 (citing *Jutzi-Johnson v. United States*, 263 F.3d 753, 759-60 (7th Cir. 2001)). Accordingly, this Court

145

reviews damages awards for wrongful death in cases similar to the one at hand. Before discussing the comparable awards, however, this Court addresses the Government's arguments concerning Solebo's alleged crimes and his life expectancy.

### A.    Solebo's alleged crimes

63.    During closing arguments in the damages phase of the trial, the Government argued that the evidence against Solebo in his criminal case included post-arrest statements made by him in which he acknowledged that he had delivered heroin to a confidential informant and testimony from a confidential informant. (June 4, 2012 Tr. 49.) In light of this evidence, the Government believed that Solebo faced a sentencing range from five to ten years, which he would have served in a federal prison that was substantially farther away from Chicago than the MCC. (June 4, 2012 Tr. 49-50.) The Government also believed that after completing his prison term, Solebo would have been removed to Nigeria. (June 4, 2012 Tr. 50.) Finally, the Government asserted that because Solebo was incarcerated at the time of his daughter's birth, he did not have a preexisting relationship with his daughter. (June 4, 2012 Tr. 52.) Therefore, the Government argued that any loss of society is limited by these circumstances. (June 4, 2012 Tr. 52.)

64.    While it is undisputed that Solebo was incarcerated at the time of his death, this Court finds it compelling that Solebo was in custody as a pre-trial detainee awaiting trial—he was not in custody as a result of being convicted of any crime—and he was therefore presumed innocent. "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 403 (1895). "The

146

presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle v. Williams*, 452 U.S. 501, 503 (1976). This presumption is not to be taken lightly, and the Supreme Court has long held that "the presumption of innocence is evidence in favor of the accused, introduced by the law in his behalf." *Coffin*, 156 U.S. at 460. While the Government would like this Court to believe that Solebo would have been convicted with one hundred percent certainty, this Court declines the Government's invitation to ignore the uncontroverted fact that at the time of his death, Solebo had never been convicted of any crimes and that he was presumed innocent as a matter of law at the time of his death.

65.     By mere coincidence, this Court also presided over the trial and heard the Government's evidence in its less than successful criminal prosecution of Solebo's co-defendant, Wasiu Mustapher, who was indicted on the same exact counts as Solebo. Specifically, the Government charged Mustapher with conspiracy to distribute and to possess heroin with intent to distribute (Count I), distribution of heroin (Count II), and possession with intent to distribute and distribution of heroin (Count III). (Def.'s Ex. 8, Indictment at 1-3, *United States v. Solebo and Mustapher*, No. 06 CR 61 (N.D. Ill. Feb. 23, 2006).) Mustapher entered a plea of not guilty to all counts, *United States v. Mustapher*, No. 06 CR 61-2, ECF No. 87 Min. Entry (Jan. 22, 2007) and proceeded to trial. The Government's case against him was heard by a jury in January 2007. *Mustapher*, No. 06 CR 61-2, ECF No. 87 Min. Entry (Jan. 22, 2007); *Mustapher*, No. 06 CR 61-2, ECF No. 92 Min. Entry (Jan. 24, 2007); *Mustapher*, No. 06 CR 61-2, ECF No. 97 Min. Entry (Jan. 26, 2007). At Mustapher's trial, a confidential informant recognized and identified Mustapher as the individual who supplied Solebo with heroin. (Stip. Ex., *United States v.*

147

*Mustapher*, No. 06 CR 61-2, Excerpt of Trial Tr. 6-7, 19 (Jan. 22, 2007, J. Castillo); Stip. Ex.,

*United States v. Mustapher*, No. 06 CR 61-2, Excerpt of Trial Tr. 50 (Jan. 24, 2007, J. Castillo)).

Nevertheless, the jury returned a split verdict of guilty on Count I, but not guilty on Counts II and

III. *Mustapher*, No. 06 CR 61-2, ECF No. 97 Min. Entry (Jan. 26, 2007).

66. At the close of trial, Mustapher made an oral motion for judgment of acquittal

pursuant to Federal Rule of Criminal Procedure 29. *Id.* This Court entered the jury verdict and

took Mustapher's oral motion for a judgment of acquittal under advisement. *Id.* On February 5,

2007, Mustapher renewed his motion for a judgment of acquittal in writing. *Mustapher*, No. 06

CR 61-2, ECF No. 100 Min. Entry (Feb. 5, 2007). Two days later, Mustapher also moved for a

mistrial on Count I. *Mustapher*, No. 06 CR 61-2, ECF No. 101 Min. Entry (Feb. 7, 2007). The

Government filed its response to each of Mustapher's motions on February 28, 2007, *Mustapher*,

No. 06 CR 61-2, ECF No. 104 Government's Resp. (Feb. 28, 2007); *Mustapher*, No. 06 CR 61-

2, ECF No. 105 Government's Resp. (Feb. 28, 2007), and this Court then held a hearing on

March 29, 2007, on Mustapher's motions, *Mustapher*, No. 06 CR 61-2, ECF No. 111 Min. Entry

(Mar. 29, 2007). At the conclusion of the hearing, this Court granted Mustapher's motion for a

judgment of acquittal, but stayed the effective date of its ruling until April 3, 2007, to allow the

Government an opportunity to appeal. *Id.*

67. The Government elected not to pursue an appeal and on April 3, 2007, this Court

entered a judgment of acquittal on Count I and dismissed Count I against Mustapher. *Mustapher*,

No. 06 CR 61-2, ECF No. 114 Min. Entry (Apr. 3, 2007). In granting Mustapher's motion for a

judgment of acquittal on Count I, this Court determined that the evidence the Government

presented at his criminal trial was insufficient to sustain the jury's verdict finding Mustapher

guilty of conspiring to distribute and to possess heroin with intent to distribute. *See* Fed. R. Crim. P. 29. In light of the acquittal on all counts of Solebo's co-defendant, there is no certainty that a jury would have found that Solebo was guilty beyond a reasonable doubt on the charges against him had he proceeded to trial.

68. Certainly, the evidence against Solebo was likely stronger than the evidence against Mustapher. Specifically, a confidential informant would have testified that he purchased heroin from Solebo on January 19, 2006, (Stip. Ex., *United States v. Mustapher*, No. 06 CR 61-2, Excerpt of Trial Tr. 74-75 (Jan. 22, 2007, J. Castillo); Damages Hr'g Stip. ¶ 3; Def.'s Ex. 18, Photo 6), and that he also orchestrated an undercover agent's sale of heroin from Solebo on January 25, 2006, (Stip. Ex., *United States v. Mustapher*, No. 06 CR 61-2, Excerpt of Trial Tr. 59-62 (Jan. 24, 2007, J. Castillo); Damages Hr'g Stip. ¶ 4; Def.'s Ex. 18, Photo 9). The confidential informant's testimony at Mustapher's trial was not without holes, however, as he testified under cross-examination that he began to cooperate with the Government in order to obtain a reduced sentence for a crime he had previously committed. (Stip. Ex., *United States v. Mustapher*, No. 06 CR 61-2, Excerpt of Trial Tr. 112-15 (Jan. 24, 2007, J. Castillo).) In fact, at Mustapher's trial, the confidential information agreed that he "had to provide somebody else [i.e., Solebo] to [the Government] or help [the Government] get somebody else who was involved in drug trafficking." (Stip. Ex., *United States v. Mustapher*, No. 06 CR 61-2, Excerpt of Trial Tr. 115-16 (Jan. 24, 2007, J. Castillo).) While this Court hesitates to speculate on what defenses Solebo would or could have brought and whether such defenses would have been successful, the jury's verdict in the case of Solebo's co-defendant suggests that something about the Government's investigation was less than conclusive and caused the jury to question the

149

Government's prosecution against Solebo's co-defendant. Therefore, this Court cannot find that it was more probably true than not true that Solebo would have been convicted of the charges against him.

69.     Even if Solebo had been convicted, incarcerated for seven years, and subsequently deported to Nigeria, as the Government argued during closing arguments, (June 4, 2012 Tr. 50, 52), this Court notes that he would have been about thirty years old when he was released from prison and his daughter would have been about seven years old, which would have very likely left time for Solebo to lead a meaningful life with his wife and daughter. Whether that life was in the United States or in Nigeria—which Plaintiff testified that they had plans to move to (June 4, 2012 Tr. 36)—is not relevant to the loss of consortium and loss of society analyses, as damages for such losses are intended to compensate a widowed spouse and the next of kin for the loss of the decedent's companionship, advice, love, and affection, among other qualities; the relationships between Solebo and his wife and Solebo and his daughter would have continued to exist regardless of whether the family was in the United States or Nigeria.

**B.     Solebo's life expectancy**

70.     This leads this Court to the question of precisely how long Solebo should have been expected to live despite the fact that he had, as this Court found, both an enlarged heart and seizure disorder. Both Dr. Holtzman and Dr. Curlin testified as to Solebo's life expectancy. Dr. Holtzman testified that Solebo's life expectancy as a result of his seizure disorder was approximately 48 years, meaning that Solebo would have lived for an additional 25 years. In making this estimate, however, Dr. Holtzman did not consider Solebo's enlarged heart and the effects his enlarged heart would have on his life expectancy. Dr. Curlin, on the other hand,

testified that Solebo's life expectancy would be "significantly lower" than the average person his age because Solebo had an enlarged heart, was morbidly obese, and had a history of smoking. Despite his testimony, Dr. Curlin did not quantify Solebo's life expectancy. During closing arguments, the Government conceded that it had not presented evidence of an actual figure but nonetheless argued that "five to ten years would be generous." (June 4, 2012 Tr. 59-60.)

71.     In light of the fact that the Government did not offer any evidence of its own regarding Solebo's life expectancy, this Court is not willing to accept its assertion that Solebo had only a five to ten year life expectancy. This Court is also unwilling to accept Dr. Holtzman's testimony that Solebo had a 25 year life expectancy because Dr. Holtzman did not consider that Solebo had both seizure disorder and an enlarged heart when making this estimate. Instead, this Court finds that a reasonable life expectancy for Solebo is 17.5 years, meaning that Solebo should have expected to live until he was 40.5 years old. *See Kwasny v. United States*, No. 80 C 2198, 1986 WL 9184, at *13-*16 (N.D. Ill. Aug. 15, 1986) (Parson, J.) (finding that the decedent's life expectancy would have been 7.6 years after considering the evidence concerning the decedent's health and despite the fact that the mortality table evidence showed the decedent's life expectancy to be 15.2 years in an FTCA action where the plaintiff sought wrongful death and survivorship damages).

### C.     Comparable cases involving minor children

72.     The Government presented this Court with one comparable case, *Trunk v. United States*, No. 04 C 1545. There, Judge James Zagel awarded the decedent's five children varying amounts for the 29 years of the decedent's life expectancy because the decedent had unequal relationships with each of his children, four of whom were adults at the time of their father's

151

death. (R. 124, Def.'s Resp. to Court's Order of July 3, 2012, *Trunk v. United States*, No. 04 C 1545, Excerpt of Trial Tr. 7 (Oct. 3, 2006 Zagel, J.)) In addition, Judge Zagel described the decedent as a less than ideal father who when judged "even on the standard of the traditional flawed father . . . had special flaws." (*Id.* at 7.) Judge Zagel awarded one of the decedent's daughters, who had "no functional relationship with her father for a very long period of time," $500 per year for a total award of $14,500.00. (*Id.* at 7.) Judge Zagel awarded $1,500.00 per year for a total award of $43,500.00 to another daughter who had a closer relationship with her father, but who "candidly admitted her relationship with her father was based on some instances of real contact and the rest of it was hope for the future." (*Id.* at 8.) Judge Zagel reasoned that in the case of the second daughter, "because she had started a relationship, because of the [decedent's grandchild], there was a significant possibility that it might continue or at least grow to some extent." (*Id.*) Judge Zagel next awarded one of the decedent's sons, who had a "decent but not extraordinary" relationship with the decedent $2,000.00 per year for a total award of $58,000.00. (*Id.*) Judge Zagel awarded another son, who "quite clearly[ had] a relationship with his father" and whose relationship was of the type "that lasts over a period of time," $5,000.00 per year for a total award of $145,000.00. (*Id.* at 9.) Judge Zagel noted that this son "admired his father," "did many of the things that his father did," and Judge Zagel believed that "he would have sought advice from his father, . . . [and] would have helped his father." (*Id.*) Finally, Judge Zagel awarded the child who was a minor at the time of the decedent's death and who "had not yet reached that point of adolescent rebellion," $3,000 for 22 years for a total award of $66,000.00. (*Id.*) Judge Zagel then noted that "[t]he more difficult question is, and obviously a more substantial question, is what the loss of the father, what significance it had for [the minor

152

child] while he was growing up." (*Id.*) Judge Zagel believed that this loss was "quite substantial" and awarded the youngest child $40,000.00 for seven years for an award of $280,000.00. (*Id.* at 10.) Thus, the total award for the "minor child" was $346,000.00. (*Id.* at 10.) On the basis of *Trunk*, the Government argued that the amounts of $500.00, $1,000.00, or $2,000.00 that Judge Zagel "provided for the children who had little relationship with their father [are] the right touchstone," (June 4, 2012 Tr. 60), and advocated for an award of $100,000.00 or less. (June 4, 2012 Tr. 62.) This Court rejects the Government's approach.

73.     The cases demonstrate a distinction—which is evident in *Trunk*—between the awards that minor children and adult children receive. *See, e.g.*, *Barry v. Owens Corning*, 668 N.E.2d 8, 10 (Ill. App. Ct. 1st Dist. 1996) (affirming jury awards of $500,000.00 to each adult child, $600,000.00 to the college-age child, and $750,000.00 to the minor child). Importantly in *Trunk*, the child who was eleven years old at the time of his father's death was awarded $40,000.00 per year for each remaining year of his father's life expectancy that the child would have remained a minor, and thereafter, the child was awarded $3,000.00 per year for each remaining year of his father's life expectancy that the child would have been an adult. Judge Zagel did not look at whether there was a preexisting relationship with the minor child, but instead inquired into the significance of the loss of the father on the minor child, which he determined was quite substantial despite the fact that the decedent was significantly flawed. Applying the same methodology here, Solebo's daughter—who was only six months old at the time of her father's death—would receive $40,000.00 for the remaining 17.5 years of Solebo's life expectancy for a total of $700,000.00.

74.     A review of jury awards in comparable wrongful death cases reveals that juries

153

have awarded minor children between approximately $40,000.00 and $90,000.00 per year when the life expectancy of the parent is known. For instance, in *Hart v. Almeida*, No. 2007-L-006654, 2011 Jury Verdicts LEXIS 15999, at \*1 (Ill. Cir. Ct. Cook Cnty. May 12, 2011), a Cook County jury awarded the decedent's daughter who was two years old at the time of her father's death and who did not live with her father, but who nonetheless had a close relationship with her father, $2,504,528.00 in wrongful death damages for loss of society. Family members testified that the daughter's life would never be the same after the loss of her father. The father died at the age of 35, but was expected to live until he was 63 years old, and therefore had a life expectancy of 28 years. Thus, the amount awarded per year for the father's remaining life expectancy was $89,447.43.

75.     In *Holston v. Sisters of the Third Order of St. Francis*, 618 N.E.2d 334, 348 (Ill. App. Ct. 1st 1993), *aff'd by* 650 N.E.2d 985 (Ill. 1995), an Illinois appellate court affirmed a Cook County jury award of $2,500,000.00 for loss of society to each minor son, ages eight and twelve, of the decedent mother. There, the mother died at the age of 29, but had a life expectancy of 50.6 years. *Id.* at 341. Thus, the amount awarded to the minor children for each year of the mother's remaining life expectancy was $49,407.11.

76.     In *Barry*, 668 N.E.2d at 10, an Illinois appellate court affirmed a Cook County jury award of $750,000.00 to a minor child who was fifteen or sixteen years old at the time of her father's death, *see* Pl.'s Br. at \*8, *Barry v. Owens-Coring Fiberglass Corp.*, 668 N.E.2d 8,10 (Ill. App. Ct. 1st 1996) (No. 1-94-2193), 1995 WL 17168001. There, the father died at the age of 59 but had a life expectancy of 19.1 years. *Barry*, 668 N.E.2d at 13. Thus, the amount awarded to the minor child for each year of the father's remaining life expectancy was $39,267.02.

77.     The cases demonstrate a trend towards awarding minor children who are younger at the time of a parent's death higher awards than minor children who are older or are teenagers at the time of a parent's death. As in *Hart*, Jadesola did not live with her father. Despite this, Solebo played a significant role in his daughter's life as he selected her name and met her within a week of her birth. In addition, Jadesola visited Solebo at the MCC at least once a week and sometimes twice a week; essentially, Jadesola visited Solebo on every available visiting day. As in *Trunk*, this Court asks about the significance that Solebo's death has had on Jadesola. It is evident that the loss is substantial. Plaintiff testified that Jadesola talks to her father in heaven each night when she says her prayers and that Jadesola asks questions about her father. As Jadesola ages, the enormity of her father's loss has become more palpable and presents itself when she asks her mother why her father cannot pick her up from school or join the family on holidays. Therefore, this Court finds that $90,000.00 for each year of Solebo's remaining life expectancy is an appropriate amount to award to Jadesola, for a total award of $1,575,000.00 in wrongful death damages for loss of society.

78.     This amount falls within the range awarded to minor children in comparable wrongful death cases where the life expectancy of the parent is not known. For instance, in *Arellano v. Cnty. of Cook*, No. 99-L-7279, 2002 Jury Verdicts LEXIS 58369, at *1 (Ill. Cir. Ct. Cook Cnty. June 13, 2002), a Cook County jury awarded $1,300,000.00 in wrongful death damages for loss of society to each of the decedent mother's three minor children, the youngest of whom was a newborn baby. Like Solebo, the mother was 23 years old at the time of her death. Similarly, in *Gleeson v. Stephani*, No. 02-L-14444, 2007 WL 3326695, at *1 (Ill. Cir. Ct. Cook Cnty. Aug. 28, 2007), a Cook County jury awarded $2,000,000.00 in wrongful death damages for

loss of the decedent mother's society to each of her minor sons, the youngest of whom was four months old. In *Gleeson*, the mother was 26 years old at the time of her death. In *Hollister v. NW Assoc. for Women's Healthcare*, No. 05-L-8872, 2010 WL 4358538, at *1 (Ill. Cir. Ct. Cook Cnty. Sept. 22, 2010), a Cook County jury awarded $400,000.00 in wrongful death damages for loss of society to each minor son, the youngest of whom was less than two years old at the time of his mother's death. Notably, *Hollister* appears to be an outlier as compared to other jury awards. In *Williams v. City of Chi.*, No. 04-L-11193, 2010 WL 6466042 at *1 (Ill. Cir. Ct. Cook Cnty. Feb. 1, 2010), a Cook County jury awarded $1,000,000.00 in wrongful death damages for loss of society to each of the decedent's minor daughters. The mother in *Williams* was 24 years old when she died. And, in *Kasongo*, 523 F. Supp. 2d at 809, an FTCA action seeking damages pursuant to the Illinois Wrongful Death Act, the Judge Rebecca Pallmeyer awarded each of the decedent's minor daughters, the youngest of whom was five years old at the time of the decedent mother's death, $1,000,000.00 for loss of society. Thus, damages awards to minor children in comparable wrongful death cases where the decedent parent's life expectancy is not ascertainable range from $400,000.00 to $2,000,000.00. When the outlier case of *Hollister* is excluded, the range of such awards is from $1,000,000.00 to $2,000,000.00. The award to Jadesola of $1,575,000.00 falls squarely within these ranges.

### D. Comparable cases for loss of consortium

79. Neither the Government nor Plaintiff presented this Court with comparable cases involving loss of consortium awards to a surviving spouse. Nonetheless, some of the cases involving minor children also involved a surviving spouse and are therefore instructive.

80. In *Arellano*, 2002 Jury Verdicts LEXIS 58369 at *1, a Cook County jury awarded

the surviving husband $40,000.00 in wrongful death damages for loss of society. The jury verdict form does not contain any information about the relationship between the decedent and her surviving husband. In *Gleeson*, 2007 WL 3326695, at *1, a Cook County jury awarded $75,000.00 in wrongful death damages to the surviving husband for loss of society. Again, the jury verdict form does not contain any information about the relationship between the decedent and her surviving husband. In *Hollister*, 2010 WL 4358538, at *1, a Cook County jury awarded $500,000.00 in wrongful death damages for loss of society to the surviving husband. Again, the jury verdict form does not contain any information about the relationship between the decedent and her surviving husband.

81.     In *Kasongo*, 523 F. Supp. 2d at 809, Judge Pallmeyer awarded the surviving husband $500,000.00 for loss of society and consortium. There, the decedent and surviving spouse had been married for fourteen years at the time of the decedent's death, and they had three children aged five, seven, and ten. *Id.* The surviving husband and the decedent had immigrated to the United States in July 2000, after fleeing the Democratic Republic of Congo due to civil wars in that region. *Id.* at 763-64. At trial, the surviving husband testified about his relationship with the decedent, explained that she was the foundation of the family's household, and described his loss as very great. *Id.* at 791.

82.     More recently, in *Arpin v. United States*, No. 04-cv-128-DRH, 2009 WL 3816844, at *6 (S.D. Ill. Nov. 13, 2009), an FTCA case grounded on the Illinois Wrongful Death Act, Chief Judge David Herndon awarded the surviving spouse $4,000,000.00 in wrongful death damages for loss of consortium. There, the decedent's widow was described as the "traditional American housewife," and she did not drive or work outside of the home. *Id.* at *3. The

157

decedent, on the other hand, was the family breadwinner. *Id.* As in *Kasongo*, the decedent in *Arpin* was said to have held the family together. *Id.* The decedent and his widow had been married 35 years. *Arpin v. United States*, No. 04-cv-128-DRH, 2006 WL 3314454, at *1 (S.D. Ill. Nov. 15, 2006). Overall, damages awards for a surviving spouse in comparable cases range from $40,000.00 to $4,000,000.00.

83.     Undoubtedly, Plaintiff's loss of her husband is significant, but it cannot be said that her loss reaches the same level as the surviving husband's loss in *Kasongo* or the surviving wife's loss in *Arpin*. At the time of Solebo's death, Plaintiff and Solebo had known each other for about three-and-a-half years and had only been married for about a year-and-a-half. Indeed, they were married for only three-and-a-half months prior to Solebo's arrest. Thus, they celebrated their first year wedding anniversary while Solebo was incarcerated at the MCC. Furthermore, although Plaintiff testified that her relationship with Solebo between October 2005 and January 2006 was excellent and that they were both happy, the evidence in the record suggests that their relationship was a nascent one and that they were still in the process of getting to know each other. For instance, in November 2005, the couple had a quarrel that they were unable to resolve without involving the police. As a result of this incident, Plaintiff signed a criminal complaint stating that Solebo had physically hurt her. Although Plaintiff testified at trial that Solebo never struck her, this Court finds her testimony on this point less than credible. Nevertheless, it appears that the young couple remained a steady unit throughout Solebo's incarceration as Plaintiff visited him both at Kankakee and at the MCC on every visiting day she could. Thus, this Court finds that while Plaintiff should be compensated for her loss of consortium, a reasonable award is one that falls in the lower range of comparable cases.

Accordingly, this Court awards Plaintiff $40,000.00 in wrongful death damages for her loss of consortium.

**E.**    **Reductions for Solebo's contributory fault and the risk of a conviction**

84.    The Wrongful Death Act limits the amount of recovery by the decedent's negligence. 740 Ill. Comp. Stat. 180/2. Under the Wrongful Death Act, "the plaintiff's recovery in actions for bodily injury or death is barred if the trier of fact finds that plaintiff's fault is more than 50% of the proximate cause of the injury. If the plaintiff's fault is not more than 50% of the proximate cause of the injury, recovery will not be barred but will be reduced in the proportion of the amount of fault attributable to the plaintiff." *Glasser v. United States*, 786 F. Supp. 1334, 1335-36 (1992) (citing *Fetzer v. Wood*, 569 N.E.2d 1237, 1240 (Ill. App. 2d Dist. 1991)); 740 Ill. Comp. Stat. 180/2. Here, this Court has determined that Solebo bore 33% of the fault for not taking his Dilantin as prescribed. Because Solebo did not bear more than 50% of the fault, recovery of damages under the Illinois Wrongful Death Act is not barred, but must be reduced. *See Gleeson*, 786 F. Supp. at 1335-36. Accordingly, this Court reduces the awards to Plaintiff and Jadesola by 33% to account for Solebo's contributory fault.

85.    Finally, this Court takes into account the fact that Solebo was a pre-trial detainee who was at risk of being convicted. To account for that risk, this Court reduces the total awards for loss of society and loss of consortium by an additional 10%, for a total reduction of 43%.

86.    Therefore, this Court reduces the loss of society award to Jadesola by $677,250.00 and accordingly awards her a total of $897,750.00. Similarly, this Court reduces the loss of consortium award to Plaintiff by $17,200.00 and accordingly awards her a total of $22,800.00. Therefore, the total amount of wrongful death damages awarded is $920,550.00.

159

## CONCLUSION

As Judges Robert Dow and Rebecca Pallmeyer have both previously recognized, FTCA claims involving alleged medical negligence can be "exceedingly challenging," *Hardnick*, 2009 WL 1810106, at *15 (citing *Kasongo*, 523 F. Supp. 2d at 812), especially because medicine "is not an exact science." *Id.* For that reason, and many others, this highly contested case presented a number of challenges. This Court is optimistic that some of the breakdowns in administering vital medication and providing adequate medical care to inmates that occurred at the MCC during Solebo's incarceration have now been remedied by improved medical procedures and oversight as a result of recent changes in the MCC leadership. Certainly, it is this Court's hope that the appropriate MCC officials will carefully study this opinion to ensure that these breakdowns do not reoccur in the future.

In this case, this Court finds on the basis of the evidence and expert testimony presented at trial that Plaintiff established by a preponderance of that evidence that the MCC personnel's negligence proximately caused Solebo's unfortunate and untimely death on May 1, 2007, and that the evidence supports this Court's reasonable damages award. Accordingly, this Court enters judgment in favor of Plaintiff and against Defendant on Plaintiff's FTCA action. This Court awards Plaintiff wrongful death damages in the amount of $920,550.00; $897,750.00 to Plaintiff's daughter for loss of society and $22,800.00 to Plaintiff for loss of consortium.

Entered:

**Chief Judge Ruben Castillo**
**United States District Court**

**Date:** September 3, 2013

160